# EXHIBIT E

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN (PP-8416)
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Liaison Counsel

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
MATTHEW P. MONTGOMERY
ELIZABETH J. ARLEO
ALEXANDRA S. BERNAY
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

FILED

OCT 2 7 2003

AT 8:30
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, CITY OF SARASOTA FIREFIGHTERS' PENSION FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 132 PENSION PLAN, NEW ENGLAND HEALTH CARE EMPLOYEES PENSION FUND, CHEMICAL VALLEY PENSION FUND OF WEST VIRGINIA, and PACE INDUSTRY UNION-MANAGEMENT PENSION FUND, On Behalf of Themselves and All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>PHARMACIA CORPORATION, FRED HASSAN, G. STEVEN GEIS, CARRIE COX, and PFIZER, INC.,<br><br>    Defendants. | No. 03-1519 (AET)<br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

## NATURE OF THE ACTION

1.     This is a securities fraud class action arising from conduct by Pharmacia Corporation ("Pharmacia" or the "Company") and certain of its top officers and directors between April 17, 2000 and May 31, 2002 (the "Class Period"), on behalf of all those who purchased Pharmacia publicly traded securities during the Class Period (the "Class").   Plaintiffs assert that during the Class Period defendants made materially false and misleading statements in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder, which artificially inflated the price of Pharmacia stock and damaged plaintiffs and the Class thereby.

## SUMMARY AND OVERVIEW OF THE ACTION

2.     In February of 1999, Pharmacia, a pharmaceutical company, launched Celebrex, a new drug which it heralded as a revolutionary non-steroidal anti-inflammatory drug ("NSAID") for use in reducing inflammation in patients suffering from arthritis.  Arthritis is commonly treated with NSAIDs like ibuprofen or aspirin, but long-term use of these medications are regularly associated with a multitude of gastrointestinal ("GI") problems, from upset stomach to life-threatening bleeding ulcers.  Indeed, each year GI problems related to the use of traditional NSAIDs cause approximately 100,000 hospitalizations and more than 15,000 deaths.

3.     According to Pharmacia, while Celebrex was roughly the equivalent of ibuprofen, for example, at reducing pain and inflammation, unlike aspirin or

- 1 -

ibuprofen, Celebrex could do so without GI side effects.  As a result, Celebrex became

the most successful product launch in the history of the pharmaceutical industry,

swiftly becoming Pharmacia's top selling drug.  However, Celebrex's GI safety

advantage had never been clinically proven.  Proving that Celebrex caused fewer side-

effects that other NSAIDs was critical to Pharmacia because Celebrex was no more

effective at reducing pain or inflammation than, for example, ibuprofen, but cost

between 60 and 100 times more.  As a result, managed care companies were reluctant

to pay extra for Celebrex.  Further, in the absence of clinical proof to the contrary, the

Food and Drug Administration ("FDA") required that Celebrex carry the same

warning carried by ibuprofen, which stated, in part:

> WARNINGS Gastrointestinal (GI) Effects — Risk of GI Ulceration,
> Bleeding, and Perforation Serious gastrointestinal toxicity such as
> bleeding, ulceration, and perforation of the stomach, small intestine or
> large intestine, can occur at any time, with or without warning
> symptoms, in patients treated with nonsteroidal anti-inflammatory drugs
> (NSAIDs).  Minor upper gastrointestinal problems, such as dyspepsia,
> are common and may also occur at any time during NSAID therapy.
> Therefore, physicians and patients should remain alert for ulceration and
> bleeding, even in the absence of previous GI tract symptoms (see
> PRECAUTIONS — Hematological Effects).  Patients should be
> informed about the signs and/or symptoms of serious GI toxicity and the
> steps to take if they occur.  The utility of periodic laboratory monitoring
> has not been demonstrated, nor has it been adequately assessed.  Only
> one in five patients who develop a serious upper GI adverse event on
> NSAID therapy is symptomatic.  It has been demonstrated that upper GI
> ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur
> in approximately 1% of patients treated for 3–6 months, and in about 2–
> 4% of patients treated for one year.  These trends continue thus,
> increasing the likelihood of developing a serious GI event at some time
> during the course of therapy.  However, even short term therapy is not
> without risk.

4.      In order to remove the FDA's warning label and allay the concerns of managed care companies, Pharmacia commissioned and funded the Celecoxib Long-Term Arthritis Safety Study (the "CLASS study"), a clinical study to compare the GI problems of patients who used Celebrex to those of patients who used other NSAIDs. The results of this study were announced at the annual meeting of the American College of Physicians, in a press release, and, most importantly, in an article written by Pharmacia consultants and employees that appeared in the *Journal of the American Medical Association* ("*JAMA*") on September 13, 2000. The *JAMA* article reported that patients who took Celebrex had fewer upper-GI toxic effects than those who took other traditional NSAIDs. Pharmacia and Pfizer, Inc. ("Pfizer"), who co-marketed Celebrex, distributed over 30,000 copies of the *JAMA* article to doctors throughout the country.

5.      In fact, contrary to defendants' public statements, the CLASS study as originally designed did *not* demonstrate a superior GI safety profile for Celebrex over traditional NSAIDs. The CLASS study was conducted as two separate trials: one 15-month trial comparing Celebrex to ibuprofen and a separate 12-month trial comparing Celebrex to diclofenac. When the trials were complete, the data, when analyzed according to the protocol established before the study began, showed that Celebrex's GI safety profile was no better than the other two drugs. Accordingly, defendants manipulated the study protocol, the data, and the comparison criteria, in order to improve Celebrex's performance.

- 3 -

6.      First, defendants only reported six months of data, discarding six months of data regarding diclofenac and nine months of data regarding ibuprofen which showed that Celebrex had no GI safety advantage at all.  Even this was insufficient to manufacture statistical superiority for Celebrex, however.  Accordingly, defendants also changed the criteria by which Celebrex was compared to the other drugs in order to favor Celebrex.  Once defendants were done manipulating the data, protocol, and criteria to obscure Celebrex's true performance, they presented the CLASS study to the public.  However, the truth is that the CLASS study data, when analyzed pursuant to the original CLASS protocol, does not demonstrate a superior GI safety profile for Celebrex.  As such, defendants' statements that it did were false and misleading.

7.      With the investing public unaware of the truth, defendants' announcements that Celebrex had been proven to cause fewer GI side effects buoyed Pharmacia's stock price.  Analysts at Deutsche Bank Alex Brown, J.P. Morgan, and ABN AMRO all issued reports discussing the CLASS study, which appeared to pave the way for Celebrex's acceptance by managed care providers and the removal of the FDA-mandated warning label.  Indeed, fueled by the CLASS study, sales of Celebrex, by far Pharmacia's largest selling drug, increased from $2.6 billion in 2000 to $3.1 billion in 2001.

8.      Defendants' scheme almost came unraveled when the FDA posted the CLASS study data on its website.  Shortly thereafter, James Wright, a clinical professor of pharmacology at the University of British Columbia, noted that *the*

- 4 -

*CLASS study lasted over twelve months, not six months as discussed in the JAMA article, and that when all the data was considered, most or all of Celebrex's purported safety advantage disappeared*.

