# McKool Smith

Adam S. Ziffer
Direct Dial: (212) 402-9804
aziffer@mckoolsmith.com

One Bryant Park
47th Floor
New York, NY 10036

Telephone: (212) 402-9400
Facsimile: (212) 402-9444

September 19, 2018

**VIA ECF**

Honorable Michael A. Hammer
United States Magistrate Judge, District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

RE: *Pharmacia Corp. n/k/a Pfizer Inc. v. Arch Specialty Insurance Co., et al.*,
No. 2:18–cv–00510–ES–MAH (D.N.J.)

Dear Judge Hammer:

Pursuant to paragraph 5 of the Pretrial Scheduling Order in this case (Dkt. No. 56) Plaintiff Pharmacia Corporation ("Pharmacia") n/k/a Pfizer Inc. ("Plaintiff") submits this letter for an order compelling Defendants Arch Specialty Insurance Company ("Arch") and Twin City Fire Insurance Company ("Twin City") (together, "Defendants") to produce documents in response to certain of Plaintiff's First Set of Requests for Production of Documents.

**1)   Specific Description of the Discovery Sought**

As discussed in more detail in Plaintiff's Complaint (Dkt. No. 1), Plaintiff is seeking insurance coverage from Arch and Twin City for the costs it incurred settling an underlying class action lawsuit alleging securities violations against Pharmacia and its former officers.[1] Defendants have denied coverage under their Excess Policies for *Garber* on the grounds, among others, that (1) *Garber* is "related" to three prior consumer class action lawsuits; (2) Plaintiff

---

[1] *Robert L. Garber v. Pharmacia Corp., et al.*, No. 03-1519 (AET) (D.N.J.), later consolidated and captioned *Alaska Electrical Pension Fund, et al. v. Pharmacia Corp., et al.*, No. 03-1519 (AET) (D.N.J.) ("*Garber*").

breached an alleged prior knowledge exclusion contained in an August 2002 "Warranty Letter";

and (3) their Excess Policies have not attached because the underlying coverage is not exhausted.

*Id.* ¶¶ 39-46. Plaintiff served discovery requests aimed to rebut these coverage defenses (and

others), including the following, which are now the subject of its motion to compel:

- Documents regarding the sale of the Arch Policy ("Underwriting Files") (Arch Req. No. 6);

- Documents, including underwriting and drafting history, concerning certain Policy exclusions and other provisions relied on by Arch (to the extent not contained in its Underwriting Files), such as the Arch Policy's PPL Exclusion, Attachment Language and Follow Form Language, and the August 2002 Letter (Arch Req. Nos. 16-19);

- Arch underwriting guidelines or other instructional documents for underwriting of D&O Policies in place for the 2002-2003 Arch Policy (Arch Req. No. 9);

- Arch's and Twin City's claims-handling guidelines or other instructional documents for claims handling that were used or available to each Defendant in connection with the handling of the *Garber* claim (Arch Req. No. 20, Twin City Req. No. 21); and

- Arch's and Twin City's organizational structure in place relating to the underwriting of each Policy, and the handling of the *Garber* claim (Arch and Twin City Req. No. 8).

**2)      Relevancy of the Discovery Sought**

     **A.      Arch's Underwriting Materials**

The thrust of Plaintiff's motion to compel is the production of Arch's Underwriting Files

for the Arch Policy (Arch Req. No. 6). Plaintiff also seeks drafting and other documents

regarding specific Policy provisions Arch is relying on to deny coverage in this litigation (Arch

Req. Nos. 16-19), and Arch's D&O underwriting guidelines (Arch Req. No. 9).

