**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PHARMACIA CORPORATION N/K/A PFIZER INC., | ) ) ) |
| Plaintiff, | ) C.A. No. 2:18-cv-00510-ES-MAH ) |
| v. | ) **DEFENDANTS' LOCAL RULE 56.1** ) **COUNTER-STATEMENT IN RESPONSE** |
| ARCH SPECIALTY INSURANCE COMPANY and TWIN CITY FIRE INSURANCE COMPANY, | ) **TO PLAINTIFF'S STATEMENT OF** ) **FACTS** ) ) **RETURN DATE: SEPTEMBER 4, 2019** |
| Defendants. | ) ) **ORAL ARGUMENT REQUESTED** |

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Civil Rule 56.1, Defendants Arch Specialty Insurance Company ("Arch") and Twin City Fire Insurance Company ("Twin City") (jointly "Insurers"), submit the following Counterstatement to the Statement of Undisputed Material Facts submitted by Plaintiff Pharmacia Corporation ("Pharmacia") n/k/a Pfizer Inc. ("Pfizer") in Support of its Motion for Summary Judgment.

A.     **The Parties, D&O Policies And Relevant Policy Provisions**

1.     In 2002, Pharmacia was a pharmaceutical company incorporated in Delaware with its principal place of business in Peapack, New Jersey. Pls. Ex. 1 at ARC14751.[1]

**RESPONSE**: Undisputed.

2.     For the 2002-2003 policy period, Pharmacia purchased $200 million in D&O coverage in 12 layers of insurance (the "2002-2003 D&O Tower") that, with certain exceptions, all follow the same scope of coverage as the policy issued by the primary insurer,

---

[1] Citations to "Pls. Ex." [or "PX"] are to exhibits to the Declaration of Robin L. Cohen, dated June 28, 2019 [D.E. #91-2].

1

National Union Fire Insurance Co. of Pittsburgh, Pa. (the "National Union Policy"). Jt. Exs. 1-11.[2]

 **RESPONSE**: Undisputed insofar as the 2002-2003 D&O Tower Policies generally follow the same scope of D&O coverage as the policy issued by the primary insurer, the National Union Policy, subject to each policy's own terms and conditions.  However, Arch and Twin City state that the terms of the Arch Policy and Twin City Policy speak for themselves and must be considered in the context of the respective policies.  Arch and Twin City respectfully refer the Court to the Arch Policy and the Twin City Policy for the true and complete content thereof. *See* Jt. Exs. 10-11.

 3. Above the previous year's total limit of $105 million, Pharmacia secured $95 million in additional coverage from several new carriers on the program, including the first three up the tower: Allied World Assurance Company ("AWAC"), which issued sixth-excess layer Policy No. C000875 (the "AWAC Policy"), with limits of $25 million excess of $105 million; Arch, which issued seventh-layer excess Policy No. 12DOX0520500 (the "Arch Policy") with limits of $10 million excess of $130 million; and Twin City, which issued eighth-excess layer Policy No. DA 0211966-02 (the "Twin City Policy"; together with the Arch Policy, the "Excess Policies") with limits of $10 million excess of $140 million. Jt. Exs. 9-11.

---

[2] Citations to "Jt. Ex." [or "JX"] are to Joint Exhibits stipulated to by all parties to this Action and filed by Defendants on June 28, 2019 [D.E. #88-10].

**RESPONSE**: Undisputed.

4.      As part of the underwriting process in May and June 2002, the proposed

carriers coordinated with, and received information and presentations from, Pharmacia's

broker Aon Northeast Risk Services ("Aon") and Pharmacia's then-Chief Financial Officer

Christopher Coughlin. Pls. Exs. 2, 3.

**RESPONSE**: Undisputed.

5.      As part of this analysis, underwriters were provided with, and would have

reviewed, extensive documentation on Pharmacia's business transactions, products, financial

outlook, current litigations or potential claims and liabilities, and news reports regarding the

same. *Id*; Pls. Ex. 4; Pls. Ex. 5 at 115:6-9, 125:6-9, 184:16-23.

**RESPONSE**: Undisputed insofar as underwriters were provided with, and would have

reviewed, documentation on Pharmacia's business transactions, products, financial outlook,

current litigations or potential claims and liabilities, and news reports regarding the same.

Whether the information was "extensive" is Pfizer's subjective characterization and is not a

fact (let alone a material fact), and the Insurers dispute that the cited evidence reflects that the

prospective insurers receiving "extensive" information about prior litigations, for example.

Furthermore, the statement in Paragraph 5 is not material to the issues presented in

Pharmacia's Motion for Summary Judgment.

6.      As part of the 2002-2003 program, Pharmacia completed renewal

applications and questionnaires for its primary coverage with National Union and first-two

excess carriers, Zurich American Insurance and Continental Casualty Company. Pls. Ex. 6;

*id.* at PFIGARB33781.

**RESPONSE**: Undisputed.

7.    In lieu of requiring a main form application and a broad exclusion for "prior

acts," the new excess carriers on the D&O Tower—including Arch and Twin City—requested

a warranty statement and a pending and prior litigation exclusion. Pls. Ex. 7 at

PFIGARB33821.

**RESPONSE**: Undisputed.

8.    Pharmacia's then-CEO Fred Hassan and Mr. Coughlin executed the

following letter, dated August 29, 2002:

### Directors & Officers Liability Policy

> No person for whom this insurance is intended has any knowledge or information of any act, error, omission, fact or circumstance that may give rise to a claim that may fall within the scope of the proposed insurance.
>
> It is agreed that any claim based upon, arising from, or in any way related to any act, error, omission, fact or circumstance of which any such person has knowledge or information will be excluded from coverage under the proposed insurance.