9.     Then, on August 5, 2001, *The Washington Post* ran an expose about Professor Wright's findings. In that expose, M. Michael Wolfe, a Boston University Gastroenterologist who wrote an editorial that accompanied and praised the *JAMA* article, was quoted as saying: *"We were flabbergasted ... I am furious ... I wrote the editorial. I looked like a fool ... [b]ut ... all I had available to me was the data presented in the article*." *JAMA*'s editor, Catherine D. DeAngelis, said the journal's editors were not informed about the missing data. "I am disheartened to hear that they had those data at the time that they submitted [the manuscript] to us," she said. *"We are functioning on a level of trust that was, perhaps, broken."*

10.     Pharmacia fiercely denied the allegations of wrongdoing. Defendant Geis, Group Vice President of Clinical Research at Pharmacia and one of the CLASS study's authors, asserted that the study included only the first six months of data because after six months, more patients had withdrawn from the comparison groups than from the Celebrex group, thus compromising the reliability of the second six months data. Based on defendants' explanations and denials, the market discounted *The Washington Post* article and Dr. Wright's claims such that Pharmacia's stock continued to trade at artificially inflated prices.

11.     Finally, on June 1, 2002, *The British Medical Journal* published an article which asserted that - contrary to Pharmacia's explanations - there was no valid reason to exclude the second six months of data from the CLASS study. The article concluded that the CLASS study had "serious irregularities" and that, based on the CLASS study data, Celebrex was no safer than drugs like ibuprofen. The conclusions of *The British Medical Journal* article were reiterated in an expose in *The New York Times* titled *Study Finding Celebrex Safer Was Flawed*.

12.     Once the public learned that Celebrex, Pharmacia's largest-selling drug, was no better than ibuprofen but cost 60-100 times more and that defendants had misleadingly manipulated the CLASS study data, Pharmacia's stock dropped from $40.596 to $36.563 in a few trading days, wiping out millions of dollars in market capitalization.

13.     On June 8, 2002, *The Washington Post* reported that the FDA had concluded that the CLASS study did not support Pharmacia's claim that Celebrex was better for the stomach than ibuprofen. As such, the FDA decided not to allow Celebrex to be sold without the warning label concerning GI side-effects. In the June 10, 2002 *The Wall Street Journal*, Sharon Levine, executive vice president of Kaiser Permanente, the nation's largest managed-care group, stated: "With the FDA action, there appears to be no good reason to prescribe Celebrex given that it's many times more expensive than ibuprofen." Indeed, worldwide sales of Celebrex *declined* from

- 6 -

$710 million in the final quarter of the Class Period to $344 million in the quarter ending June 30, 2003.

14.     On June 10, 2002, *The Washington Post* ran a story comparing Pharmacia to Enron, which stated:

> Pharmacia Corp. funded a study to show that a medicine called Celebrex works better than cheap alternatives such as ibuprofen. The study collected 12 months of data, which suggested no Celebrex advantage. So *the authors selectively published the first six months of results, which purported to show that Celebrex had fewer side effects. In 2001 alone, this Arthur Andersen-type trick caused patients to spend $3 billion unnecessarily*.

15.     On June 24, 2002, *Business Week* ran an article in which *JAMA* deputy editor Drummond Rennie stated that the study's authors, including Pharmacia, *"were not open with us ... [t]hey signed letters saying the studies have all the relevant stuff,"* but *"they had contradictory results when they sent us this paper, and they should have revealed them to us. And they didn't."*

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and §27 of the 1934 Act [15 U.S.C. §78aa].

18.     Venue is proper pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).

Pharmacia was headquartered in this District during the Class Period and many of the

alleged false and misleading statements were distributed from this District.

## THE PARTIES

19.     As detailed in the attached Schedule A, Lead Plaintiff Alaska Electrical

Pension Fund purchased Pharmacia common stock at artificially inflated prices during

the Class Period and has suffered substantial damage as a result.

20.     As detailed in the attached Schedule A, Lead Plaintiff City of Sarasota

Firefighters' Pension Fund purchased Pharmacia common stock at artificially inflated

prices during the Class Period and has suffered substantial damage as a result thereof.

21.     As detailed in the attached Schedule A, Lead Plaintiff International

Union of Operating Engineers Local 132 Pension Plan purchased Pharmacia common

stock at artificially inflated prices during the Class Period and has suffered substantial

damage as a result thereof.

22.     As detailed in the attached Schedule A, Lead Plaintiff New England

Health Care Employees Pension Fund purchased Pharmacia common stock at

artificially inflated prices during the Class Period and has suffered substantial damage

as a result thereof.

23.     As detailed in the attached Schedule A, Lead Plaintiff PACE Industry

Union-Management Pension Fund purchased Pharmacia common stock at artificially

- 8 -

inflated prices during the Class Period and has suffered substantial damage as a result thereof.

24. As detailed in the attached Schedule A, named plaintiff Chemical Valley Pension Fund of West Virginia purchased Pharmacia common stock at artificially inflated prices during the Class Period and has suffered substantial damage as a result thereof.

25. Defendant Pharmacia was a pharmaceutical company headquartered at Peapack, New Jersey. During the Class Period, Pharmacia's common stock was listed on the New York Stock Exchange under the symbol PHA and traded in an efficient market. On April 16, 2003, Pharmacia participated in a stock-for-stock merger with Pfizer. In that merger, Pharmacia's stock was exchanged for Pfizer stock, such that Pharmacia stock is no longer publicly traded.

26. Defendant Pfizer is a pharmaceutical company headquartered in New York, New York that merged with Pharmacia on April 16, 2003, and is the successor in interest to Pharmacia's liability for the acts described herein.

27. At all relevant times, defendant Fred Hassan ("Hassan") was the Chief Executive Officer ("CEO") of Pharmacia throughout the Class Period and Chairman of the Board of Directors. As Chairman and CEO, Hassan was fully aware of the CLASS study results. One former clinical product director at Pharmacia has stated that Hassan retained and exercised editorial control over the content of medical journal articles, like the *JAMA* article here, which explained the results of Pharmacia-

- 9 -

sponsored drug trials.  Hassan was a hands-on manager, so much so in fact that he

once held up the introduction of a new drug by two weeks while he decided the color

of the box in which it was to be sold.  In this case, Celebrex was by far Pharmacia's

biggest selling product and it needed the CLASS study to convince managed care

companies to pay many times more for Celebrex than for other NSAIDs.  Further, the

results of the CLASS study were critical to Pharmacia's attempt to obtain the FDA's

permission to sell Celebrex without the GI warning label.  Hassan also had the

authority to and did approve the *JAMA* article as well as all of the press releases and

other public statements by the Company alleged herein.

28.     At all relevant times, defendant G. Steven Geis ("Geis") was Group Vice

President of Clinical Research at Pharmacia during the Class Period.  Geis was a co-

author of the *JAMA* article and directly participated in the CLASS study.  One of the

other authors of the *JAMA* article has stated that Geis participated in the decision to

release only the first six months of data.  As such, he was fully aware that defendants'

statements were false and misleading.

29.     At all relevant times, defendant Carrie Cox ("Cox") was Pharmacia's

President of Global Prescriptions.  Her responsibilities included informing the

investing public of developments in medical research relevant to Pharmacia's

pharmaceutical business.  Cox was aware that Pharmacia had commissioned the

CLASS study to establish the GI safety of Celebrex, Pharmacia's biggest selling drug.