In general, underwriting documents, including analyses of risks and scope of coverage,

internal communications and communications with brokers, and the drafting of specific

provisions and exclusions, are relevant to the interpretation of coverage under the Arch Policy

and the intent of the parties at the time the Policy was issued. Plaintiff should already have these

files; indeed, Twin City produced its underwriting files for 2002-2003 Twin City Policy without

Hon. Michael A. Hammer
September 19, 2018
Page 3

protest, because these files are, at a minimum, potentially relevant to the parties' claims and defenses in this insurance coverage dispute.[2]

More specifically, Arch has put its own underwriting *directly in issue*, stating in the third paragraph of its memorandum of law in support of its motion to dismiss this case:

> In light of these prior consumer actions, <u>Arch negotiated specific policy provisions to protect itself against exposure to claims that may be made during the policy period arising from Pharmacia's pre-existing issues and course of conduct concerning Celebrex</u>; to wit, a Pending and Prior Litigation ["PPL"] Exclusion and a Warranty Statement containing a Prior Knowledge Exclusion.

Dkt. No. 17-12 at 2 (emphasis added). Neither one of these provisions says anything about Celebrex. However, Arch has represented that they were intended deny coverage for *Garber* and that it specifically "negotiated" them to effectuate that intent. These purported negotiations and specific intent, should they even exist, would be located in Arch's Underwriting Files for the 2002-2003 Policy. Arch has stated it will provide the name of its underwriter for the Arch Policy (Ex. D at 3), which Plaintiff already knows (it is listed on the August 2002 Letter that Arch supposedly "negotiated"), but refuses to produce that person's files. Plaintiff should not be forced to rely on this person's 15-year-old memory at a deposition without any supporting documents. Arch cannot specifically put negotiations of its Policy in issue, admit they are relevant to its intent, and then refuse to produce documents regarding negotiations of its Policy. Plaintiff is allowed to test the veracity of Arch's supposed "intent" to not cover *Garber*.

Similar to its Underwriting Files for its D&O Policy issued to Pharmacia, documents concerning the underwriting or drafting of the Policy provisions and the August 2002 Letter at issue and Arch's D&O underwriting guidelines are also relevant. Again, these are the very

---

[2] In fact, in Plaintiff's pending coverage suit in Delaware against Arch, where the insurers also are claiming that the claim at issue is "related" to prior lawsuits, the other insurer in the litigation has agreed to produce its underwriting files for the policy at issue *and* the two years prior.

provisions Arch allegedly negotiated to deny coverage here; Plaintiff is allowed to discover if they are intended as Arch suggests in this case. Moreover, Arch's underwriting guidelines are relevant to both coverage interpretation and Arch's specific defenses. These guidelines are written by insurance company experts in each area of insurance and are provided to their employees to guide them as to the intended scope of the D&O coverage. For example: whether coverage for D&O securities claims should be precluded by earlier-filed *consumer protection* lawsuits (and whether any prior lawsuit should be considered in underwriting D&O coverage); whether coverage does not attach even if every underlying insurer has paid its full policy limit; or whether a document such as the August 2002 Letter is required for coverage to be placed.

  **B.**   **Defendants' Claims-Handling Guidelines/Manuals**

Both Defendants' claims-handling guidelines (Arch Req. No. 20, Twin City Req. No. 21) are relevant to various issues in this case which the Defendants have raised, including (1) how to determine when the Excess Policies attach and exhaustion has occurred, and (2) how to determine when claims are "related" for intended purposes of their exclusions. Similar to the underwriting guidelines discussed above, these claims-handling guidelines inform the veracity of Defendants' coverage positions here. For example, there may be guidelines regarding when underlying exhaustion has occurred, and whether, as Twin City maintains, it is not enough that each underlying carrier pay its limit—it must also "admit liability" in order for Twin City's Policy to attach before Twin City pays. They also can show the proper analysis for the claims handler to determine if a lawsuit is related to prior claims—this is all potentially relevant evidence to policy interpretation unrelated to any claim for bad faith. These guidelines thus will show Arch's and Twin City's interpretation of their own Excess Policies as well as the service functions contemplated by their coverage.

### C.    Defendants' Underwriting and Claims Organizational Structures

Organizational charts or similar documents for Arch's and Twin City's underwriting and claims-handling divisions during the issuance of their Policies and the handling of the *Garber* claim (Req. No. 8) can show who was responsible for making decisions on Policy issuance and claim denial, and who could be witnesses at deposition and trial.  It is not enough for Arch to offer to supply names of employees.  Plaintiff is allowed to determine for itself whether other members of their departments who may have been involved in underwriting and claims handling are relevant to this case, and should not have to wait for depositions in hopes that the witnesses will remember who supervised their departments or assisted their work from 15 years ago.