Jt. Ex. 12 (the "Warranty Letter").

**RESPONSE**: Undisputed.  However, the Warranty Letter speaks for itself.  Arch and

Twin City respectfully refer the Court to the Warranty Letter for the true and complete contents

thereof.  *See* Jt. Ex. 12.

9.    The new excess carriers' pending and prior litigation exclusions

("PPL Exclusions") were given the date of the beginning of the policy period. The Arch Policy

PPL Exclusion provides, in relevant part, that:

4

1. The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

a. any litigation . . . against any **Insured** occurring prior to, or pending as of, September 1, 2002;

b. any subsequent litigation . . . against any **Insured** arising from or based on any matter alleged in such prior or pending litigation. . . .; or

c. any **Wrongful Act** which gave rise to such prior or pending litigation . . . against any **Insured**, or any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described above, constitute **Interrelated Wrongful Acts**.

2. "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3. "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

Jt. Ex. 10 at PFIGARB2706.

**RESPONSE**: Undisputed.  However, the Arch Policy speaks for itself.  Arch and Twin City respectfully refer the Court to the Arch policy for the true and complete contents thereof.

10.    Twin City's PPL Exclusion provides that:

Underwriters shall not be liable to make any payment for loss in connection with any claim made against any Insured:

1. arising from any litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured occurring prior to, or pending as of, 9/01/02, of which any Insured had received notice or otherwise had knowledge as of such date;

2. arising from any subsequent litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured arising from, or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured; or

3. arising from any act of an Insured which gave rise to such prior or pending litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured.

Jt. Ex. 11 at PFIGARB2560.

**RESPONSE**: Undisputed.  However, the Twin City Policy speaks for itself.  Arch and Twin City respectfully refer the Court to the Twin City Policy for the true and complete contents thereof.

11.    The Excess Policies each provide when it is triggered for coverage based on underlying exhaustion. The Arch Policy provides that:

The insurance coverage afforded by this Policy shall apply only after exhaustion of the Underlying Limit solely as a result of actual payment, in legal currency, under the Underlying Insurance in connection with Claim(s). . . .

Jt. Ex. 10 at PFIGARB2702.

**RESPONSE**: Undisputed.  However, the Arch Policy speaks for itself.  Arch and Twin City respectfully refer the Court to the Arch policy for the true and complete contents thereof.

12.    The Twin City Policy provides:

It is expressly agreed that liability for any loss shall attach to [Twin City] only after the Primary and Underlying Excess Insurers shall have duly admitted liability and shall have paid the full amount of their respective liability. . . .

Jt. Ex. 11 at PFIGARB2555.

**RESPONSE**: Undisputed.  However, the Twin City Policy speaks for itself.  Arch and Twin City respectfully refer the Court to the Twin City policy for the true and complete contents thereof.

B.      **The *Garber* Action**

13.     On April 7, 2003, eight months after policy issuance, Pharmacia shareholders

filed the action *Robert L. Garber v. Pharmacia Corp., et al.*, No. 031519 (AET) (D.N.J.),

later consolidated and captioned *Alaska Electrical Pension Fund, et al. v. Pharmacia Corp.,*

*et al.*, No. 03-1519 (AET) (D.N.J.) (the "*Garber* Action"), against Pharmacia and three

executives (including Mr. Hassan). Jt. Ex. 16.

**RESPONSE**: Undisputed.

14.     The *Garber* Action Consolidated Complaint (the "Complaint") was filed on

or about October 27, 2003. Jt. Ex. 17.

**RESPONSE**: Undisputed.

15.     On April 16, 2003 Pharmacia merged with Pfizer. Pls. Ex. 8; Pls. Ex. 9 at

PFIGARB22308.

**RESPONSE**: Undisputed.  However, the statement in Paragraph 15 is incomplete.

The merger between Pfizer and Pharmacia was announced in July of 2002 and closed on

April 16, 2003.  *See* Compl. D.E.1, at ¶7.

16.     The *Garber* Action was "brought on behalf of all those who purchased

Pharmacia" securities between April 17, 2000 and May 31, 2002. Jt. Ex. 17 ¶ 1.

**RESPONSE**: Undisputed.  However, the Consolidated Complaint for Violation of

the Federal Securities Laws filed in *Garber* on October 27, 2003 speaks for itself.  Arch

and Twin City respectfully refer the Court to the Consolidated *Garber* Complaint for the true and complete contents thereof. *See* Jt. Ex. 17.

17.    The *Garber* Action Complaint alleged that Pharmacia commissioned a clinical drug study called Celecoxib Long-Term Arthritis Safety Study (the "CLASS Study") to compare the gastrointestinal (GI) side effects of Celebrex versus ibuprofen or diclofenac with the principal aim of getting the Food and Drug Administration ("FDA") to remove Celebrex's GI warning label. *Id.* ¶ 4.

**RESPONSE**: Undisputed. However, the Consolidated Complaint for Violation of the Federal Securities Laws filed in *Garber* on October 27, 2003 speaks for itself. Arch and Twin City respectfully refer the Court to the Consolidated *Garber* Complaint for the true and complete contents thereof. *See* Jt. Ex. 17.

18.    The *Garber* plaintiffs claimed Pharmacia misrepresented the Study's results to investors and financial analysts alike by only reporting the trial's first six months instead of the Study's results for the original endpoints of twelve and fifteen months, which allegedly did not demonstrate that Celebrex had a superior GI safety profile than the other two drugs. *Id.* ¶¶ 5-6.