When the CLASS study data failed to support Celebrex's GI safety, Cox was fully

informed of the decision to manipulate the CLASS study data, criteria, and analysis. Cox sold 101,700 shares of Pharmacia stock during the Class Period for insider-trading proceeds of $5.9268 million, which constituted 18.16% of her holdings.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of Pharmacia during the Class Period and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of Pharmacia during the Class Period, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pharmacia common shares were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Pharmacia or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

33. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pharmacia; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

35. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

36. On April 17, 2000, Pharmacia issued a press release on *PR Newswire*

announcing the results of a study presented two days earlier at the American College

of Physicians' annual meeting, stating:

> In a ***landmark study*** to assess the overall long-term safety of the COX-2
> specific inhibitor Celebrex(R) (celecoxib capsules), arthritis patients
> taking four times the recommended osteoarthritis (OA) dose of the drug
> experienced ***fewer symptomatic gastrointestinal (GI) ulcers and ulcer***
> ***complications than patients taking ibuprofen and diclofenac***.

37. That same day, J.P. Morgan published an analyst report authored by Carl

Seiden which stated:

> [R]esults of the Celebrex (Pharmacia) CLASS trial (on GI events vs.
> NSAIDs) were presented Sat. night (April 15). On a variety of
> measures, Celebrex showed clear statistical superiority on GI safety
> versus NSAIDs .... We expect meaningful modification of the standard
> NSAID GI warning ... after these data are reviewed.

38. As reports of the CLASS study report circulated among investors, shares

of the Company traded higher, rallying from a low of $52 per share on April 17, 2000,

to a high of $59.75 per share by April 19, 2000. Thereafter and throughout the Class

Period, Pharmacia shares continued to trade at artificially inflated prices.

39. On April 25, 2000, Pharmacia management held a conference call with

financial analysts. During that call, Al Heller, the head of Pharmacia's

Pharmaceuticals Unit, stated:

The top line takeaway is that our landmark long-term arthritis study provides compelling evidence of the broad safety profile of Celebrex across a full spectrum of GI measures and in major organ systems versus the traditional NSAID comparators, ibuprofen and diclofenac.... We look forward to presenting the fully analyzed data ... from this trial to the FDA before mid-year.

40.    The false statements issued by the Company had their intended effect, and on May 2, 2000, Arnhold & S. Bleichroeder published an investment analyst report highlighting the positive impact of Celebrex sales on the Company stating that "Celebrex's exceptional safety profile was confirmed with the presentation of top-line results reported for the landmark CLASS study earlier this month. *These results confirm Celebrex's impressive safety profile vis-à-vis traditional NSAIDs."*

41.    On May 22, 2000, Pharmacia presented the CLASS study results at the Digestive Disease Week Conference in San Diego, California. The following day, on May 23, 2000, Pharmacia issued another release which stated:

New data from the Celebrex(R) (celecoxib capsules) long-term safety study presented during Digestive Disease Week (DDW) revealed that the risk for serious gastrointestinal complications with the NSAID comparators ibuprofen and diclofenac can start within the first few days after treatment begins. Further, study patients who were H. pylori positive had a two times greater risk of developing both symptomatic ulcers and ulcer complications when taking the NSAID comparators than did H. pylori negative patients. No such increase was observed with patients taking Celebrex, regardless of H. pylori status.

42.    The same day, Deutsche Banc Alex Brown issued a report authored by Barbara Ryan reiterating the contents of Pharmacia's press release, stating:

CLASS DATA SUPPORTS CELEBREX'S BETTER GI SAFETY PROFILE .... *We believe that the CLASS data could support a positive*

- 14 -

*label change, tempering GI warnings dramatically* .... PHA/PFE could file the data in 2Q00, with a potential label change coming in approximately one year, spurring an [sic] reacceleration in Celebrex New RXs which have recently plateaued.

43.    In light of the CLASS study data, the market eagerly anticipated that revenue would increase dramatically with the removal of the GI warning label from Celebrex. On June 9, 2000, J.P. Morgan issued an analyst report authored by Carl Seiden which, based upon Pharmacia's presentation at the Digestive Disease Week Conference, stated:

Celebrex sales, along with valdecoxib (the next oral form) and parecoxib (an injectable) are projected to reach $6.7 billion by 2004. *This drives over half the company's EPS growth. We view risks to this forecast as skewed to the upside, especially if FDA-label modification enables more aggressive direct-to-consumer advertising touting the comparative GI benefits of this class.*

44.    On July 25, 2000, Pharmacia announced the results for the second quarter of 2000, as follows:

Celebrex, the number one selling prescription arthritis medication worldwide had sales of $630 million in the quarter and $1.2 billion in the first half.

45.    On September 13, 2000, defendant Geis and fifteen other Pharmacia employees and consultants published an article in *JAMA* regarding the CLASS study. The stated objective of the Class Study was "to determine whether celecoxib [Celebrex], a COX-2–specific inhibitor, is associated with a lower incidence of significant upper GI toxic effects and other adverse effects compared with conventional NSAIDs." The study's main outcome measures were described as

- 15 -

"[i]ncidence of prospectively defined symptomatic upper GI ulcers and ulcer complications (bleeding, perforation, and obstruction) and other adverse effects during the 6-month treatment period." The article further states:

> In this study, celecoxib [Celebrex], at dosages greater than those indicated clinically, *was associated with a lower incident of symptomatic ulcers and ulcer complications combined, as well as other clinically important toxic effects, compared with NSAIDs at standard dosages.* The disease in upper GI toxicity was strongest among patients not taking aspirin concomitantly.

> \*     \*     \*

> *This study determined that celecoxib* [Celebrex], a COX-2-specific inhibitor, when used for 6 months in a dosage 2 to 4 times the maximum therapeutic dosage, *is associated with a lower incidence of combined clinical upper GI events than compared to NSAIDs* (ibuprofen and diclofenac) used at standard therapeutic dosages.

> In this study, *patients taking NSAIDs had significantly higher rates of symptomatic ulcers or ulcer complications than did patients taking celecoxib* [Celebrex], but the rate for ulcer complications did not differ. The statistically indistinguishable rate of ulcer complications associated with celecoxib and NSAIDs appears to be a function of a higher-than-expected event rate observed in the celecoxib group. The previously reported annualized incidence rate for ulcer complications in patients taking celecoxib (used for the sample size determination) was 0.2%, obtained from pooled analyses of 14 randomized controlled trials.