### 3)    The Parties' Efforts to Meet and Confer

In response to Plaintiff's document requests, both Defendants served objections and responses that refused to produce certain documents, including those outlined above.  *See* Arch's July 11, 2018 and Twin City's July 16, 2018 Responses and Objections, attached as Exhibit A.

On July 30, 2018, Plaintiff sent letters to both Defendants outlining the deficiencies of their responses and requesting a meet and confer phone call with each Defendant no later than August 6, 2018.  *See* Ex. B.  On August 9, Plaintiff's counsel held a meet and confer call with Twin City's counsel.  During the call, the parties narrowed their disputes.  However, Twin City still refused to produce claims-handling guidelines or organizational charts for the persons involved in the underwriting and claims-handling for the Policy and the *Garber* claim.  On August 17, Twin City's counsel sent a letter confirming the parties' agreements.  *See* Ex. C.

Arch responded to Plaintiff's July 30 letter via its own letter on August 20 (*see* Ex. D).  A meet and confer phone call was held on August 22, during which Arch's counsel flatly refused to produce its Underwriting Files, even though it knew Twin City agreed to produce its

underwriting files without protest. Plaintiff's counsel followed up with an email that same day listing Arch's further efforts to respond to Plaintiff's discovery requests. Ex. E. One such request made during the call was for Arch to at least confirm whether it had D&O underwriting and claims-handling manuals and guidelines in the first place, which could obviate the need for Plaintiff to move for them here. *Id.* Arch responded on September 4 and refused to produce the requested documents, or to confirm whether it even had the manuals or guidelines. Ex. F at #7.

**4)** **Legal Argument**

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." It is well settled that "the scope of discovery in federal litigation is broad." *Wiggins v. City of Trenton*, No. 11–5366 (AET), 2013 WL 1145483, at *1 (D.N.J. Mar. 18, 2013). "Courts have construed this rule [26(b)(1)] liberally, creating a broad vista for discovery[.]" *Tele-Radio Sys. Ltd. v. De Forest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981). "Thus, the relevancy standard is satisfied, and discovery requests should be granted, if there is any possibility that the information sought may be relevant to the general subject matter of the action." *Wiggins*, 2013 WL 1145483, at *2.

**A.** **Arch's Underwriting Materials Are Not Confidential and Are Relevant**

Arch's grounds for its refusal to produce its underwriting materials are that (1) the underwriting materials are confidential/proprietary and (2) the documents are not relevant to this action for breach and declaratory judgment. *See* Ex. D at 2-4. First, even if Arch's Underwriting Files were confidential, the Discovery Confidentiality Order (Dkt. No. 57) entered in this case protects disclosure of these materials to non-parties. Arch has cited no support for the position that underwriting files are independently confidential and may not be disclosed in litigation (unlike non-party settlement agreements), and Plaintiff is unaware of any such law.

Hon. Michael A. Hammer
September 19, 2018
Page 7

Second, Arch does not meet the high burden to show the documents are not relevant under the liberal rules of discovery. According to Arch's letter, its underwriting materials are not relevant absent a contract ambiguity or claim for bad faith. Ex. D at 2-4. However, "[m]any courts have already addressed the issue of the discoverability of underwriting files, and the general consensus is that they are discoverable"—even in the absence of a claim for bad faith and even where the responding party asserts that the language is unambiguous. *Clean Earth of Md., Inc. v. Total Safety, Inc.*, 2011 WL 4832381, at *8 (N.D. W.Va. Oct. 12, 2011) (collecting cases). The standard for relevancy is not admissibility, and Arch's underwriting "is relevant to determining the risks that [Arch] expected to cover in the policy, how it interpreted the various policy terms, and whether the terms of the policy are ambiguous in the first instance." *Silgan Containers v. Nat'l Union Fire Ins. Co.*, 2010 WL 5387748, at *8 (N.D. Cal. Dec. 21, 2010).