**RESPONSE**: Undisputed. However, the Consolidated Complaint for Violation of the Federal Securities Laws filed in *Garber* on October 27, 2003 speaks for itself. Arch and Twin City respectfully refer the Court to the Consolidated *Garber* Complaint for the true and complete contents thereof. *See* Jt. Ex. 17.

19.     The *Garber* plaintiffs claimed that, "[w]ith the investing public unaware of the truth," the Pharmacia defendants' "announcements that Celebrex had been proven to cause fewer GI side effects buoyed Pharmacia's stock price." *Id.* ¶ 7.

**RESPONSE**: Undisputed.  However, the Consolidated Complaint for Violation of the Federal Securities Laws filed in *Garber* on October 27, 2003 speaks for itself.  Arch and Twin City respectfully refer the Court to the Consolidated *Garber* Complaint for the true and complete contents thereof.  *See* Jt. Ex. 17.

20.     The *Garber* plaintiffs alleged the truth came to light on June 1, 2002, when the British Medical Journal ("BMJ") published an article concluding that, "based on the CLASS study data" that had not been originally published, Celebrex provided no GI advantage over ibuprofen. *See id.* ¶ 11.

**RESPONSE**: Undisputed.  However, the Consolidated Complaint for Violation of the Federal Securities Laws filed in *Garber* on October 27, 2003 speaks for itself.  Arch and Twin City respectfully refer the Court to the Consolidated *Garber* Complaint for the true and complete contents thereof.  *See* Jt. Ex. 17.

21.     The *Garber* Plaintiffs claimed defendants' conduct resulted in an artificially inflated share price for Pharmacia's stock, and sought claims for violations of federal securities laws. *See id.* ¶¶ 80-89.

**RESPONSE**: Undisputed.  However, the Consolidated Complaint for Violation of the Federal Securities Laws filed in *Garber* on October 27, 2003 speaks for itself.  Arch and Twin City respectfully refer the Court to the Consolidated *Garber* Complaint for the true and complete contents thereof.  *See* Jt. Ex. 17.

22.      In October 2012, Pharmacia moved for preliminary approval of a $164 million settlement of *Garber*, which was approved with the case's dismissal in January 2013. Jt. Ex. 18; Pls. Ex. 10.

  **RESPONSE**: Undisputed.

23.      Pharmacia incurred approximately $207 million in total defense and indemnity costs for *Garber*. *Id.*; Pls. Ex. 11 at PFIGARB1320-39 (showing defense costs).

  **RESPONSE**: Undisputed.

**C.**    **Pharmacia's *Garber* Claim and Insurers' Coverage Denial**

24.      On or about April 14, 2003, Pharmacia gave notice of the *Garber* Action to its insurers under the 2002-2003 D&O Tower (the "*Garber* Claim"). Pls. Ex. 12.

  **RESPONSE**: Undisputed.

25.      National Union accepted coverage for the *Garber* Claim and began paying the defense costs above the retention. Pls. Ex. 13.

  **RESPONSE**: Undisputed that National Union began paying the defense costs above the retention; however, the Insurers dispute that National Union "accepted coverage." To

the best of the Insurers' knowledge, National Union paid defense costs under a reservation

of rights. DX42 at PFIGARB000014 – 15.[3]

    26.    During the *Garber* Action, Pharmacia held calls with the 2002-2003 D&O

Tower to provide them with status updates in the *Garber* Action. *See* Pls. Ex. 14 at ARC2;

Pls. Ex.15 at ARC15454.

    **RESPONSE**: Undisputed.

    27.    National Union eventually exhausted its coverage in 2011, after which time

first-layer excess insurer Zurich took over Pharmacia's defense in *Garber*. *See* Pls. Ex. 16 at

TC1148.

    **RESPONSE**: Undisputed to the extent that the first-layer excess insurer Zurich

eventually took over handling Pharmacia's defense.  Disputed to the extent Pharmacia cites to

the Claim Summary Report completed by Patrick Maloney for the truth of the matter.  The

Claims Summary Report does not purport to make a coverage determination but rather is an

internal running log of the information conveyed to Twin City by the Insureds and their

counsel.  *See* PX16 at TC0001148 ("***Pharmacia reports that t**he National Union primary

policy ($25M x $10M SIR) has been exhausted by payment of defense expenses.  Zurich

($15M x 25M) has assumed role of primary") (emphasis added).

---

[3] "DX" citations 1-44 are to the exhibits attached to the Declaration of Gabriela Richeimer dated June 28, 2019 (D.E. #88-8).  "DX" citations 45 and above are to the exhibits attached to the Supplemental Declaration of Gabriela Richeimer dated August 14, 2019 and filed contemporaneously with this counter-statement.

28.     By January 2006, Arch already had grown dissatisfied with Pharmacia's "excessive defense costs" for *Garber*, and its request that insurers not use materials it shared from *Garber* to deny coverage, which Arch called "a deal breaker." Pls. Ex. 15 at ARC15455.

**RESPONSE**: Undisputed that, upon learning of the amount of claimed defense costs for the first time, and without the benefit of the cooperation from Pharmacia in providing defense cost statements and budgets, in an internal document, Arch characterized Pharmacia's defense costs as "excessive," and stated that it would be a "deal breaker" to sign an agreement which precluded Arch from using materials obtained for coverage purposes.  However, the document speaks for itself, and Arch respectfully refers the court to Pls. Ex. 15 at ARC15455 for its true and complete contents.