46.     The statements set forth in ¶¶36, 37, 39, 40-43, 45 were false and misleading as follows:

(a)     The CLASS study trial was not one trial comparing Celebrex to diclofenac and ibuprofen as reported. Instead, the CLASS study consisted of two trials: one comparing Celebrex to diclofenac and a separate trial comparing Celebrex to ibuprofen;

- 16 -

(b) The CLASS study trial did not last six months as stated. Instead, the Celebrex versus ibuprofen trial lasted 15 months and the Celebrex versus diclofenac trial lasted 12 months;

(c) Prior to the trials, the protocol setting forth the criteria for the CLASS study indicated that Celebrex would only be found superior to ibuprofen or diclofenac if it caused statistically significantly fewer ulcer-related complications. After the trials were complete, defendants added symptomatic ulcers to the comparison criteria in order to improve Celebrex's relative performance. Such post-hoc changes to the protocol violated standard scientific practice and misleadingly portrayed Celebrex's GI safety;

(d) Prior to beginning the trials, the CLASS study protocol called for a two-step procedure: (1) the incidence of GI side effects in the Celebrex group were to be compared to the incidence of GI side effects in the diclofenac and ibuprofen groups combined; and (2) the Celebrex group was then to be compared to the ibuprofen and diclofenac groups separately. The protocol explicitly specified that Celebrex would only be found superior to traditional NSAIDs if both comparisons were statistically significant and in favor of Celebrex. Even using six months of data, Celebrex was not superior to ibuprofen. As such, by the rules of its own study, Pharmacia could not claim that Celebrex was superior to traditional NSAIDs, but it did; and

(e) Analyzing the CLASS study data pursuant to the original protocol, meaning 12 and 15 months of data compared head-to-head and in combination for

ulcer-related complications, Celebrex does not offer greater GI safety than traditional

NSAIDs. As such, defendants' claims that Celebrex had a superior GI safety profile

were false and misleading.

47. On September 13, 2000, *PR Newswire* reported that *JAMA* had published

an article authored by Pharmacia employees and consultants asserting that the CLASS

study proved that Celebrex caused fewer GI problems than traditional drugs. That

press release stated:

> A newer medication used to treat arthritis appeared to have *fewer deleterious side effects than the traditional therapies studied*, according to a study published in the Sept. 13 issue of the Journal of the American Medical Association (JAMA).
>
> *          *          *
>
> *In the study, patients who took the medication Celebrex(R) (celecoxib capsules), had two- to three-fold fewer serious gastrointestinal complications* – including bleeding ulcers, perforated ulcers and obstructions, or blockages of the upper gastrointestinal tract – than those who received ibuprofen or another widely prescribed anti-inflammatory drug called diclofenac.

Physician reaction, reported in the same release, was also purported to be very

favorable, as follows:

> "This is good news for arthritis patients seeking a safe and effective option for treating this chronic condition, which requires them to take medication indefinitely," said Dr. Jay Goldstein, professor of medicine at the University of Illinois at Chicago, a study author and chair of the Gastrointestinal Events Committee. "The news is especially significant because many arthritis patients are unable to use and often have to discontinue traditional therapies because of gastrointestinal or other side effects."
>
> *          *          *

"Compared with traditional nonsteroidal anti-inflammatory agents, Celebrex has been shown to effectively manage the pain and inflammation of arthritis, while reducing the potential for ulcer complications and other serious side effects that can lead to hospitalization and even death," said Dr. Goldstein. "This is particularly important because 60 to 80 percent of gastrointestinal complications from nonsteroidal anti-inflammatory drug use occur without previous symptoms."

48.  Pharmacia and Pfizer, which co-marketed Celebrex, heavily publicized the *JAMA* article. Together they circulated at least 30,000 reprints of the *JAMA* article to doctors throughout the country. The article became ubiquitous and was subsequently cited over ten times more often than any other article published in the same issue of *JAMA*.

49.  On September 18, 2000, ABN AMRO published an analyst report authored by Mario Corso based upon the September 13, 2000 press release which stated, in part, the following:

> [T]he key to continued COX-2 penetration hinges in large part on managed care's willingness to pay more for these drugs ($3-4/day vs. <$0.50/day for older NSAID's), even though safety benefits have only been surmised until now. With the publishing of the data in the most recent issue of the Journal of the American Medical Association (JAMA), managed care companies such as United Health (NYSE:UNH-$92 11/16-Hold) can now evaluate the product's safety for inclusion on formularies.... Upon reviewing this GI safety data, which we believe is compelling, COX-2's could attain preferred status, resulting in lower co-payments and expanding usage.

50.  On October 30, 2000, Pharmacia management held a conference call with financial analysts. During that call, defendant Cox, President of Pharmacia's Global Prescription Business, stated: "The Celebrex long-term outcome study published in

September in *JAMA*, reinforces the superior safety and tolerability profile of Celebrex verses ibuprofen and diclofenac."

51. On October 31, 2000, Bear Stearns issued an analyst report authored by Joseph Riccardo which repeated information provided by defendants Hassan and Cox in the previous day's conference call. That report stated in part:

> Celebrex and the Cox-2 family remain the company's major growth driver.... [A]n expected label change in June 2001 for improved GI safety (Sept. 13, JAMA Study) ... should support growth.

52. On a February 12, 2001 conference call with analysts, defendant Cox, Pharmacia's President of Global Prescriptions, stated that:

> Celebrex was proven safer than older NSAIDs in its NDA [CLASS]trials through endoscopy measures and now again in long-term clinical use.... And if there are any further questions about the data, I actually might refer you to the publication of the long-term outcomes data in the September issue of JAMA ....

53. The statements alleged in ¶¶47, 49-52 were false and misleading as set forth in ¶46 above.

54. On February 12, 2001, Pharmacia published its results for the fourth quarter and year 2000, the period ended December 31, 2000, which stated:

> Pharmacia recorded net sales of continuing businesses of $4.5 billion, an increase of 8% over the fourth quarter of 1999....

> \*    \*    \*

> Celebrex, the number-one selling prescription arthritis medication worldwide, had sales of $772 million in the fourth quarter and $2.6 billion for the full year....

- 20 -

55.     In late March 2001, Pharmacia disseminated its 2000 Annual Report to

Shareholders.  The report included a letter to shareholders from Hassan which stated

in part:

> In 2000, we launched *Celebrex* in Europe and *Zyvox* in the United
> States.  *Celebrex* is our breakthrough compound for arthritis (and the
> world's top-selling prescription arthritis medication) ....

The report also stated:

> *Innovative Arthritis Therapy*
>
> In 1999, *Celebrex* was introduced in the United States and became the
> most successful product launch in the history of the pharmaceutical
> industry.  Since launch, more than 40 million prescriptions have been
> written for *Celebrex*, a record for arthritis medicines.  To confirm the
> long-term safety of this innovative product, we completed a landmark
> arthritis study in more than 8,000 patients during 2000.  The study results
> are currently under review with the U.S. Food and Drug Administration.

56.     On April 25, 2001 Pharmacia announced its results for the first quarter

2001, which stated:

> Net sales for the company's pharmaceutical businesses were $3.2
> billion in the first quarter, a 13% increase over the first quarter of 2000.

> \*       \*       \*

> Celebrex, the number-one selling arthritis medication, had sales of
> $649 million in the quarter [a 24% increase]....

57.     On April 25, 2001, Pharmacia management also held a conference call

with financial analysts.  During that call, defendant Cox, Pharmacia's President of

Global Prescriptions, stated: "We're confident that this [CLASS] study and all

previous studies comparing Celebrex to traditional NSAIDs in approximately 20,000

subjects have demonstrated that Celebrex is effective, well tolerated, and offers an excellent GI safety profile."

58. On May 30, 2001, Prudential Securities issued an analyst report authored by Tim Anderson, M.D. which repeated information provided by defendants Hassan and Cox, stating:

> Celebrex is the lead driver of the PHA story – it is by and large the biggest contributor of growth that, in our opinion, faces almost no near- or longer-term threats .... Celebrex was the best drug launch ever within the pharmaceutical industry due to its superior safety profile and the marketing muscle PHA and its co-marketing partner, Pfizer ... have put behind it.