Accordingly, courts (including those in this Circuit) have found the underwriting/drafting history documents that Plaintiff seeks are discoverable for this purpose, and compelled their production. *See, e.g.*, *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 105-06 (D.N.J. 1990) *aff'd*, No. 89–1701(CSF), 1990 WL 191922 (D.N.J. Nov. 13, 1990) (compelling discovery of policies' drafting history because, when the "Court has not yet ruled whether the policies are subject to a plain meaning interpretation or whether the policies are ambiguous," the drafting history is relevant and discoverable); *Leksi, Inc. v. Fed. Ins. Co.*, 129 F.R.D. 99, 104 (D.N.J.1989) (compelling production of drafting history where ambiguity in the contract has not yet been resolved, and it is relevant to the interpretation of policy language); *Diebold, Inc. v. Cont'l Cas. Co.*, No. 07-1991 (JEI/JS), 2009 WL 10677602, at *1 (D.N.J. Aug. 27, 2009)

Hon. Michael A. Hammer
September 19, 2018
Page 8

(stating that underwriting files for policy at issue were "relevant to the claims" for coverage in the case, including insurer's alleged "negotiations" regarding the scope of the coverage).[3]

Arch's cited case law on this point is either predicated on distinct rules from other jurisdictions (mostly Florida) with no relation to this case,[4] or supports Plaintiff. For example, in *Westchester Fire Insurance Co. v. Household International, Inc.*, 167 F. App'x 895, 899 (3d Cir. 2006), cited by Arch, the court held that documents regarding the umbrella policies' endorsement's drafting and intent were irrelevant to the insureds' claims because the court had *already ruled* the endorsement at issue was unambiguous and clearly excluded coverage. *See id.*

---

[3] While the insured in *Diebold* brought a claim for bad faith that ultimately was dismissed, it does not appear from the face of the decision that claim was the basis for the Court's finding of relevance for the underwriting files. Indeed, while Arch's letter attempted to distinguish Plaintiff's case law based on the presence of a bad faith claim in certain cases (Ex. D at 3), that claim was not the sole (or even a partial) basis for the courts' decisions that underwriting materials were relevant. *See, e.g.*, *Silgan*, 2010 WL 5387748, at *8; *see also Rhone–Poulenc Rorer, Inc. v. Home Indem. Co.*, 1991 WL 78200, at *2 (E.D. Pa. May 7, 1991) (compelling drafting history in absence of bad faith claim; "in [*Leksi*] the District Court of New Jersey . . . determined that when the question of ambiguity in the contract has not yet been resolved, the drafting history is relevant and discoverable under the Federal Rules."); *Rembrandt Enters., Inc. v. Ill. Union Ins. Co.*, 2016 WL 6997108, at *2-4 (D. Minn. Jan. 13, 2016) (not alleging bad faith; compelling production of underwriting manuals where "[p]laintiff seeks to obtain extrinsic evidence relevant to interpreting the provisions at issue should they be deemed ambiguous").

[4] Ex. D at 2-4 (citing *Builders Mut. Ins. Co. v. Parallel Design & Dev. LLC*, 2010 WL 6573365 (E.D. Va. Oct. 5, 2010) (underwriting, claims files and all other documents irrelevant to determination of insurer's duty to defend under Virginia's "Eight Corners Rule" that looks only at the policy and complaint, and staying discovery until first there is a determination on summary judgment of whether exclusion was ambiguous); *Lappin v. Gwartney*, 2001 WL 185167 (D. Kan. Feb. 20, 2001) ("Kansas' rules for interpreting insurance policies do not include consideration of extrinsic evidence."); *Westfield Ins. Co. v. Icon Legacy Custom Modular Homes*, 321 F.R.D. 107 (M.D. Pa. 2017) (denying discovery of underwriting and claims materials where insured could not point to any potential ambiguity in the policy to justify discovery, and filed motion to compel two days before discovery deadline rendering it "tainted," and production of documents in response to 11 overbroad requests would be unduly burdensome); *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 702 (S.D. Fla. 2007) (denying motion to compel underwriting file where "[b]y Plaintiff's own admission, there are no underwriting issues in this case."); *Royal Bahamian Ass'n, Inc. v. QBE Ins. Co.*, 268 F.R.D. 692, 695 n.2 (S.D. Fla. 2010) (policyholder "not entitled to this [underwriting] file because [policyholder] has not raised any underwriting issue. . . .")).