29.     Arch retained counsel, who denied coverage on August 11, 2006, stating they had "discovered the existence" of three consumer lawsuits against Pharmacia involving Celebrex that fell under the PPL and Warranty Letter Exclusions.[4] Pls. Ex. 17 at PFIGARB955.

**RESPONSE**: Undisputed that, by letter dated August 11, 2006, upon discovering the Consumer Actions, Arch's coverage counsel denied coverage, including because the PPL Exclusion and the Warranty preclude coverage for *Garber* based on the existence of

---

[4]  The three consumer lawsuits are *Cain v. Merck & Co., et al.*, No. 1:01-CV-03441 (E.D.N.Y. filed May 29, 2001) ("*Cain* Action"); *Leonard v. Pharmacia Corp., et al.*, No. 3:01-CV-04104 (D.N.J. filed Aug. 27, 2001) ("*Leonard* Action"); and *Astin v. Pharmacia Corp., et al.*, No. L-1322-01 (N.J. Super. Ct., Law Div. filed Aug. 27, 2001) ("*Astin* Action") (collectively, the "Consumer Class Actions").

the Consumer Actions.  However, the document speaks for itself, and Arch respectfully

refers the court to Pls. Ex. 17 at PFIGARB955 for its true and complete contents.

30.     According to Arch's denial letter, the Consumer Class Actions had "a common

nexus of facts" with *Garber*, and "by virtue of the [Actions], the Insureds, as of August 29,

2002, had notice of the acts . . . that form the basis of the Garber" (Pls. Ex. 17)—even though

*Leonard* and *Astin* had been dismissed for years. Pls. Ex. 18; Pls. Ex. 1 at ARC14761.

**RESPONSE**: Disputed.  Paragraph 30 is vague and misleading.  It attempts to draw a

distinction between *Garber* and the Consumer Class Actions because of a supposed distance in

time, when in reality *Garber* was filed on April 7, 2003 while the *Leonard* and *Cain* actions

were filed on August 27, 2001 and May 29, 2001 respectively. *See* JX16 (*Garber* Complaint);

JX14 (*Leonard* Complaint); DX10 (*Cain* Docket).  Insurers also dispute that *Leonard* and *Astin*

had been dismissed "for years."  The parties in *Astin* entered a consent order to dismiss on

January 4, 2002.  *See* DX45 at PFIGARB000872 – 873.  The parties in *Leonard* entered a

stipulation and order dismissing the class allegations on November 19, 2002 and the final order

dismissing the action as settled was entered on January 31, 2003, both *after* the Arch and Twin

City Policy Periods incepted on September 1, 2002.  *See* PX18 at #29 – 30 (*Leonard* Docket);

JX10 at Declarations Item 2 Policy Period (Arch Policy) ("Policy Period: From September 1,

2002 at 12:01 a.m. … To: September 1, 2003 at 12:01 a.m."); JX11 at Declarations Item B

Policy Period (Twin City Policy) ("Policy Period: From 12:01 a.m. on 9/01/02 … To 12:01

a.m. on 9/01/03").  In any event, the timing of the dismissal is not material to Arch and Twin

City's motion for summary judgment; rather, the material facts concern the common facts alleged in *Garber* and the Consumer Actions.

31.     Arch did not even have the *Astin* complaint when it denied coverage on August 11, 2006. Pls. Ex. 17; Pls. Ex. 19 at 153:12-154:8.

**RESPONSE**:  Undisputed.  However, Arch did not need a copy of the *Astin* complaint in order to deny coverage, and Arch did have a copy of the *Leonard* and *Cain* complaints as well as a description of *Astin* from Pharmacia's Form 10-Q.  Arch respectfully refers the court to Pls. Ex. 17 for its true and complete contents.

32.     Twin City reserved its rights under the Warranty Letter (Pls. Ex. 20 at TC418)—as was standard practice, Pls. Ex. 21 at 72:12-73:2—but did not deny coverage until nine years later. Pls. Ex. 22 at TC72.

**RESPONSE**: Undisputed; however, the assertion is immaterial and misleading.  As Pfizer is aware, the *Garber* litigation stretched over many years and through appeal; and Twin City issued the coverage letter Pharmacia refers to in Paragraph 32 on March 20, 2012, not long before *Garber* settled on October 5, 2012.  *See* PX 22 at TC72 (Twin City Coverage Letter); JX18 (Stipulation of Settlement in *Alaska Electrical Pension Fund, et al. v. Pharmacia Corp., et al*., No. 03-1519 (D.N.J.)).  In other words, Twin City issued its denial letter at the appropriate point in time once Pfizer had indicated that it was contemplating a settlement that could reach the Twin City layer.

33.    Twin City's claims handler, Patrick Maloney, monitored the *Garber* Action through discovery and dismissal at the trial court level, updating regularly his claim status reports ("CSR") that evaluated both the *Garber* Action and Twin City's liability for the same, including that the claim was considered "$0W('weak')" with respect to Twin City's exposure. *See, e.g.*, Pls. Exs. 16, 23, 24 Pls. Ex. 25 at 86:24-87:25.