59. On July 25, 2001, Pharmacia announced its results for the second quarter of 2001, which stated:

> Net sales for the company's pharmaceutical businesses were $3.4 billion in the second quarter, a 7% increase over the second quarter of 2000 ....

> \*        \*        \*

> Celebrex, the number-one selling arthritis medication, had worldwide sales of $710 million in the quarter, a 13% increase over the prior year....

60. On July 25, 2001, Pharmacia management also held a conference call with financial analysts. During that call, defendant Cox, Pharmacia's President of Global Prescriptions, stated: "The studies have shown that Celebrex is equal in efficacy to traditional NSAIDs, but superior in its ability to free arthritis patients from gastrointestinal side-effects."

61.     The statements described in ¶¶57 and 60 were false and misleading as set forth in ¶46.

62.     In order to rid Celebrex of the ominous GI warning label, which imposed limits on the Company's marketing of the drug, Pharmacia petitioned the FDA to amend its label to drop the warnings regarding GI problems.  In support of that petition, defendants submitted the data behind the CLASS study to the FDA.

63.     As a result of a lawsuit by the Public Citizen's Health Research Group, a consumer organization, the FDA had recently changed its policy and began to post all drug studies presented to its advisory committees on its public website.  As a result, the FDA posted the data from the CLASS study on its website.

64.     When the CLASS study data was posted on the FDA's website, questions began to arise.  It appeared that there were differences between the article Pharmacia had published in *JAMA* and the CLASS study data.  After reviewing the data, James Wright, a professor of clinical pharmacology at the University of British Columbia, noted that while the article *JAMA* had published included only six months of data, Pharmacia had submitted over *12* months of data to the FDA.  Further, almost all of the ulcer complications that occurred during the second six months were in Celebrex users.  Wright concluded that when all of the data was considered most of Celebrex's purported GI safety advantage disappeared.

65.     On August 5, 2001, *The Washington Post* ran an expose about Professor Wright's finding, reporting the following:

- 23 -

Missing Data on Celebrex; Full Study Altered Picture of Drug

When editors of the Journal of the American Medical Association sent medical expert M. Michael Wolfe an unpublished study on the blockbuster arthritis drug Celebrex last summer, he was impressed by what he read.

Tested for six months in a company-sponsored study involving more than 8,000 patients, the drug was associated with lower rates of stomach and intestinal ulcers and their complications than two older arthritis medicines – dyclofenex and ibuprofen.

JAMA's editors wanted to rush the findings into print, and Wolfe and a colleague provided a cautiously favorable editorial to accompany it. But in February, when Wolfe was shown the complete data from the same study as a member of the Food and Drug Administration's arthritis advisory committee, he said he saw a different picture.

*"We were flabbergasted,"* he said.

*The study – already completed at the time he wrote the editorial – had lasted a year, not six months as he had thought,* Wolfe learned. *Almost all of the ulcer complications that occurred during the second half of the study were in Celebrex users.* When all of the data were considered, most of Celebrex's apparent safety advantage disappeared.

*"I am furious.... I wrote the editorial. I looked like a fool,"* said Wolfe, a Boston University gastroenterologist. "But ... *all I had available to me was the data presented in the article."*

JAMA's editor, Catherine D. DeAngelis, said the *journal's editors were not informed about the missing data.* "I am disheartened to hear that they had those data at the time that they submitted [the manuscript] to us," she said. *"We are functioning on a level of trust that was, perhaps, broken."*

\*   \*   \*

After reviewing the full study, the FDA's *arthritis advisory committee concluded that Celebrex offers no proven safety advantage over the two older drugs in reducing the risk of ulcer complications, said FDA spokesman Susan Cruzan.* The company has requested a

change in the drug's labeling to state that it is indeed safer, but the FDA has asked for additional information before making a decision.

Meanwhile, the JAMA article and editorial have likely contributed to Celebrex's huge sales. *"When the JAMA article comes out and confirms the hype, that probably has more impact than our labeling does,"* said Robert J. Temple, director of medical policy at the FDA's Center for Drug Evaluation and Research.

66. Pharmacia vehemently denied these allegations of wrongdoing. In the same August 5, 2001 *The Washington Post* article, defendant Geis, Group Vice President of Clinical Research at Pharmacia and one of the CLASS study's authors, asserted that the study included only the first six months of data because after six months, more patients had withdrawn from the comparison groups than from the Celebrex group as a result of GI adverse events. Because the ibuprofen and diclofenac groups had proportionally fewer patients inclined to GI events as a result of the withdrawals, those groups would be expected to have fewer GI side effects and the comparison was no longer valid. "The intention really was not to be deceptive in any way," Geis said. "People thought that six months was the appropriate analysis." With inclusion of the later data, "the actual difference between Celebrex and [the other drugs] are not as wide as they were at six months," he acknowledged. "But I think in the end, it does show that Celebrex has a superior safety profile."

67. In order to perpetuate defendants' fraud, Pharmacia caused three of the authors of the CLASS study, Fred Silverstein, M.D., Lee Simon, M.D. and Gerald Saich, M.D. to publish a letter in the November 21, 2001 issue of *JAMA*, which stated:

> *In retrospect, we acknowledge that we could have avoided confusion by explaining to the JAMA editors why were chose to inform them only of the 6-month analyses and not the longer-term data that were available to us when we submitted the manuscript.* We submitted only this information because the authors believed the 6-month data were the most scientifically and clinically valid. The data after 6 months were so confounded as to be difficult to interpret for assessing a drug-related causal GI toxicity.

68.     The statements set forth in the preceding two paragraphs were false and misleading as set forth in ¶46 and because there was no scientifically justifiable reason for excluding data from the CLASS study after six months. The absolute number of dropouts and withdrawals from the CLASS study increased gradually, without any sudden increase after six months, and withdrawal rates stayed roughly constant in different treatment groups during the entire follow-up period. As such, the decision to exclude the data after six months was motivated not by the withdrawal rate, but by the side effects suffered by patients in the Celebrex group after six months. Further, no reliable scientific evidence exists to suggest that those prone to GI adverse events are also more prone to ulcer-related complications. Thus, the withdrawal of patients who suffered GI adverse events did not necessarily bias the study. Accordingly, defendants' statements that CLASS data after six months was properly excluded were false and caused Pharmacia stock to continue to trade at artificially inflated prices.

69.     Finally, on Saturday, June 1, 2002, *The British Medical Journal* published an article which exposed Pharmacia's excuses as nothing more than lies. *The British Medical Journal* article stated:

- 26 -

[The CLASS study] authors' explanations ... for these serious irregularities [in the CLASS study] were inadequate.  They failed to justify the post hoc changes in design, outcomes, and analysis and provided an unconvincing explanation for considering the six month follow up only.  They argued that a large and differential dropout rate had occurred during the later stage of the trial, which depleted patients with gastrointestinal adverse events preferentially in the groups taking non-steroidal anti-inflammatory drugs and that these patients were at higher risk of developing ulcer related complications....  However, the absolute number of dropouts and withdrawals, both overall and due to gastrointestinal adverse events, increased gradually, without any sudden increase after six months, and withdrawal rates stayed roughly constant in different treatment groups during the entire follow up period.  In addition, there was no robust evidence that gastrointestinal adverse events were actually a risk factor for ulcer related complications....