(the "[p]olicyholders are simply attempting to relitigate our prior determination that the FIE unambiguously excludes this type of coverage."). Here, Arch moved to stay discovery pending its motion to dismiss on the argument that its Policy unambiguously excluded coverage. Not only was that motion for a stay denied (Dkt. No. 50), whether the various provisions at issue—including the PPL Exclusion and August 2002 Letter—were negotiated to exclude coverage was put in issue by Arch's own statements to the Court. Dkt. No. 17-12 at 2. Underwriting and drafting documents concerning their intended scope and interpretation must be produced.

### B. Both Defendants' Claims-Handling Guidelines Are Discoverable

Both Defendants have taken the position that they will not produce claims-handling guidelines, claiming they too are relevant only where there is a bad faith claim or there is an ambiguity. In its August 20 letter, Arch cited two Florida decisions that again bear no resemblance to the case at bar.[5] As discussed above, there is no threshold requirement of ambiguity to make these documents relevant, and while claims manuals or other instructional documents *are* relevant to bad faith, *i.e.*, whether the insurer acted reasonably in denying coverage, they also are relevant where policy interpretation is at issue. *See Nestle Foods*, 135 F.R.D. at 105-06 (compelling discovery of "claims-handling manuals and guidelines" where policyholder argued "such evidence could undermine defendants' position that the language in question is clear and unambiguous"); *Silgan*, 2010 WL 5387748, at *8 ("Claims manuals also are . . . . relevant for coverage claims (not just bad-faith claims) . . . . and can show how the insurer applied the standard language . . . . [and] establish that an ambiguity exists in the policy").[6]

---

[5] *See* Ex. D at 4 (*e.g.*, citing *Kennedy v. Provident Life & Accident Ins. Co.,* 2009 WL 3048683 (S.D. Fla. 2009) (disability insurance policy where no ambiguity argument was raised)).

[6] *See also Rembrandt*, 2016 WL 6997108, at *2 ("When a court will be tasked with interpreting an insurance policy, . . . claims manuals,' for example, 'are relevant and discoverable.'").

Hon. Michael A. Hammer
September 19, 2018
Page 10

Here, the claims manuals at issue could shed light on how the Defendants should determine when their Excess Policies attach and underlying exhaustion has occurred, or how to determine when claims are "related," for instance under a PPL Exclusion. If the claims manuals, for example, contradict the process or positions taken in Defendants' claims files (which have been produced), they would be relevant to the issue of whether the Policies are ambiguous and how they should be interpreted. Such manuals are relevant and discoverable.

      C.      **Defendants' Organizational Documents Are Relevant and Not Burdensome**

Plaintiff made clear to both Twin City and Arch during its respective meet and confer calls that it is merely seeking organizational charts, or similar documents (to the extent they exist) of the relevant departments or divisions in place when the Excess Policies were issued and the *Garber* claim was handled. Nevertheless, both Defendants refused, claiming such documents were irrelevant and/or burdensome to produce. They are neither. These documents are clearly relevant to potential witnesses in this case, and should consist of only a couple of pages each, and refusing to compel production now will force Plaintiff to inquire as to additional names of employees at depositions and then seek supplemental documents and depositions in response to those answers. *See, e.g.*, *Cunningham v. Standard Fire Ins. Co.*, 2008 WL 2902621, at *2 (D. Colo. July 24, 2008) (ordering production of organizational chart of insurer's claims department that was sought for depositions, rejecting the insurer's argument that documents were irrelevant).

For the reasons stated above, Plaintiff respectfully requests that the Court grant, in full, its motion to compel the production of documents.

                                        Respectfully submitted,

                                        By: s/ Adam S. Ziffer

                                        Adam S. Ziffer

cc: All counsel of record (via ECF)