**RESPONSE**: Undisputed; however, to the extent Pharmacia cites to the Claim Summary Report completed by Patrick Maloney for the truth, the Claims Summary Report does not purport to make a coverage determination but rather is an internal running log of the information conveyed to Twin City claims personnel by the Insureds and their counsel (among others).  *See* PX16 at TC0001148 ("Pharmacia reports that…").  Twin City does not dispute the citation to the Deposition of Patrick Maloney; however, the excerpt in Paragraph 33 is incomplete and misleading.  In describing what "$0W" in the Claims Summary Report meant, Mr. Maloney stated: "Yes, that's sort of a shorthand code that we assign to 10b-5s as to what in our opinion at that stage of the process what do we think our exposure is and how strong our estimate is…The "W" means weak. …Well, it means that we view our exposure as zero but there is a possibility either that there might be a settlement for less than policy limits.  There might be – at this stage I don't believe that a denial had issued but if there was a denial issued, there is the potential for coverage litigation and when you're in litigation, there is always the possibility that the judge will not agree with us.  So that we cannot say with certainty that this is a zero.  We believe it is a zero but we sort of give it an indicator

15

that we're not, you know, we're not going to swear to this on our mother's grave."  PX16 at
87:1-25.

34.    On October 3, 2011, Pharmacia's defense counsel held a presentation for
insurers to encourage participation in a possibly significant settlement at mediation. Pls. Ex.
26.

**RESPONSE**: Undisputed.

35.    On October 19, 2011, Twin City learned that underlying insurer AWAC's
lawyers found a copy of the long-dismissed *Leonard* Action complaint, and had used it as
the basis to deny coverage. Pls. Ex. 27 at TC513.

**RESPONSE**: Undisputed.

36.    On October 27, 2011, Twin City asked Pharmacia for the emails cited at the
October 3 meeting in which Pharmacia researchers discussed in 2001 the use of the 6-month
results from CLASS. Pls. Ex. 28 at TC88.

**RESPONSE**: Undisputed.

37.    On March 20, 2012, Mr. Maloney denied coverage for *Garber* based on his
analysis of the wrong policy that wrongly included a "Prior Acts" exclusion, which Mr.
Maloney even cited to exclude coverage. Pls. Ex. 22; Pls. Ex. 25 at 141:12-143:5.

**RESPONSE**: Twin City disputes the characterizations contained in Paragraph 37.  As
clarification, Twin City states that Mr. Maloney's March 20, 2012 letter cited to a draft
version of the Twin City Policy, which contained (among other policy provisions) a Prior

Acts Exclusion.  In the years between policy issuance and March 2012, all underwriters involved with underwriting the Twin City Policy had left the company, and Mr. Maloney unknowingly originally reviewed a draft version of the policy containing the deleted Prior Acts Exclusion.  As Pfizer is aware, Twin City has not raised any defenses based on a Prior Acts exclusion in this coverage litigation.  *See* D.E.21 (Defendant Twin City Fire Insurance Company's Answer and Affirmative Defenses to Complaint).

38.     Twin City's March 20, 2012 denial letter also denied coverage under (1) the PPL Exclusion based on *Leonard*, and (2) the Warranty Letter based on articles on CLASS and the above-referenced internal Pharmacia emails. Pls. Ex. 22.

**RESPONSE**: Undisputed.  However, Twin City's March 20, 2012 coverage letter speaks for itself, and Twin City refers the Court to the entire letter for its contents.

39.     Following National Union's payment of the full limits of the primary policy towards defense of the *Garber* Action, and the court's final order approving the settlement, all seven insurers whose policies underlie Arch's and Twin City's Policies paid Pharmacia their policies' limits for *Garber*, including AWAC, which had the same exact defenses as Insurers here, but withdrew its denial and paid its full limit. Pls. Exs. 29, 30; Pls. Ex. 24 at TC1120.

**RESPONSE**: Undisputed that after Pfizer settled with National Union and related entities, such as Starr, for payment of $25 million on terms set forth in the settlement agreement; and, after the court's final order approving settlement, all seven insurers whose policies underlie Arch's and Twin City's Policies paid Pharmacia their policies' limits for

*Garber*.  Also undisputed that AWAC had similar defenses as Insurers here (not the "same exact" due to variations in policy language) and paid $25 million to Pfizer on terms set forth in the settlement agreement between AWAC and Pfizer. The Insurers dispute the remaining assertions in Paragraph 39 to the extent inconsistent with the settlement agreements: (1) between National Union and related entities and Pfizer; and (2) between AWAC and Pfizer. Furthermore, to the extent Pharmacia cites to the Claim Summary Report completed by Patrick Maloney for the truth, the Claims Summary Report does not purport to make a coverage determination but rather is an internal running log of the information conveyed to Twin City by the Insureds and their counsel (among others).  PX24 at TC1121 ("However, on June 9, 2015 *we received a letter from Pfizer/Pharmacia's coverage counsel* advising that AWAC has paid its $25m limit toward the settlement.") (emphasis added).

40.     Pursuant to an Alternative Dispute Resolution ("ADR") Provision in the National Union Policy, which required binding arbitration or mediation, on September 14, 2017, the parties conducted mediation, which was unsuccessful.

**RESPONSE**: Undisputed.

41.     After the ADR Provision's 120-day waiting period for filing suit expired, Pharmacia filed this lawsuit. Dkt. No. 1.

**RESPONSE**: Undisputed.

### D.   **Additional Material Facts**

42.     The Excess Policies were issued to Pharmacia at its headquarters in Peapack, where its risk management and executives were located. Pls. Ex. 7 at PFIGARB33821, Jt. Exs. 10, 11.