Secondly, the flawed findings published in the original article ... appear to be widely distributed and believed.  About 30,000 reprints of CLASS were bought from the publisher (W. Bartolotta, personal communication), and a recent search of the Science Citation Index yielded 169 articles citing it, more than 10 times as many citations as for any other article published in the same issue.  This wide distribution and citation has coincided with the sales of celocoxib increasing from $2623m in 2000 to $3114m in 2001....

***Publishing and distributing overoptimistic short term data using post hoc changes to the protocol, while omitting disappointing long term data of two trials, which involved large numbers of volunteers, is misleading.***  While some of the problems related to CLASS were partially covered in the news sections of BMJ [*The British Medical Journal*] ... and other journals, it was not emphasized how flawed the trial actually was, ... and how inadequate the authors' justifications....  Consequently, CLASS may still be relied on by many physicians without reference to these flaws.  In our experience most still believe the findings published originally....  For example, most of 58 physicians attending an osteoarthritis workshop in Berne, Switzerland, in December 2001 had not realized that CLASS was seriously biased.

70.    On June 1, 2002, *The New York Times* reported the following:

**Study Finding Celebrex Safer Was Flawed**, Journal Says

An editorial in the June 1 issue of The British Medical Journal harshly criticizes a scientific study that the drug company Pharmacia used to promote Celebrex, the arthritis drug that is its best-selling product.

Its authors said *the study, which concluded that Celebrex, which had $3 billion in sales last year, was safer than other widely used pain relievers because it caused fewer ulcers, had "serious irregularities."*

They also said Pharmacia's previous explanation for discrepancies in the study was "inadequate." *Doctors should be informed, they added, that the conclusion that Celebrex was safer than drugs like ibuprofen had been contradicted.*

*"The flawed findings published in the original article appear to be widely distributed and believed,"* wrote Dr. Peter Juni, a senior researcher at the University of Berne in Switzerland, and two other doctors. If Pharmacia is not required to inform doctors that the study's conclusion was invalid, they said, "the pharmaceutical industry will feel no need to put the record straight in this or any future instances."

*       *       *

*When all the data are analyzed, Dr. Juni and his colleagues said, much of Celebrex's safety advantage appears to disappear because almost all of the ulcer complications in the last six months occurred in Celebrex users.*

71.    With the full truth about the CLASS study finally revealed and defendants' explanations shown to have no merit, investors realized that Pharmacia's single most important product had no demonstrable advantages over ibuprofen, but cost 60-100 times more. Accordingly, Pharmacia's stock tumbled from $40.596 on the day before *The British Medical Journal* and *The New York Times* articles were published to $36.563 just a few trading days later. As a result, innocent investors who bought Pharmacia stock without knowing the truth about Celebrex millions of dollars.

- 28 -

## POST CLASS PERIOD REVELATIONS
## CONFIRM DEFENDANTS' FRAUD

72.   On June 8, 2002, *The Washington Post* reported that the FDA had

decided *not* to allow Celebrex to be sold without the GI warning label, as follows:

> Drug Firm May Not Call Celebrex Safer, FDA Says; Study Did Not
> Back Anti-Arthritis Drug Claims
>
> ***The maker of the best-selling arthritis drug Celebrex will not be
> allowed to claim that its product is safer for the stomach and digestive
> tract than older, less expensive arthritis medicines***, the Food and Drug
> Administration announced yesterday.
>
> *      *      *
>
> Sidney Wolfe, of the Public Citizen Health Research Group, an
> FDA watchdog, said the latest research undermined Pharmacia's heavily
> advertised efforts to promote the drug. ***"The whole hype was that it is
> safer for the stomach," he said. "If it's not, then why pay five or 10
> times more for it?  There is no evidence of any benefit in terms of
> effectiveness, so why would anyone use the drug in the first place?"***
>
> *      *      *
>
> The company followed 4,000 arthritis sufferers who were treated
> with Celebrex and 4,000 given ibuprofen or diclofenac, other common
> anti-inflammatory drugs. The result, Goldkind said, "was that ***the study
> did not prove that Celebrex was better for the stomach***."

73.   On June 10, 2002, *The Wall Street Journal* reported that:

> Celebrex has become one of the nation's top-selling drugs largely
> because of claims by the drug's marketers that it is gentle on the
> stomach, but *federal drug regulators have concluded Celebrex is just as
> likely to cause ulcers as older, cheaper medicines like ibuprofen*.
>
> ***Nor is Celebrex any better at curing pain or inflammation than
> ibuprofen, regulators concluded. Indeed, a new label approved Friday
> for the blockbuster drug gives Celebrex, sold for about $2.50 a pill, no
> clear advantages over ibuprofen or another older pain pill, diclofenac***,
> which are sold for about 10 cents per pill.

* * *

> *"With the FDA action, there appears to be no good reason to prescribe Celebrex given that it's many times more expensive than ibuprofen,"* said Sharon Levine, executive vice president of Kaiser Permanente, the nation's largest managed-care group.

74.    On June 10, 2002, *The Washington Post* ran a story comparing Pharmacia to Enron, stating:

> Pharmacia Corp. funded a study to show that a medicine called Celebrex works better than cheap alternatives such as ibuprofen. The study collected 12 months of data, which suggested no Celebrex advantage. So *the authors selectively published the first six months of results, which purported to show that Celebrex had fewer side effects. In 2001 alone, this Arthur Andersen-type trick caused patients to spend $3 billion unnecessarily*.

75.    On June 24, 2002, *Business Week* ran an article in which *JAMA* deputy editor Drummond Rennie stated that *the study's authors, including Pharmacia, "were not open with us ... [t]hey signed letters saying the studies have all the relevant stuff," but "they had contradictory results when they sent us this paper, and they should have revealed them to us. And they didn't."*

## DEFENDANTS' SCIENTER

76.    As more particularly set forth in ¶¶27-29, defendant Geis was aware of the true results of the CLASS study because he participated in the CLASS study trials and was a co-author of the *JAMA* article. Defendant Cox had overall responsibility for Celebrex and was responsible for communicating the results of the CLASS study to analysts during conference calls. Finally, defendant Hassan was a hands-on manager, Celebrex was by far Pharmacia's biggest-selling drug and the CLASS study

- 30 -

was critical to its future. As such, each individual defendant knew that the CLASS study data did not support Pharmacia's claim that Celebrex had a GI safety profile superior to those of other NSAIDs.