**RESPONSE**: Undisputed that Pharmacia's address listed on the Excess Policies is Peapack, New Jersey, where its risk management and executives were located before Pharmacia was absorbed into Pfizer; however, the transmittal letter for the Twin City Policy reflects that it in fact was delivered to Pfizer's broker (not Pharmacia's broker) located in New York City.  DX46.  Likewise, the declarations page of the Twin City Policy reflects that it was counter-signed in December 2004 and reflects a March New York date stamp of January 2005.  JX11 at PFIGARB002549.  The same is true of the Arch Policy.  JX10 at PFIGARB002699—2701.

43.     The National Union Policy includes a New Jersey surcharge. Pls. Ex. 32 at ARC14539.

**RESPONSE**: Undisputed.

44.    Twin City's CSRs for the Garber Claim state New Jersey as the "Insured['s] Residence," and list "New Jersey" as the location of the accident/loss. Pls. Ex. 23 at TC80; Pls. Ex. 33 at TC2.

**RESPONSE**: Undisputed.

45.     The Insurers follow form to the National Union Policy's ADR provision (*e.g.*, Jt. Ex. 2 at ARC15408; Pls. Ex. 25 at 221:6-11), which provides that all disputes must be submitted for arbitration or mediation under Delaware law, and willingly participated in the latter before litigating this action in this Court. Dkt. No. 1 ¶¶ 47-48.

**RESPONSE**: Undisputed that the Insurers follow form to the National Union Policy's ADR provision; however, that provision provides only that "the mediator or arbitrators shall [] give due consideration to the general principles of the law of the state where the Named Entity is incorporated in the construction or interpretation of the provisions of this policy." JX2 at ARC15408.

46.     Neither Pharmacia, Arch nor Twin City are citizens of New York or have a principal place of business in New York.

**RESPONSE**: Disputed.  There is no citation for the statement in Paragraph 45.  The Insurers do not dispute that they are not citizens of New York (although both do business in New York).  "Pharmacia" by the time a coverage dispute had arisen with the Insurers and when this lawsuit was filed was part of Pfizer, which is a citizen of New York. *See, e.g.*, DX36 (Pfizer's Form 10-K stating that Pfizer is incorporated in Delaware and has New York as the address of its principal executive offices).

47.     Arch and Twin City have documentation—copies of checks and wire transfers—showing that (1) the exact amount of each underlying insurer's policy limit was paid (2) under that insurer's 2002-2003 policy (3) for Garber. Pls. Exs. 29, 30.

**RESPONSE**: Undisputed that Arch and Twin City have documentation—copies of checks and wire transfers—showing that the exact amount of each underlying insurer's policy limit was paid. The Insurers dispute the characterizations contained in Paragraph 47 to the extent they are inconsistent with settlement agreements entered into between Pfizer and certain underlying insurers, including National Union and related entities such as Starr (DX42); and/or inconsistent with the checks and wires, certain of which do not provide whether they are "for *Garber*". *See, e.g.*, Plf. Ex. 29 at PFIGARB001055 – 1057 (Zurich checks); *id.* at PFIGARB001060 (XL Specialty check); *id.* at PFIGARB001061 (Lloyd's and AWAC wires).

48.     After receiving proof of the underlying limits exhaustion, Twin City reported in its internal CSR that "[a]ll underlying layers [beneath Arch] have paid their full limits" and all that was left for the Twin City Policy to attach, was Arch "exhaust[ing] their underlying limits." Pls. Ex. 24 at TC1121, 1128.

**RESPONSE**: Twin City disputes that it "receiv[ed] proof of the underlying limits exhaustion," and the document cited is not proof of same. To the extent Pharmacia cites to the Claim Summary Report completed by Patrick Maloney for the truth of the matter, the Claims Summary Report does not purport to make a coverage determination but rather is an internal running log of the information conveyed to Twin City by the Insureds and their counsel (among others).

49.     Twin City concedes that the first prong of its PPL Exclusion does not apply to *Garber*. Pls. Ex. 25 at 156:18-157:1.

**RESPONSE**: Undisputed to the extent that Twin City is not relying solely on the first prong of the PPL Exclusion.  However, the terms of the Twin City Policy speak for themselves and must be considered in the context of the entire policy.  The Insurers respectfully refer the Court to the Twin City Policy for the true and complete contents thereof. *See* Jt. Ex. 11.  *See also* PX 25 at 164:17-19 ("[T]he exclusion speaks for itself.  The – what is excluded by the exclusion is what is stated therein.").

50.     In *Garber*, the shareholders alleged that, for the class period of April 17, 2000 to May 31, 2002, defendants misled investors as to the results of the clinical CLASS Study regarding Celebrex's GI side effects, and hundreds of millions of dollars in market capitalization was lost in the days following the June 1, 2002 British Medical Journal article about Pharmacia's alleged misstatements of CLASS. Jt. Ex. 17 ¶¶ 1, 4-7, 11-12.

**RESPONSE**: Undisputed.   Arch and Twin City respectfully refer the court to the *Garber* complaint for the complete contents.  Jt. Ex. 17.

51.     The three Consumer Class Actions were brought on behalf of individuals who took and/or purchased Celebrex and Vioxx and claimed to have suffered physical injuries from a defective product or sought economic damages for Pharmacia's and other pharmaceutical company defendants' false marketing concerning the cardiovascular and GI safety of those drugs. *See* Pls. Ex. 39 ¶¶ 119; Jt. Ex. 15 ¶¶ 1-7, 22 (*Cain* plaintiffs suffered cardiac illnesses from taking

Vioxx and Celebrex, and alleged the two drugs were falsely marketed as being safer than alternative pain relievers, and that the drugs enhanced risk of blood clotting, heart attacks and other cardiovascular illnesses); Jt. Ex 14 ¶¶ 21-26 (*Leonard* plaintiffs alleging Pharmacia, Pfizer, and Searle engaged in a fraudulent effort to obtain FDA approval for Celebrex and misled the public in advertisements regarding the GI and cardiovascular health risks of Celebrex in order to charge higher prices than alternative drugs); Jt. Ex.13 ¶¶ 20-25 (*Astin*) (same).