77. The scienter of all defendants is also demonstrated by the manipulation of the CLASS study data, criteria, and protocols. When defendants realized that the results of the CLASS study as originally designed did not show any GI advantage for Celebrex, they combined the two trials (Celebrex vs. diclofenac and Celebrex vs. ibuprofen) into one. They then discarded nine months of data regarding the ibuprofen trial and six months of data regarding the diclofenac trial in order to improve the results of Celebrex. Next, they changed the criteria by which Celebrex was compared to the other two drugs, adding symptomatic ulcers to the comparison to favor Celebrex. Finally, defendants disregarded the original standard by which Celebrex would be evaluated. Prior to the trials, the CLASS study protocol stated that Celebrex's GI safety profile would only be considered superior to traditional NSAIDs if the Celebrex group had a lower incidence of GI side effects than the diclofenac group, the ibuprofen group, and both groups combined. Despite this, defendants claimed that Celebrex's GI safety profile was superior when it only passed two of the three tests, even after defendants had manipulated the trial length and criteria. The numerous changes to the original protocol and the exclusion of unfavorable data demonstrate a conscious effort to deceive.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

78.    At all relevant times, the market for Pharmacia common stock was an efficient market for the following reasons, among others:

(a)    Pharmacia common stock met the requirements for listing, and was listed and actively traded, on the New York Stock Exchange;

(b)    As a regulated issuer, Pharmacia filed periodic public reports with the SEC; and

(c)    Pharmacia stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.  Among the securities firms that followed the Company and/or issued reports about Pharmacia during the Class Period were: A.G. Edwards & Sons; ABN AMRO; Argus Research; Banc of America Securities; CIBC World Markets; Credit Suisse First Boston; Deutsche Bank; Edward Jones; First Albany Corp.; Friedman, Billings, Ramsey; Goldman Sachs; J.P. Morgan; Lehman Brothers; Morgan Stanley; Morningstar, Inc.; Arnhold & S. Bleichroeder; Pershing/Div. of DLJ; PNC Advisors; Raymond James & Associates; Salomon Smith Barney; Sanford C. Bernstein; SG Cowen Securities Corporation Inc; Standard & Poor's; Thomas Weisel Partners;  and/or UBS Warburg.

79.     As a result, the market for Pharmacia securities digested current information with respect to Pharmacia from all publicly available sources and reflected such information in Pharmacia's securities prices.     Under these circumstances, all purchasers of Pharmacia securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### For Violations of §10(b) of the 1934 Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

80.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

81.     Throughout the Class Period, defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company, including the side-effects of Celebrex, its most important product, as specified herein. Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts about Celebrex.  Specifically, defendants knew, or but for their reckless disregard of the truth should have known, that Celebrex

did not result in a lower incidence of GI problems than comparable drugs, as defendants claimed.

82. Pharmacia and the individual defendants, as top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers or directors, the individual defendants were able to and did control the content of the public statements disseminated by the Company. With knowledge of or reckless disregard for the falsity and misleading nature of the statements contained therein, defendants caused the heretofore-complained-of public statements to contain misstatements and omissions of material facts as alleged herein.

83. Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The individual defendants constituted senior management and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public.

84. As a result of defendants' false and misleading statements and omissions, the market prices of Pharmacia publicly traded securities were artificially inflated throughout the Class Period. In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative

- 34 -

devices employed by defendants, plaintiffs, in reliance on either the integrity of the market or directly on the statements and reports of defendants, purchased Pharmacia publicly-traded securities at artificially inflated prices and were damaged thereby.

85.     Had plaintiffs known of the material adverse information not disclosed by defendants, or been aware of the truth behind defendants' material misstatements, they would not have purchased Pharmacia publicly-traded securities at artificially inflated prices.

86.     By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### (Against All Defendants)

87.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

88.     Each of the individual defendants acted as a controlling person of the Company within the meaning of §20(a) of the 1934 Act during the Class Period. Specifically, Hassan had the power and authority to cause the Company to engage in the wrongful conduct complained of herein by virtue of his positions as CEO and Chairman of the Board of Pharmacia.  Geis, as Group Vice President of Clinical Research at Pharmacia, was also in a position of power and authority to cause the

Company to engage in the wrongful acts complained of herein. Pharmacia controlled the individual defendants and all of its employees.

89. By reason of the wrongful conduct alleged herein, defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of their wrongful conduct, plaintiffs suffered damages in connection with their purchases or other acquisitions of Pharmacia publicly traded securities during the Class Period.

## PRAYER

**WHEREFORE**, plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding plaintiffs and the members of the Class compensatory damages;

C. Awarding plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E. Awarding such other relief as this Court may deem just and proper.

- 36 -

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury.

DATED: October 27, 2003

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN (PP-8416)

_____
     PETER S. PEARLMAN

Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Liaison Counsel

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
MATTHEW P. MONTGOMERY
ELIZABETH J. ARLEO
ALEXANDRA S. BERNAY
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

SCOTT + SCOTT, LLC
DAVID R. SCOTT
KAREN M. LESER
108 Norwich Avenue
Colchester, CT 06415
Telephone: 860/537-3818
860/537-4432 (fax)

Additional Counsel for Plaintiffs

S:\PleadingsSD\Pharmacia\CPTConsol2.doc

## SCHEDULE A

## SECURITIES TRANSACTIONS

### Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| | **PACE Industry Union - Management Pension Fund** | |
| 01/29/2001 | 13,200 | $55.58 |
| 02/09/2001 | 17,400 | $53.20 |
| 02/13/2001 | 24,300 | $52.44 |
| 02/16/2001 | 2,100 | $51.90 |
| 03/06/2001 | 22,400 | $53.15 |
| 03/13/2001 | 16,500 | $48.87 |
| 03/22/2001 | 42,200 | $43.90 |
| 03/22/2001 | 11,100 | $44.15 |
| 05/15/2001 | 12,000 | $46.60 |
| 06/11/2001 | 24,500 | $49.08 |
| 09/18/2001 | 44,300 | $39.44 |

### Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| | **PACE Industry Union - Management Pension Fund** | |
| 03/27/2001 | 1,500 | $49.25 |
| 04/09/2001 | 1,000 | $51.59 |
| 05/08/2001 | 1,500 | $49.09 |
| 10/05/2001 | 19,600 | $40.45 |
| 10/25/2001 | 8,500 | $39.16 |
| 11/19/2001 | 10,600 | $44.84 |
| 11/26/2001 | 11,300 | $45.72 |
| 12/26/2001 | 13,600 | $43.30 |
| 03/22/2002 | 3,900 | $45.22 |
| 03/25/2002 | 3,300 | $45.25 |
| 03/26/2002 | 2,800 | $44.96 |
| 03/27/2002 | 5,600 | $45.04 |
| 03/28/2002 | 2,700 | $45.25 |
| 04/01/2002 | 1,800 | $45.13 |
| 05/16/2002 | 43,950 | $41.40 |
| 05/16/2002 | 17,100 | $40.50 |

Opening position of 40,000 based on February 2001 holdings
(net of all prior transactions during class period)

## Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| | **Alaska Electrical Pension Fund** | |
| 06/13/2000 | 12,000 | $53.00 |
| 08/15/2000 | 5,600 | $55.56 |
| 08/24/2000 | 4,900 | $58.94 |
| 08/24/2000 | 1,600 | $58.91 |
| 01/12/2001 | 4,600 | $55.00 |
| 06/05/2001 | 7,000 | $49.17 |
| 06/20/2001 | 7,300 | $50.89 |
| 06/27/2001 | 21,500 | $48.09 |
| 07/27/2001 | 17,800 | $41.90 |
| 03/19/2002 | 10,000 | $46.27 |
| 04/01/2002 | 3,400 | $45.07 |
| 05/01/2002 | 4,500 | $41.65 |
| 05/01/2002 | 500 | $41.54 |

## Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| | **Alaska Electrical Pension Fund** | |
| 07/06/2000 | 16,954 | $54.13 |
| 07/18/2000 | 2,500 | $55.50 |
| 10/03/2000 | 900 | $58.31 |
| 10/03/2000 | 100 | $57.97 |
| 11/22/2000 | 10,000 | $58.88 |
| 12/18/2000 | 7,000 | $58.81 |
| 01/23/2001 | 9,300 | $55.69 |
| 05/09/2001 | 700 | $47.43 |
| 05/09/2001 | 2,200 | $47.39 |
| 05/10/2001 | 100 | $47.45 |
| 05/10/2001 | 1,500 | $47.08 |
| 10/29/2001 | 1,700 | $40.21 |
| 02/28/2002 | 20,000 | $41.16 |

Opening position of 37,754 based on April 2000 holdings
(net of all prior transactions during class period)

## Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| | **New England Health Care Employees Pension Fund** | |
| 08/28/2000 | 10,800 | $58.19 |
| 09/21/2000 | 4,100 | $54.89 |
| 09/25/2000 | 2,500 | $58.85 |
| 10/12/2000 | 4,700 | $57.35 |
| 11/08/2000 | 5,800 | $59.21 |
| 02/27/2001 | 5,200 | $49.87 |
| 10/24/2001 | 4,300 | $38.53 |
| 10/25/2001 | 1,800 | $38.67 |
| 11/19/2001 | 9,400 | $44.57 |
| 11/20/2001 | 8,200 | $45.61 |
| 11/29/2001 | 900 | $43.62 |
| 12/27/2001 | 2,000 | $42.74 |
| 01/07/2002 | 4,700 | $41.27 |
| 01/16/2002 | 900 | $40.01 |
| 01/30/2002 | 2,100 | $39.26 |
| 02/19/2002 | 300 | $39.42 |
| 02/20/2002 | 800 | $39.77 |
| 02/27/2002 | 400 | $40.60 |

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| | **New England Health Care Employees Pension Fund** | |
| 05/11/2001 | 6,300 | $46.35 |
| 05/14/2001 | 3,300 | $45.24 |
| 07/24/2001 | 2,500 | $42.42 |
| 07/25/2001 | 2,800 | $41.95 |
| 07/26/2001 | 3,200 | $41.61 |
| 10/23/2001 | 8,900 | $38.43 |
| 10/24/2001 | 6,100 | $38.61 |

Opening position of zero shares based on November 2001 holdings
(net of all prior transactions during class period)

## Acquisitions

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| | **City of Sarasota Firefighters' Pension Fund** | |
| 08/28/2000 | 2,000 | $58.19 |
| 08/29/2000 | 1,400 | $58.60 |
| 08/30/2000 | 1,200 | $59.14 |
| 08/31/2000 | 2,000 | $58.69 |
| 09/21/2000 | 1,500 | $54.88 |
| 09/25/2000 | 2,900 | $58.85 |
| 10/02/2000 | 4,200 | $59.38 |
| 10/13/2000 | 3,300 | $55.01 |
| 10/23/2000 | 1,000 | $52.06 |
| 11/09/2000 | 3,600 | $58.80 |
| 02/27/2001 | 4,700 | $50.30 |
| 03/15/2001 | 2,250 | $48.25 |
| 04/06/2001 | 1,000 | $50.40 |
| 05/22/2001 | 1,400 | $49.56 |
| 09/07/2001 | 900 | $40.79 |
| 11/19/2001 | 6,500 | $44.57 |
| 11/20/2001 | 5,700 | $45.61 |

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| | **City of Sarasota Firefighters' Pension Fund** | |
| 11/06/2000 | 300 | $57.06 |
| 05/15/2001 | 7,600 | $46.29 |
| 07/27/2001 | 5,800 | $41.85 |
| 10/24/2001 | 10,900 | $39.57 |
| 12/12/2001 | 100 | $42.76 |
| 12/26/2001 | 8,650 | $43.18 |
| 12/27/2001 | 1,100 | $42.65 |
| 01/03/2002 | 200 | $41.77 |
| 01/09/2002 | 1,000 | $41.28 |

*No holdings position were given for this fund

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| | Internatonal Union of Operating Engineers, Local 132 Pension Plan | |
| 07/10/2000 | 1,200 | $56.18 |
| 07/12/2000 | 12,500 | $56.88 |
| 07/17/2000 | 3,400 | $56.31 |
| 09/27/2000 | 3,700 | $58.44 |
| 02/01/2001 | 4,400 | $57.20 |
| 02/26/2001 | 3,800 | $48.97 |
| 05/02/2001 | 1,800 | $50.85 |
| 10/24/2001 | 1,100 | $38.53 |
| 10/25/2001 | 500 | $38.67 |
| 11/29/2001 | 200 | $43.62 |
| 12/27/2001 | 400 | $42.74 |
| 01/07/2002 | 1,200 | $41.27 |
| 01/16/2002 | 300 | $40.01 |
| 01/30/2002 | 600 | $39.26 |
| 02/20/2002 | 300 | $39.77 |
| 04/30/2002 | 100 | $41.47 |

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| | Internatonal Union of Operating Engineers, Local 132 Pension Plan | |
| 07/27/2001 | 30,800 | $41.89 |

Opening position of zero shares based on January 2001 holdings
(net of all prior transactions during class period)

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| | **Chemical Valley Pension Fund of West Virginia** | |
| 07/10/2000 | 9,950 | $56.18 |
| 07/17/2000 | 2,500 | $56.00 |
| 09/26/2000 | 2,800 | $58.00 |
| 02/01/2001 | 3,200 | $57.20 |
| 02/26/2001 | 2,700 | $48.97 |
| 09/28/2001 | 1,200 | $40.00 |
| 12/17/2001 | 1,200 | $43.19 |

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| | **Chemical Valley Pension Fund of West Virginia** | |
| 01/09/2001 | 700 | $55.52 |
| 07/27/2001 | 21,150 | $41.89 |

Opening position of 700 based on April 2000 holdings (net of all prior transactions of class period)

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2.     That on October 27, 2003 declarant served the CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.     That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of October, 2003, at San Diego, California.

BONNIE M. NAIDITCH

- 39 -

PHARMACIA (LEAD)
Service List - 10/24/2003   (03-0118)
Page 1 of 1

**Counsel For Defendant(s)**

Jonathan M. Hoff
Cadwalader, Wickersham & Taft   *
100 Maiden Lane
New York, NY  10038
   212/504-6000
   212/504-6666 (Fax)

**Counsel For Plaintiff(s)**

Peter S. Pearlman
Cohn Lifland Pearlman Herrmann & Knopf LLP
Park 80 Plaza West-One
Saddle Brook, NJ  07663
   201/845-9600
   201/845-9423 (Fax)

Sandra  Stein
Laura S. Stein
Milberg Weiss Bershad Hynes & Lerach LLP
1845 Walnut Street, 9th Floor
Philadelphia, PA  19103
   215/988-4546
   215/988-9885 (Fax)

Arthur C. Leahy
Matthew P. Montgomery
Elizabeth J. Arleo
Milberg Weiss Bershad Hynes & Lerach LLP
401 B Street, Suite 1700
San Diego, CA  92101-4297
   619/231-1058
   619/231-7423 (Fax)

David R. Scott
Michael A. Swick
Scott + Scott, LLC
108 Norwich Avenue
Colchester, CT  06415
   860/537-3818
   860/537-4432 (Fax)

*Denotes service via overnight mail