     **RESPONSE**: Undisputed that the three Consumer Class Actions were brought on behalf of individuals who took and/or purchased Celebrex and Vioxx and who sought economic damages for Pharmacia's and other pharmaceutical company defendants' false marketing concerning the cardiovascular and GI safety of those drugs.  The Insurers dispute that the plaintiffs in these actions "claimed to have suffered physical injuries"—although two of the named plaintiffs in *Cain* alleged cardiac illnesses as a result of taking Vioxx and Celebrex, the complaint does not allege that all named plaintiffs or that all putative class members suffered physical injuries, and the damages sought were economic in nature.  In any event, the *Leonard*, *Cain*, and *Astin* Complaints speak for themselves.  Arch and Twin City respectfully refer the Court to the Complaints for the true and complete contents thereof.  *See* JX13-15.

     52.     The Consumer Class Actions do not allege D&O or securities claims, anything about Pharmacia's stock performance, or any misconduct by Pharmacia executives.

**RESPONSE**: Undisputed.  However, the *Leonard*, *Cain*, and *Astin* Complaints speak for themselves.  Arch and Twin City respectfully refer the Court to the Complaints for the true and complete contents thereof.  *See* JX13-15.

53.     The National Union Policy states that (1) the persons entitled to coverage are directors and officers against whom a D&O claim has been brought, whereas (2) entity coverage, is limited: an entity or "**Organization**" is considered an "**Insured**" entitled to coverage "only with respect to a **Securities Claim**." Jt. Ex. 2 at ARC15397.

**RESPONSE**: Disputed insofar as Paragraph 53 is a characterization of the National Union Policy and not a statement of its terms.  The Insurers do not dispute the definitions of **Insured Person** (which includes directors, officers and employees) and **Organization** as stated in the National Union Policy.  In any event, the National Union Policy speaks for itself. Arch and Twin City respectfully refer the Court to the National Union Policy for the true and complete contents thereof.  *See* JX2.

54.     The Twin City Policy does not independently define "Insured," so the definition of that term in the Twin City Policy is adopted and incorporated from the National Union Policy. Pls. Ex. 25 at 149:16-18.

**RESPONSE**: Disputed.  To begin with, the testimony to which Pharmacia refers addresses the definition of "Loss" not "Insured. PX25 at 149:12-18 ("Q. … When it's talking about "loss" and "any claim", it may not be capitalized but it's taking the word as they mean from the primary or underlying policies, correct?" A. Yes, if those terms are defined in an

24

underlying policy and there is nothing contrary to it in our policy, we would follow the definition.").  Furthermore, the Twin City Policy defines "Insured" as "Pharmacia Corporation."  *See* JX 11, at PFIGARB002549 (Declarations Item A).  In any event, the Twin City Policy speaks for itself.  Arch and Twin City respectfully refer the Court to the Twin City Policy for the true and complete contents thereof.  *See* JX11.

55.     Insurers' expert stated that the Exclusion here is designed to exclude only those D&O "claims that are already brewing based on known events."  Pls. Ex. 37 at 184:7-22; Pls. Ex. 38 ¶ 53.

**RESPONSE**: Disputed.  Pharmacia's excerpt in Paragraph 55 is incomplete and misleading.  In the excerpt, Insurers' expert is discussing the Warranty not the Exclusion.  *See* PX37 at 184:7-22; PX38 ¶ 53.

56.     Insurers' expert stated that the articles discussing the CLASS Study to which Defendants point provide no "evidence of knowledge of a claim."  Pls. Ex. 37 at 106:3-8; *see also id.* at 103:23-104:1 ("This doesn't have evidence for a D&O claim.").

**RESPONSE**: Disputed.  The statement in Paragraph 56 is inaccurate and misleading.  Arch and Twin City's expert stated: "Not exactly.  I would say what I said before that this is evidence of acts, errors or omissions that may give rise to a claim and I agree with the preamble as I did a second ago."  PX37 at 106:8-13.

57.      On June 7, 2002, the FDA approved labeling changes for Celebrex" based on the "valuable safety data from CLASS" showing that higher doses of Celebrex did not increase

rates of serious cardiovascular events as compared to lower doses of ibuprofen or diclofenac. Pls. Ex. 46 at PFIGARB475-76.

**RESPONSE**: Undisputed, however the excerpt in Paragraph 57 is incomplete and misleading.  The "FDA agreed with its Advisory Committee recommendations of February 7, 2001 that CLASS did not show a safety advantage in upper gastrointestinal (GI) events for Celebrex compared to either ibuprofen or diclofenac. … The agency concluded that the drug labeling for Celebrex should continue to include the standard warning for doctors and their patients about risks associated with all NSAIDS, including risks of GI ulceration, bleeding and perforation."  PX46 at PFIGARB475-76.

58.     Aon's May 2002 presentation to the underwriters stated that "[t]he overall consensus of Wall street analysis currently, is a buy on [Pharmacia] stock." Pls. Ex. 2 at ARC14725.

**RESPONSE**: Undisputed.

**DEFENDANTS' SUPPLEMENTAL COUNTERSTATEMENTS TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Insurers incorporate by reference, as if set forth in full herein, each and every one of the facts set forth in Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, submitted on June 28, 2019.  D.E. #88-1.  In addition, Insurers state as follows:

59.     The Arch Policy defines "**Insured(s)**" as "any person(s) or entity(ies) that are entitled to coverage under the **Followed Policy** [National Union] at its inception."  JX10 at PFIGARB002702 (Section III(B)).

60.     The Twin City Policy defines "**Insured**" as "Pharmacia Corporation" JX11 at PFIGARB002549 (Declarations Item A).

61.     In an article by Pfizer's expert, Larry Goanos, *What is a Warranty Letter, and Why is My Client Being Asked to Sign One*, AmWINS Group, Inc., Mr. Goanos cautioned that "might" give rise to a claim is very broad warranty language which should not hastily be signed by an insured because "almost anything might give rise to a claim".  DX46.

62.     In *Pfizer Inc. v. Arch Ins. Co.*, CVN18C01310PRWCCLD, 2019 WL 3306043, at *7 (Del. Super. Ct. July 23, 2019) (the "Morabito Coverage Action"), Pfizer stated in its Motion for Summary Judgment that: the "more (and only) reasonable interpretation of the Exclusion is that it would only preclude coverage for any further litigation arising out of or sharing a *common nexus* with Garber—that is, further D&O litigation attributable to alleged misrepresentations regarding the "GI side effects" of Celebrex."  DX47 at 31.

63.     The fraud causes of action pled in the Consumer Actions were based, at least in part, on the class plaintiffs' allegation that Pharmacia misled the public about the GI side effects of Celebrex.  JX13 at ¶44; JX14 at ¶45; JX15 at ¶82, 85.

64.     Plaintiffs in *Garber* alleged under the count for violations of that: (b) of the 1934 Act and Rule 10b-5 thereunder that: "Defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material Facts about Celebrex. Specifically, defendants knew, or but for their reckless disregard of the truth should have known, that Celebrex did not result in a lower incidence of GI problems than comparable drugs, as defendants claimed."  JX16 at ¶81.

65.     The Second Amended Complaint in *Cain* asserts throughout that Celebrex lacked adequate safety warnings *generally* (thus bringing in the GI safety issues), and that

27

Pharmacia grossly exaggerated the overall safety and efficacy of Celebrex relative to other NSAIDs to justify its exponentially higher cost.  JX15 at ¶¶4–5, 13–14, 19–21.

66.     The *Cain* Action asserts that Pharmacia was unjustly enriched by overcharging consumers for Celebrex ostensibly based on its superiority over traditional NSAIDs.  Part of Celebrex's claimed superiority was the GI safety profile falsely touted in connection with the CLASS Study.  JX15 at ¶4-5, 79-81.

67.     The Leonard and Astin Actions allege that Pharmacia committed fraud under New Jersey's consumer protection statute and common law when, among other things, it "omitted, suppressed, or concealed material facts concerning the dangers and risks associated with the use of Celebrex, including, but not limited to, the risks of serious damage from ***ulcers***" while at the same time Pharmacia  "knew or should have known, and would have known, had appropriate testing been done, that the use of Celebrex caused serious side effects ***including ulcers***, especially when used for extended periods of time."  JX13 at ¶44; JX14 at ¶ 45 (emphasis added).  Further, that Pharmacia did so because "the prospect of huge future profits outweighed health and safety issues, all to the detriment of Plaintiff and the other members of the Class."  *Id.*

68.     The "prior and pending litigation exclusions" in the primary National Union policy and in the Allied World policy each uses a narrower version of the exclusion requiring that the current litigation arise from "the same or essentially the same facts as alleged in such pending or prior litigation."  JX2 at ARC0015399 (National Union Policy Section 4(e)); JX9 at PFIGARB002544 (AWAC Pending and Prior Litigation Exclusion Endorsement No. 1).

69.     Twin City's Policy was underwritten in New York.  *See* DX6 at TC71 (Revised Binder for Twin City sent to Cynthia Beveridge and executed by Deborah Guiliano for Twin City); DX48 at 16:5-23 (Dep. of D. Guiliano) ("Q. You went to Hartford in 2000 in which

location? …A. …it was 2 Park Avenue and then we moved to 7 World Trade because I was at 7 World Trade for … 2001. … Q. So what was your first job title at Hartford? A. …underwriter.").

70.    For the Court's convenience, Insurers are attaching as DX49 a chart compiling all exhibits submitted by Insurers to this point in the briefing as well as the exhibits cited in Pfizer's original statement of facts (designate as "PX").

Dated: New York, NY
August 14, 2019

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

/s/ Erica Kerstein
Erica Kerstein, Esq. (ID No. 1879-2001)
Andrew Hamelsky, Esq.
7 The Legal Center, One River Front Plaza
1037 Raymond Blvd. Suite 230
Newark, New Jersey 07102
(201) 368-7206
Kersteine@whiteandwilliams.com
*Attorneys for Defendant*
*Arch Specialty Insurance Company*


**CLYDE & CO US LLP**

/s/ Marianne May
Marianne May, Esq. (ID No. 4703-1997)
Marianne.May@clydeco.us
200 Campus Drive, Suite 300
Newark, NJ 07932
(973) 210-6700

Douglas Mangel (admitted *pro hac vice*)
Gabriela Richeimer (admitted *pro hac vice*)
1775 Pennsylvania Ave, N.W. 4th Floor
Washington, DC 20006
(202) 747-5100
Doug.Mangel@clydeco.us
Gaby.Richeimer@clydeco.us
*Attorneys for Defendant*
*Twin City Fire Insurance Company*