**WHITE AND WILLIAMS LLP**
Erica Kerstein, Esq. (ID No. 1879-2001)
Andrew Hamelsky, Esq.
The Legal Center, One River Front Plaza
1037 Raymond Blvd. Suite 230
Newark, New Jersey 07102
(201) 368-7206
*Attorneys for Defendant*
*ARCH SPECIALTY INSURANCE COMPANY*

**CLYDE & CO US LLP**
Marianne May, Esq. (ID No. 4703-1997)
Douglas Mangel (admitted pro hac vice)
Gabriela Richeimer (admitted pro hac vice)
200 Campus Drive, Suite 300
Newark, NJ 07932
(973) 210-6700
*Attorneys for Defendant*
*TWIN CITY FIRE INSURANCE COMPANY*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
-------------------------------------------------------------------x
PHARMACIA CORPORATION N/K/A PFIZER, INC.,

                          Plaintiff,

             -against-

ARCH SPECIALTY INSURANCE COMPANY and
TWIN CITY FIRE INSURANCE COMPANY,

                        Defendants.
-------------------------------------------------------------------x

No.: 2:18-cv-00510-ES-MAH

**RETURN DATE:**
**SEPTEMBER 3, 2019**

**ORAL ARGUMENT**
**REQUESTED**

<u>**DEFENDANTS ARCH SPECIALTY INSURANCE COMPANY'S**</u>
<u>**AND TWIN CITY FIRE INSURANCE COMPANY'S**</u>
<u>**RESPONSE IN OPPOSITION TO PLAINTIFF'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

I.      INTRODUCTION ........................................................................ 1

II.     RESPONSE TO PFIZER'S STATEMENT OF FACTS ................... 4

        A.      The Pending and Prior Litigation Exclusion ........................... 4

        B.      Warranty Statement ............................................................ 7

        C.      Exhaustion ........................................................................ 8

        D.      Extraneous Issues in Pfizer's Brief ...................................... 8

III.    ARGUMENT ............................................................................ 9

        A.      New York Law Controls to the Extent a Choice of Law Analysis Is Needed ...... 9

                1.      Pharmacia Agreed to the Application of New York law in the Allied World Policy to Which the Excess Policies Follow Form ........... 9

                2.      New York Has the Most Significant Relationship to the Parties' Dispute ........... 11

        B.      The Pending and Prior Litigation Exclusions in the Policies Preclude Coverage for the Garber Action .......... 13

                1.      New Jersey and New York Courts Enforce Pending and Prior Litigation Exclusions as Written ........... 13

                2.      The Garber Action and Consumer Actions Share a Common Factual Nexus That Easily Triggers the Prior and Pending Litigation Exclusion ........... 16

                3.      The Differences Between the Garber and Consumer Actions Are Irrelevant Once the Required Factual Nexus is Established ........... 18

        C.      The Prior Knowledge Exclusion In The Warranty Statement Precludes Coverage For The Garber Action ........... 23

                1.      The Relevant Inquiry Is Objective:  Whether a Known Set of Facts "Might" Give Rise to a Claim ........... 23

                2.      Insured Persons Had Knowledge of Facts That Reasonably Could Give Rise to a Claim Under the 2002-03 D&O Tower ........... 27

        D.      Pfizer Has Not Met Its Burden Under the Insurers' Policies To Show Full Exhaustion of Underlying Limits ........... 30

                1.      This Court Should Enforce the Exhaustion Provisions Strictly as Written ........... 31

                2.      The Twin City Policy Expressly Requires Pharmacia To Show Both Underlying Claim Payments "and" that Each Underlying Insurer Admitted Liability ........... 32

                3.      Pfizer Has Not Shown That All Underlying Limits Were Actually Paid for the Garber Action ........... 34

IV.     CONCLUSION ......................................................................... 37

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abner, Herrman & Brock, Inc. v. Great Northern Insurance Co.,*
  308 F. Supp. 2d 331 (S.D.N.Y. 2004)......................................................................9

*Ali v. Federal Insurance Co.,*
  719 F.3d 83 (2d Cir. 2013)..............................................................................31

*Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's London,*
  No. 02-2075, 2004 WL 2341388 (Mass. Super. Ct. Sept. 30, 2004).........................................4

*Assicurazioni Generali, S.P.A. v. Clover,*
  195 F.3d 161 (3d Cir. 1999)..............................................................................9

*Bell v. USAA Casualty Insurance Co.,*
  Civ. No. 2008–100, 2009 WL 2524351 (D.V.I. Aug. 14, 2009) ............................................9

*Blizzard v. Federal Insurance Co.,*
  No. 05–5283, 2007 WL 675346 (E.D. Pa. Feb. 27, 2007) ...............................................9

*Carpenter Technology Corp. v. Admiral Insurance Co.,*
  800 A.2d 54 (N.J. 2002).................................................................................36

*Catlin Insurance Co. v. Flight Light Inc.,*
  A-0689-13T3, 2014 WL 3407055 (N.J. Super. Ct. App. Div. July 15, 2014).........................9

*Chem. Leaman Tank Lines, Inc. v. Aetna Casualty & Sur. Co.,*
  177 F.3d 210 (3d Cir. 1999)..............................................................................36

*Colliers Lanard & Axilbund v. Lloyds of London,*
  337 F. App'x 195 (3d Cir. 2009) .......................................................................26

*Colliers Lanard & Axilbund v. Lloyds of London,*
  458 F.3d 231 (3d Cir. 2006)..............................................................23, 24, 25, 26

*Collins v. Mary Kay, Inc.,*
  874 F.3d 176 (3d Cir. 2017)..............................................................................9

*Cushman & Wakefield, Inc. v. Illinois National Insurance Co.,*
  14 C 8725, 2018 WL 1898339 (N.D. Illinois Apr. 20, 2018)..............................................20

*Dormitory Authority of N.Y. v. Continental Casualty Co.,*
  No. 12 civ. 281, 2013 WL 840633 (S.D.N.Y. Mar. 5, 2013) ..............................................20

*Federal Insurance Co. v. Raytheon Co.*,
    426 F.3d 491 (1st Cir. 2005) ........................................................................... 11, 21

*Flomerfelt v. Cardiello*,
    997 A.2d 991 (N.J. 2010) ........................................................................................ 31

*Forest Labs., Inc. v. Arch Insurance Co.*,
    953 N.Y.S.2d 460 (Sup. Ct. 2012) ......................................................................... 32

*Fruchthandler v. Tri-State Consumer Insurance Co.*,
    96 N.Y.S.3d 649 (App. Div. 2019) ................................................................... 30, 31

*Gladstone v. Westport Insurance Corp.*,
    No. CIV.A. 10-652 PGS, 2011 WL 5825985 (D.N.J. Nov. 16, 2011) ................... 14

*Imperium Insurance Co. v. Porwich*,
    No. A-4714-12T4, 2015 WL 807630 (N.J. Super. Ct. App. Div. Feb. 27,
    2015) ................................................................................................................... 25, 26

*Sosa v. Massachusetts Bay Insurance Co.*,
    206 A.3d 1011 (N.J. Super. Ct. App. Div. 2019) ................................................... 33

*JP Morgan Chase & Co. v. Indian Harbor Insurance Co.*,
    947 N.Y.S.2d 17 (App. Div. 2012) ................................................... 31, 32, 34, 35

*Liberty Surplus Insurance Corp. v. Nowell Amoroso, P.A.*,
    916 A.2d 440 (N.J. 2007) ..................................................................................... 25, 26

*McMillen Eng'g, Inc. v. Travelers Indem. Co.*,
    744 F. Supp. 2d 416 (W.D. Pa. 2010) ..................................................................... 24

*Memorial Props., LLC v. Zurich Am. Insurance Co.*,
    46 A.3d 525 (N.J. 2012) ........................................................................................... 31

*National Union Fire Insurance Co. of Pittsburgh v. Ambassador Grp., Inc.*,
    691 F. Supp. 618 (E.D.N.Y. 1988) .......................................................................... 20

*National Union Fire Insurance Co. v. Becton Dickinson & Co.*,
    No. 14-4318, 2019 WL 1771996 (D.N.J. Apr. 23, 2019) ...................................... 36

*Nomura Holding America, Inc. v. Federal Insurance Co.*,
    45 F. Supp. 3d 354 (S.D.N.Y. 2014) ....................................................................... 19

*Old Bridge Municipal Utilities Authority v. Westchester Fire Insurance Co.*,
    No. CV126232MASTJB, 2016 WL 4083220 (D.N.J. July 29, 2016) ............... 14, 19

*Papalia v. Arch Insurance Co.*,
    No. 2:15-cv-02856, 2017 WL 3288113 (D.N.J. Aug. 1, 2017) .............................. 13

*Patriarch Partners, LLC v. Axis Insurance Co.*,
   758 F. App'x 14 (2d Cir. 2018) .................................................................25

*Pfizer Inc. v. Arch Insurance Co.*,
   CVN18C01310PRWCCLD, 2019 WL 3306043 (Del. Super. Ct. July 23,
   2019) .........................................................................................................15

*Platte River Insurance Co. v. Baptist Health*,
   4:07-cv-0036, 2009 WL 2015102 (E.D. Ark. April 17, 2009) .................26

*Quanta Lines Insurance Co. v. Investors Capital Corp.*,
   No. 06 CIV. 4624, 2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009)...........23

*In re Rapid-Am. Corp.*,
   No. 13-10687, 2016 WL 3292355 (Bankr. S.D.N.Y. June 7, 2016) .......31

*Realcomp II, Ltd. v. Ace Am. Insurance Co.*,
   46 F. Supp. 3d 736 (E.D. Mich. 2014).....................................................21

*Regal-Pinnacle Integrations Indus., Inc. v. Philadelphia Indem. Insurance Co.*,
   No. CIV.A. 12-5465 NLH, 2013 WL 1737236 (D.N.J. Apr. 22, 2013)...................20

*Rivelli v. Twin City Fire Insurance Co.*,
   No. 08-cv-1225, 2008 WL 5054568 (D. Colo. Nov. 21, 2008)...............26

*Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*,
   178 F.3d 160 (3d Cir. 1999)......................................................................12

*Selko v. Home Insurance Co.*,
   139 F.3d 146 (3d Cir.1998)................................................................23, 25

*Seneca Insurance Co. v. Kemper Insurance Co.*,
   No. 02-10088, 2004 WL 1145830 (S.D.N.Y. May 21, 2004) .................14

*Templeton v. Catlin Specialty Insurance Co.*,
   612 F. App'x 940 (10th Cir. 2015) ...........................................................14

*Templo Fuente De Vida Corp. v. National Union Fire Insurance Co. of
   Pittsburgh, PA*,
   129 A.3d 1069 (N.J. 2016)...........................................................31, 33, 36

*The One James Plaza Condo. Ass'n, Inc. v. RSUI Grp., Inc.*,
   No. CV 15-294, 2015 WL 7760179 (D.N.J. Dec. 2, 2015) .....................20

*UMC/Stamford, Inc. v. Allianz Underwriters Insurance Co.*,
   647 A.2d 182 (N.J. Super. Ct. Law Div. 1994) .......................................35

*W.C. & A.N. Miller Development Co. v. Continental Casualty Co.*,
   2014 WL 5812316 (D. Md. Nov. 7, 2014) ...............................................................22

*Washington Constr. Co. v. Spinella*,
   84 A.2d 617 (1951) ...................................................................................................32

*Weaver v. Axis Surplus Insurance Co.*,
   No. 13-CV-7374, 2014 WL 5500667 (E.D.N.Y. Oct. 30, 2014)......................................13, 14

*Westport Insurance Corp. v. Cotten Schmidt, LLP*,
   605 F. Supp. 2d 796 (N.D. Tex. 2009) ...................................................................24

*XL Specialty Insurance Co. v. Agoglia*,
   08 CIV.3821(GEL), 2009 WL 1227485 (S.D.N.Y. Apr. 30, 2009) ..................................23, 26

*Zahler v. Twin City Fire Insurance Co.*,
   No. 04-civ-01299, 2006 WL 846352 (S.D.N.Y. Mar. 31, 2006)............................................21

*Zunenshine v. Executive Risk Indemnity, Inc.*,
   No. 98-9251, 1999 WL 464988 (2d Cir. June 29, 1999) ........................................19

## Other Authorities

L. Goanos, *What is a Warranty Letter, and Why is My Client Being Asked to Sign
   One* .............................................................................................................................25

Defendants Arch Specialty Insurance Company and Twin City Fire Insurance Company submit this Response in Opposition to the Motion for Summary Judgment filed by Plaintiff Pharmacia Corporation n/k/a Pfizer, Inc.[1]

## I.   <u>INTRODUCTION</u>

Arch and Twin City agreed to join Pharmacia's pre-existing D&O tower in September 2002 conditioned on Pharmacia's agreement to certain policy provisions designed to protect the Insurers from stepping into Pharmacia's pre-existing problems.  As a stranger to that contract, Pfizer as the successor to Pharmacia now wants to re-work the terms of the deal by asking the Court to write a better contract than the one Pharmacia and its broker negotiated.  This Court's task, however, is to enforce, not ignore, the plain language of the parties' bargained-for contract. The Court should deny Pfizer's motion, and grant the Insurers' motion for summary judgment, for the following reasons:

***First***, the Pending and Prior Litigation Exclusion bars coverage for the Garber Action because it arises out of, is based upon, and attributable to Wrongful Acts and Interrelated Wrongful Acts alleged in the Consumer Actions, which were pending at the time the Policy was issued.  All three Consumer Actions accused Pharmacia of misleading the public and the FDA concerning the gastrointestinal ("GI") safety of its blockbuster drug Celebrex—at least until Pharmacia's alleged scheme of deception unraveled in 2001 and 2002 following a series of exposés in national publications like *The Washington Post* and *The Wall Street Journal*.  After Pharmacia's stock price dipped, its shareholders picked up the same thread and filed the Garber Action, alleging the ***same misrepresentations*** (about the GI safety) of the ***same product*** (Celebrex) for ***the same reason*** (increasing profits by pushing Celebrex sales).

---

[1] For convenience, the Insurers will use the same short form abbreviations in this response brief that are used in their affirmative motion and memorandum of law ("Insurer Mem."), D.E.88.

Although Pfizer urges the Court to apply New Jersey law to this issue, it does not identify an actual conflict of laws between New York law (where Pfizer is located and which is the locus of **all** contacts between the parties in the sixteen years since the 2003 merger) and New Jersey law (where Pharmacia was located until 2003 when it merged into Pfizer).  In fact, the courts in both states routinely enforce broad exclusionary language that is highly similar to the language in the Pending and Prior Litigation Exclusion where, as here, the allegations in the current and prior litigation share even a modest common factual nexus.  Pfizer's attempt to scour the operative pleadings in the Consumer Actions and the Garber Action for differences thus falls short by any measure.  This is because the exclusion is irrevocably triggered as soon as the required factual nexus is established.  Under both New York and New Jersey law, the glaring factual overlap that Pfizer ignores is more than enough to trigger the exclusion and the differences to which it points are simply a side-show.

**Second**, coverage is independently barred for the Garber Action under the Prior Knowledge Exclusion contained in the Warranty Statement.  The undisputed facts discussed in the Insurers' opening brief and in this response brief show that Pharmacia, through its senior management and other employees, were well aware of the disconnect between its rosy public statements about Celebrex based on the selective six-month results of the CLASS Study and the questionable truth of those statements in light of the full twelve-month study results.  An objectively reasonable insured in this position would understand the potential for a claim based on the true facts.

Pfizer asks this Court to ignore what Pharmacia knew and instead focus on what the Insurers might have been able to piece together from Pfizer's public statements and news reports about the CLASS Study.  But the correct focus is on the knowledge of the "person[s] for whom

-2-

this insurance is intended," *i.e.*, Pharmacia's executives and employees, **not** the Insurers. Furthermore, the Insurers do not have to meet an absurd burden of showing that the individual signatories to the Warranty Statement confessed to having a subjective belief that a securities claim might be brought.  Rather, the question for the Court is whether an objectively reasonable insured possessing the same facts known to any "person for whom this insurance is intended" would believe that a claim **might** be brought.  Pfizer's attempt to sidestep the Prior Knowledge Exclusion violates widely accepted principles of contract interpretation by asking this Court to erect limitations that are not contained in the text of the exclusion.  Summary judgment is appropriate with respect to the Prior Knowledge Exclusion, but should be granted in favor of the Insurers, not Pfizer.

*Third*, Pfizer is not entitled to coverage because it has failed to meet its burden of establishing that the full amount of all underlying insurance has been exhausted by the actual payment of loss by the underlying insurers.  Pfizer cannot meet this burden because certain underlying carriers settled with Pfizer ████████████████████████████████████ ████████████████████████████████████.  The Twin City Policy includes the critical additional requirement that each underlying insurer must have **duly admitted liability** with respect to the Garber Action.  Pfizer cannot meet this burden because Pfizer's settlements with most of the underlying insurers ████████████████████████████████████ ████████████████  Rather than confront the unambiguous requirements contained in the Arch Policy and Twin City Policy (the "Excess Policies"), Pfizer again invites the Court to adopt a standard that is untethered to the policy language itself.  This invitation should be rejected, and Pfizer must bear the consequences of the agreements that it negotiated and executed with the assistance of its highly sophisticated team of brokers and lawyers.

Pfizer tries to distract further from the merits of the coverage dispute by suggesting that decisions made by other carriers, for their own business reasons, somehow undermine the Insurers' position here.  With one exception, however, the underlying policies did not contain Pending and Prior Litigation Exclusions and Prior Knowledge Exclusions that permitted the underlying insurers to make any of the arguments advanced by Twin City and Arch.  With respect to the one remaining insurer, its pending and prior litigation exclusion was narrower (not identical as Pfizer suggests), and Pfizer's own expert conceded that "very little weight" should be given to its payment of the policy limit.  SOF ¶128.  The courts agree that the "practical business decisions" made by other insurers to settle with Pfizer do not merit any evidentiary weight in this dispute.  *See Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's London*, No. 02-2075, 2004 WL 2341388, at *4 (Mass. Super. Ct. Sept. 30, 2004).

## II.     RESPONSE TO PFIZER'S STATEMENT OF FACTS

The Insurers incorporate by reference their separate statement of undisputed facts ("SOF") and supporting evidence (D.E. #88), as well as their responsive factual statement filed with this brief ("CSOF").  The Insurers address here certain key points of agreement between the parties, and also identify certain material facts that are inaccurately presented in Pfizer's motion.

### A.     The Pending and Prior Litigation Exclusion

The parties agree on this much: both Arch and Twin City issued excess policies to Pharmacia with unambiguous Pending and Prior Litigation Exclusions.  The Arch Policy excludes coverage for any claim arising out of, based upon or attributable to "*[a]ny* Wrongful Act" that gave rise to "*[a]ny* litigation … against *any* Insured occurring prior to, or pending as of, September 1, 2002" or "*any* other Wrongful Act, whenever occurring, which, together with a Wrongful Act described above, constitute Interrelated Wrongful Acts."  SOF ¶15 (emphasis added).  The Arch Policy defines "Wrongful Act" broadly as "*any* actual or alleged breach of

duty, neglect, error, misstatement, misleading statement, omission or act." *Id.* (emphasis added). "Interrelated Wrongful Acts" means "Wrongful Acts that have as a common nexus *any* fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes." *Id.* (emphasis added).  In addition, the Arch Policy defines "Insured" as a person or entity entitled to coverage under the National Union policy at its inception.  *See* CSOF ¶59.

The Pending and Prior Litigation Exclusion in the Twin City Policy similarly bars coverage for any claim "arising from *any act* of an *Insured*" which gave rise to "*any* litigation . . . against *any* Insured occurring prior to, or pending as of, 9/01/02."  SOF ¶16 (emphasis added). Contrary to Pfizer's suggestion, the Twin City Policy expressly includes "Pharmacia Corporation" within its own definition of **Insured**.  *See* CSOF ¶60.

By its terms, the exclusion does not as Pfizer maintains pigeon-hole its scope to prior "D&O" or "securities" claims. Instead, the exclusion requires merely that prior litigation of *any* kind be asserted against an "Insured"—a requirement readily satisfied based on the specific definitions of that term that are contained in the Excess Policies.[2]  In other words, the policy language focuses on the presence or absence of common facts alleged against an Insured, and not on whether the pending or prior litigation was covered by a D&O policy.

Furthermore, Pfizer appears to agree that the Pending and Prior Litigation Exclusion can be triggered based on a comparison of the pleadings in the Garber Action to those in the prior Consumer Actions.  The parties also agree that the Consumer Actions and the Garber Action allege common or overlapping underlying wrongful conduct—*i.e.*, misrepresentations on

---

[2] In contrast, the parallel exclusions in the National Union primary policy and underlying Allied World excess policy each uses a narrower version of the exclusion requiring that the current litigation arise from "***the same or essentially the same facts*** as alleged in such pending or prior litigation."  CSOF ¶68 (emphasis added).

Pharmacia's part to the public and the FDA concerning the "GI safety" of Celebrex—and cite the same media reports revealing Pharmacia's alleged fraud in touting the superior GI safety profile of Celebrex relative to other NSAIDs.  *See, e.g.,* Pfizer Br. at 32-33 (noting that "[t]he three Consumer Class Actions … were brought on behalf of individuals who took and/or purchased Celebrex … and claimed to have suffered physical injuries from a defective product or sought economic damages for Pharmacia's … ***false marketing*** concerning the cardiovascular ***and GI safety*** of those drugs") (emphasis added); *id.* at 34 (conceding that "the Consumer Class Actions all, in some way, involved misstatements about Celebrex's safety" and cited "published articles criticizing the CLASS Study").

Pfizer's concession about the overlapping wrongful conduct between the Consumer Actions and the Garber Action—*i.e.*, Pharmacia's alleged misrepresentations about Celebrex's safety profile, including GI safety—renders any differences immaterial.  But Pfizer's attempt to focus the Court on purported differences is not only flawed legally.  It is factually incorrect.  For example, Pfizer erroneously suggests (Br. at 34) that the Consumer Actions did not plead any "claims" related to Pharmacia's allegedly incomplete and misleading reporting of the results of the CLASS Study, when in fact the injuries pled in the Consumer Actions related to Pharmacia's alleged misrepresentations about the CLASS Study and the GI safety profile of Celebrex.

SOF ¶¶ 33-38 (*Cain* allegations); ¶¶43-47 (*Leonard* and *Astin* allegations).  Pfizer also contends that the Consumer Actions plead bodily injuries, but this too is incorrect.  *See* Br. at 34.  All three of the Consumer Actions sought economic damages, including disgorgement, resulting from Pharmacia's alleged misrepresentations, which allegedly caused consumers to pay more for Celebrex than its true safety profile warranted.  SOF ¶39 (*Cain*), ¶49 (*Leonard* and *Astin*).

### B. <u>Warranty Statement</u>

The parties also agree that the Excess Policies were issued subject to the Prior Knowledge Exclusion in the Warranty Statement.  In particular, the Warranty Statement, signed by Fred Hassan (CEO/President) and Chris Coughlin (CFO) on behalf of Pharmacia, affirmed:

> ***No person*** for whom this insurance is intended has ***any*** knowledge or information of ***any*** act, error, omission, fact or circumstance that ***may*** give rise to a claim that ***may*** fall within the scope of the proposed insurance.
>
> It is agreed that any claim based upon, arising from, or in any way related to ***any*** act, error, omission, fact or circumstance of which ***any*** such person has any knowledge or information will be excluded from coverage under the proposed insurance.

SOF ¶20 & JX12 (emphasis added).

Pfizer has not argued that the Prior Knowledge Exclusion is in any way ambiguous.  In fact, when Mr. Hassan signed the Warranty Letter, Mr. Hassan understood and expressed the plain intent of the Warranty Statement quite simply as: "***If somebody knows something is going on, then that is not part of the coverage of insurance. That, to me, is what it means***."  SOF ¶21 (emphasis added).  Mr. Hassan also confirmed that he was not signing the Warranty Letter based only on his own personal knowledge, but instead relied on "people around [him]" to vet documents requiring his signature.  SOF ¶22.  Mr. Coughlin similarly relied on the legal and risk management departments to review the Warranty Letter.  SOF ¶23.

As discussed below, Pfizer does not dispute Pharmacia's knowledge of its limited disclosure of the CLASS Study and its potentially important impact on Pharmacia's business. Pfizer disputes only the legal significance of those known facts and urges the Court to construe the Warranty Statement in a way that would defy both the policy language and applicable law.

C.    **Exhaustion**

The final coverage issue involves the attachment and exhaustion provisions in the Excess Policies and likewise turns on how this Court interprets the operative policy language as a matter of law.  Both policies contain express conditions that must be satisfied before coverage can be triggered.  The Arch Policy states that:

> The insurance coverage afforded by this Policy shall apply only after exhaustion of the Underlying Limit solely as a result of actual payment, in legal currency, under the Underlying Insurance in connection with Claim(s) and after the Insureds shall have paid the full amount of any applicable deductible or self insured retentions.

SOF ¶9.  The Twin City Policy contains a parallel exhaustion provision and imposes a critical additional requirement.  It states that:

> It is expressly agreed that liability for any loss shall attach to [Twin City] only after the Primary and Underlying Excess Insurers ***shall have duly admitted liability and*** shall have paid the full amount of their respective liability ….

SOF ¶12 (emphasis added).

The settlement agreements between Pfizer and the underlying insurers are before the Court, and together with Pfizer's evidence of payment by the underlying insurers, permit this Court to determine as a matter of law that Pfizer did not properly exhaust its underlying insurance and that the underlying insurers ███████████████████████████████.

D.    **Extraneous Issues in Pfizer's Brief**

Pfizer's brief discusses additional purported "facts" pertaining to claims handling by the Insurers over the ten or more years that the Garber Action was pending.  *See* Pfizer Br. at 11-13. By picking through the record to identify supposed claims handling anomalies, Pfizer seeks to distract the Court from the actual material facts that are relevant to a resolution of the coverage dispute.  Whether these extraneous matters are disputed or undisputed, they are completely irrelevant to the task of interpreting the concededly unambiguous policy language at issue here.

*See, e.g, Catlin Ins. Co. v. Flight Light Inc.,* A-0689-13T3, 2014 WL 3407055, at *7 (N.J. Super. Ct. App. Div. July 15, 2014) (rejecting insureds' attempt to introduce parol evidence "to vary and contradict the plain language of the policies"); *Abner, Herrman & Brock, Inc. v. Great Northern Ins. Co.*, 308 F. Supp. 2d 331, 336 (S.D.N.Y. 2004) (extrinsic evidence is not admissible to alter or interpret the meaning of an unambiguous contract) (citation omitted).

Rather than waste the Court's time by going toe-to-toe with Pfizer on the diversions it seeks to create, the Insurers respectfully refer the Court to their contemporaneously filed Counter-Statement in Response to Plaintiff's Statement of Facts ("CSOF"), which refutes Pfizer's statements where appropriate.

## III.   ARGUMENT

### A.   New York Law Controls to the Extent a Choice of Law Analysis Is Needed

The parties agree that the Court needs to address choice of law only if it finds an actual conflict between New York and New Jersey law on any of the key issues.  No such conflict exists.  But, even if it did, New York law controls if a conflict of law analysis is required.

### 1.   *The Higher Level Excess Policies Both Expressly and Implicitly Require the Application of New York Law*

New Jersey choice of law rules provide that "[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice."  *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183–84 (3d Cir. 2017) (quoting *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992)).  In insurance policies, the choice of law can be expressed directly, or it can be implied through the addition of state amendatory endorsements.  *See Assicurazioni Generali, S.P.A. v. Clover,* 195 F.3d 161, 165 (3d Cir. 1999); *Bell v. USAA Cas. Ins. Co.*, Civ. No. 2008–100, 2009 WL 2524351, at *3 (D.V.I. Aug. 14, 2009) (policy's repeated references to Massachusetts law

constituted an implicit choice of that state's law); *Blizzard v. Federal Ins. Co.*, No. 05–5283, 2007 WL 675346, at *2 (E.D. Pa. Feb. 27, 2007) (parties implicitly selected New Jersey law to govern because of New Jersey uninsured motorist endorsement).

In this case, the parties agreed that New York law would govern the Policies. The Allied World excess policy immediately underlying the Arch and Twin City policies states in relevant part that: "This policy shall be construed and enforced in accordance with the internal laws of the State of New York …" SOF ¶ 119. This New York choice of law provision flows up to the Arch and Twin City policies, which incorporate not only the terms and conditions of the Primary Policy but also certain additional terms contained in the underlying excess policies. SOF ¶¶ 8, 11. In addition, the Twin City Policy includes multiple New York amendatory endorsements— further underscoring the parties' choice of New York law. *See* SOF ¶ 120. Thus, the Twin City Policy at least implicitly mirrors Allied World's explicit selection of New York law.

Pfizer's purported "expectation" that New Jersey law would govern the Insurers' policies, despite its agreement to New York law in the Allied World Policy and agreement to New York-specific endorsements in the Twin City Policy, is manifestly unreasonable. As discussed in the Insurers' opening brief (at 4-5), Arch and Twin City were part of a ***brand new*** set of excess insurance policies purchased for Pharmacia in 2002—***after*** it had announced the merger with New York based Pfizer—to sit atop Pharmacia's existing D&O tower. *See* SOF ¶¶ 3, 121. These new layers attached after the exhaustion of $105 million in underlying insurance and began with the Allied World excess policy, followed by the Arch and Twin City policies respectively. These facts and circumstances eliminate any reasonable suggestion that the parties did not intend for New York law to govern the construction of the newly added layers of excess insurance.

Pfizer tries to avoid this result by parsing the language of the Excess Policies. *See* Br. at 18. It first describes Allied World's stand-alone New York choice of law provision (Section X) as being "integrate[d]" with a distinct mandatory arbitration provision in that policy (Section IX), such that (according to Pfizer) the New York choice of law provision only applies to arbitration and not litigation. If these provisions were intended to be integrated, they could have been combined into a single provision. The fact that the provisions are set forth separately negates any suggestion that they are integrated. The only reasonable interpretation of the Allied World choice of law provision—which by its terms applies to "***th[e] policy***"—is that the parties envisioned that the policy, along with the other newly issued excess policies, would be governed by New York law in light of Pharmacia's merger into Pfizer. The Court can reach this result without, as Pfizer suggests, creating a conflict with the primary policy issued by National Union, which contains an alternative dispute resolution provision that does not dictate choice of law.

Pfizer also misses the mark when it suggests that the Arch Policy cannot incorporate a choice of law provision in an underlying excess policy because a choice of law provision is not a "more restrictive" coverage limitation (the Twin City Policy does not contain this limitation). If, however, New York law would interpret a particular policy provision more restrictively than New Jersey law, then New York law should apply. Otherwise, in contravention of the express terms of those excess policies, they could be found to extend broader coverage than an underlying policy. *See Fed. Ins. Co. v. Raytheon Co.,* 426 F.3d 491, 495 (1st Cir. 2005). Consequently, if the choice of law provision in the Allied World policy has the ultimate effect of narrowing or eliminating coverage, it must be incorporated into the Arch Policy by its terms.

      2.     <u>New York Has the Most Significant Relationship to the Parties' Dispute</u>

Applying New York law to any coverage dispute between Pfizer and the Excess Insurers is required for additional reasons. Where, as here, the insured's operations are spread across

multiple states, "the governing law is that of the state with the ***dominant significant relationship***" to the dispute, considering: (1) competing interests of the relevant states; (2) the interests of commerce among several states; (3) the interests of the parties in realizing justified expectations and achieving predictable results; and (4) the interests of judicial administration. *See Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 165-66 & n.7 (3d Cir. 1999) (citing *Pfizer, Inc. v. Emp'rs Ins. of Wausau,* 712 A.2d 634, 638-40 (N.J. 1998)) (emphasis added).

The relevant contacts here overwhelmingly support the application of New York law to the coverage dispute between Pfizer and the Insurers:

- Pfizer is a New York corporation.  CSOF ¶46.

- The Excess Policies were underwritten in New York.  CSOF ¶69; SOF ¶122.

- The Excess Policies were negotiated with Pharmacia's broker (Aon) in New York.  SOF ¶122.

- The Excess Policies were issued in December 2004—***after*** Pfizer had acquired Pharmacia—to Pfizer's broker (Marsh) in New York.  CSOF ¶42.

- The Twin City Policy was issued with New York endorsements.  SOF ¶120.

- Pfizer's own coverage lawyers asserted that New York law applied to the construction of the Excess Policies before this litigation incepted.  SOF ¶123.

- The parties to the settlement of the Garber Action—a matter litigated ***for 10 years in New Jersey***—selected ***New York*** law to govern any post-settlement disputes in explicit recognition of the state with the greatest interest.  SOF ¶124.

These dominant New York contacts between Pfizer and the Insurers dwarf the contacts that Pfizer cites in an attempt to opportunistically persuade this Court to apply New Jersey law. Any "Pharmacia" purported contacts are stale today and have been for more than a decade.  The Insurers agreed to insure Pharmacia in September 2002, ***after*** Pfizer and Pharmacia had announced their combination.  Pfizer finally acquired Pharmacia in July 2003, a few short

months after the Garber Action was filed, before the Consolidated Complaint in the Garber Action was filed and before even the Excess Policies were issued (a situation fairly common with multilayered D&O towers because each successive insurer waits to issue its policy until having the opportunity to review the underlying policies).  To be sure, Pharmacia was once, long ago, an entity with New Jersey as its principal place of business, but this long-dead status is far less important today than Pfizer's status as a living, breathing New York entity seeking $20 million in combined limits from the Insurers.  Any recovery in this case would flow to Pfizer in New York, giving New York the superior interest in the outcome of this coverage dispute.  Pfizer cannot be heard to feign surprise or allege unfairness when this Court applies the law of *Pfizer's* home state of New York—which also happens to be the law that Pharmacia expressly or at least implicitly agreed would govern the policies that were first issued to it in September 2002.

**B.      The Pending and Prior Litigation Exclusions in the Policies Preclude Coverage for the Garber Action**

1.      *New Jersey and New York Courts Enforce Pending and Prior Litigation Exclusions as Written*

The Arch and Twin City policies each contain a Pending and Prior Litigation Exclusion barring coverage for claims arising out of, based upon or attributable to *any* wrongful acts or interrelated wrongful acts alleged in *any* litigation against *any* Insured occurring prior to, or pending as of, September 1, 2002.  Pfizer's brief does not identify any actual conflict of law between New Jersey and New York law in enforcing similar "interrelated wrongful acts" provisions.  *Compare Papalia v. Arch Ins. Co.*, No. 2:15-cv-02856, 2017 WL 3288113, at *10 (D.N.J. Aug. 1, 2017) (finding analogous "interrelated wrongful acts" definition to be "extraordinarily broad" insofar as it should apply to "*all* Claims… that have as common nexus *any* fact, circumstance, situation, event, transaction, cause *or* series of causally connected facts, circumstances, situations, events, transactions or causes") (emphasis added), *with Weaver v. Axis*

*Surplus Ins. Co.*, No. 13-CV-7374, 2014 WL 5500667, at *12 (E.D.N.Y. Oct. 30, 2014) ("[w]here the policy's language refers to '*any*' fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes, it is 'immaterial' that one claim may involve additional facts or allegations because **all that is required is 'any' common fact,** circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes") (emphasis added), *aff'd,* 639 F. App'x 764 (2d Cir. 2016).

Whether the legal standard is framed as requiring a "common factual nexus" or a "substantial overlap," the determinative issue under both New York and New Jersey law is whether the Garber Action and the Consumer Actions share even a modest factual connection. Where the second action concerns common underlying wrongful conduct, *i.e.*, it "grows out of the same 'foundation or logical basis'" as the first, the claims allege "interrelated wrongful acts." *Old Bridge Mun. Utils. Auth. v. Westchester Fire Ins. Co.,* No. CV126232MASTJB, 2016 WL 4083220, at *5 (D.N.J. July 29, 2016) (citing *Fed. Ins. Co. v. Raytheon Co.,* 426 F.3d 491, 499 (1st Cir. 2005)); *see also Gladstone v. Westport Ins. Corp.,* No. CIV.A. 10-652 PGS, 2011 WL 5825985, at *9 (D.N.J. Nov. 16, 2011) ("courts have found that claims are related when there is a logical connection between them"), *aff'd sub. nom*, *Szaferman, Lakind, Blumstein & Blader, PC v. Westport Ins. Co.*, 518 F. App'x 107 (3d Cir. 2013); *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02-10088, 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004) (claims are interrelated where they share logically connected facts and circumstances), *aff'd*, 133 F. App'x 770 (2d Cir. 2005); *Templeton v. Catlin Specialty Ins. Co.*, 612 F. App'x 940, 958 (10th Cir. 2015) (under New York law, claims involve "Interrelated Wrongful Acts" when they are connected by common facts).

Pfizer evidently agrees with this interpretation of New York law because it cites favorably to the broad application of this standard as articulated by the court in *Weaver.* *See* Br. at 31.

Although it is irrelevant to this Court's decision-making under New York or New Jersey law, the Insurers expect Pfizer to cite a recent Delaware state court decision applying Delaware law in a separate coverage dispute between Pfizer and Arch under later D&O policies issued to Pfizer containing a "Specific Litigation Exclusion" barring coverage for matters interrelated with the Garber Action. *See Pfizer Inc. v. Arch Ins. Co.*, CVN18C01310PRWCCLD, 2019 WL 3306043, at *7 (Del. Super. Ct. July 23, 2019) (the "Morabito Coverage Action"). Twin City participated in the Pfizer D&O coverage tower at issue in the Morabito Coverage Action but settled its coverage dispute with Pfizer and was never named as a party to that action.

The Delaware court in the Morabito Coverage Action applied Delaware law after finding an actual conflict of laws between New York and Delaware. Under Delaware law (according to that court), "similar 'relatedness' or 'arising out of' policy language is interpreted as precluding coverage only where two underlying actions are '***fundamentally identical***.'" *Id.* (emphasis added). A "fundamentally identical" standard is irreconcilable both with the language of the Insurers' Pending and Prior Litigation Exclusion ***and*** the standards employed in New York and New Jersey. Moreover, the Insurers are not aware of any other jurisdiction in the United States adopting a "fundamentally identical" standard for policy language that expressly links claims through "any" common act or fact. *See* Insurers' Opening Br. at 21-22 & n.4 (discussing cases from other jurisdictions broadly construing similar prior and pending litigation exclusions or other "interrelated wrongful acts" provisions).

Because the law to be applied in this action is either New York or New Jersey, a Delaware state court decision applying Delaware law has no bearing on the parties' motions. In

any event, the Morabito Coverage Action is factually distinct.  There, Pfizer asserted that the Morabito and Garber pleadings were not "fundamentally identical" because the Garber Action concerned **GI health risks**, whereas Morabito focused entirely on **cardiovascular health risks**. *Id.* at *10.  Indeed, Pfizer argued to the Delaware court that Morabito could "shar[e] a common nexus with Garber" if it were "**attributable to alleged misrepresentations regarding the 'GI side effects' of Celebrex**."  CSOF at ¶62; DX 47 at p.31 (emphasis added).

Here, on the other hand, Pfizer **concedes** that both the Garber Action and the Consumer Actions involve misrepresentations regarding the GI side effects of Celebrex.  Br. at 32-33 (noting that the Consumer Actions sought damages for Pharmacia's "false marketing concerning the cardiovascular and GI safety of those drugs").  Thus, the factual linkage or nexus of "GI safety" that Pfizer urged was missing in Morabito is undeniably present here.

2.       *The Garber Action and Consumer Actions Share a Common Factual Nexus That Easily Triggers the Pending and Prior Litigation Exclusion*

Pfizer argues (Br. at 30) that the Insurers are trying to leverage the Pending and Prior Litigation Exclusion as an across the board "Celebrex Exclusion[.]"  This is nonsense.  What the Insurers have argued—and what matters under the governing law and policy language—is that all four actions involve nearly identical allegations of misconduct.  Specifically, they allege that Pharmacia and Old Pfizer aggressively promoted Celebrex as safer and more effective than less expensive NSAIDs in order to increase profits, but lied to the public and the FDA in doing so:

- They each allege that Pharmacia aggressively marketed Celebrex in a false and misleading way so as to induce the public and the FDA into believing that Celebrex was safer and more effective than other, less expensive, alternatives.  SOF ¶¶28; 30; 32; 38; 41; 42-43; 47; 53.

- They each allege that Pharmacia manipulated the CLASS Study protocol specifically to mislead the public and the FDA into believing Celebrex was safer for the GI tract and more effective than other NSAIDs.  SOF ¶¶33-37; 44; 57; 62-69.

- They each allege that Pharmacia widely disseminated the purported results of the CLASS Study including through publication in the *JAMA* article.  SOF ¶¶37; 45; 59-61.

- They each allege that Pharmacia made material misrepresentations and omissions over a common time period (*i.e.,* the period from the time Celebrex became available in 1999 to the time Pharmacia's fraud was exposed around August 2001-June 2002). SOF ¶¶25-26; 50 & JX16; 70.

- They each allege that the above conduct was exposed by many of the same news media articles, which plaintiffs in each action relied upon in accusing Pharmacia of fraud. Plaintiffs in the Cain Action relied upon the August 2001 *Washington Post* article and a June 2002 piece in *The British Medical Journal.*  SOF ¶¶34-37.  Plaintiffs in the Leonard and Astin Actions relied upon an August 22, 2001 *Wall Street Journal* article. SOF ¶44.  Plaintiffs in the Garber Action relied on articles in *The Washington Post*, *The Wall Street Journal*, and *The New York Times*.  SOF ¶¶63-68.

- The fraud causes of action pled in the Consumer Actions were based, at least in part, on the class plaintiffs' allegation that Pharmacia misled the public about the GI side effects of Celebrex.  CSOF ¶63.  The same was true of the Garber Action.  CSOF ¶64.

Under both New York and New Jersey law, this factual overlap between the Garber and Consumer Actions easily suffices to trigger the plain terms of the Pending and Prior Litigation Exclusion.   That is, all these actions are premised on the ***same*** allegations that Pfizer misrepresented the allegedly superior GI safety profile of Celebrex over traditional NSAIDs to the public and the FDA over the ***same*** period of time by manipulating the results of the CLASS Study.   The various actions even rely on the ***same*** public disclosures that exposed the alleged fraud.    In addition, although Pfizer suggests otherwise, the Consumer Actions ***did*** plead economic injuries relating to Pharmacia's misrepresentations about the CLASS Study and Celebrex's GI side effects.  SOF ¶¶39, 49.  These multiple overlapping and common facts between the Garber and Consumer Actions far exceed the required showing under the Excess Policies that the actions share ***any*** common wrongful act to trigger the exclusions.

3.    *The Differences Between the Garber and Consumer Actions Are Irrelevant Once the Required Factual Nexus is Established*

In order to avoid the Pending and Prior Litigation Exclusion, Pfizer clings to the mantra that the Garber and Consumer Actions involve "different parties," "different legal theories" and "different harms." This characterization relies on a misreading of the allegations in the Consumer Actions and in any event is premised on a legal argument that has been rejected repeatedly by courts throughout the country, including courts in both New Jersey and New York.

With respect to the allegations in the Consumer Actions, Pfizer makes two unsupported claims that defy a plain reading of the operative complaints. First, Pfizer asserts that "[t]he Cain Action's claims are based entirely on **cardiovascular injuries** from taking Vioxx and Celebrex." Br. at 34 (emphasis added). This is incorrect. In fact, while the Cain Action alleges that some plaintiffs suffered cardiovascular injuries, the Second Amended Complaint **also** asserts throughout that Celebrex lacked adequate safety warnings generally (thus bringing in the GI safety issues), and that Pharmacia grossly exaggerated the overall safety and efficacy of Celebrex relative to other NSAIDs to justify its exponentially higher cost. CSOF ¶65.

Second, Pfizer urges the Court to disregard the CLASS Study allegations in the Consumer Actions as gratuitous insofar as they purportedly do not pertain to the claims in the Consumer Actions. Br. at 34. This, too, is false. As noted, the Cain Action asserts that Pharmacia was unjustly enriched by overcharging consumers for Celebrex ostensibly based on its superiority over traditional NSAIDs—part of Celebrex's claimed superiority, of course, was the GI safety profile falsely touted in connection with the CLASS Study. CSOF at ¶66. The Leonard and Astin Actions squarely allege that Pharmacia committed fraud under New Jersey's consumer protection statute and common law when, among other things, it "omitted, suppressed, or concealed material facts concerning the dangers and risks associated with the use of Celebrex,

-18-

including, but not limited to, the risks of serious damage from *ulcers*" while at the same time Pharmacia  "knew or should have known, and would have known, had appropriate testing been done, that the use of Celebrex caused serious side effects *including ulcers*, especially when used for extended periods of time."  CSOF at ¶67 (emphasis added).  Pharmacia did so because "the prospect of huge future profits outweighed health and safety issues, all to the detriment of Plaintiff and the other members of the Class."  *Id.*

Accordingly, allegations in the Consumer Actions relating to the CLASS Study are far from gratuitous: the heart of those actions is that Pharmacia allegedly misrepresented the safety of Celebrex to the public and the FDA, and the GI safety issues formed a critical part of those alleged misrepresentations.  These GI safety issues were premised on the *same* national news reports found in the Garber Action complaint, which revealed in 2001 and 2002 that Pharmacia misrepresented the results of the CLASS Study.  Accordingly, the allegations that Pharmacia misrepresented the results of the CLASS Study were just as important to plaintiffs' claims against Pharmacia in the Consumer Actions as in the Garber Action.

Pfizer attempts to confuse the Court with these bogus distinctions because the only actual distinctions between the Garber and Consumer Actions—differences in plaintiffs and the causes of action—have been rejected by courts around the country as a basis to overcome the plain reach of the Pending and Prior Litigation Exclusion.  Under New York and New Jersey law alike, these differences are irrelevant.  *See, e.g.*, *Zunenshine v. Executive Risk Indem. Inc.*, No. 98-9251, 1999 WL 464988, at *2 (2d Cir. June 29, 1999) ("it is immaterial that the two lawsuits involved different parties and somewhat different legal harms . . . because the . . . policy terms clearly focus on the existence of common facts"); *Nomura Holding Am., Inc. v. Fed. Ins. Co.*, 45 F. Supp. 3d 354, 372-73 (S.D.N.Y. 2014) (rejecting insured's attempt to distinguish allegations

-19-

of five different actions involving different offerings and plaintiffs in determining whether claims were related because insured "has failed to provide any case law support for such a narrow definition of relatedness" or "to demonstrate that these identified differences mattered"), *aff'd,* 629 F. App'x 38 (2d Cir. 2015); *Old Bridge*, 2016 WL 4083220, at *4 (rejecting insured's argument that actions involving different parties and different claims cannot be interrelated: the "differences in parties and claims asserted" was not determinative).[3]

For example, in *G-I Holdings v. Hartford Fire Insurance Co.*, the court held that differences in plaintiffs and causes of action pled between three separate lawsuits arising from overlapping, common factual allegations regarding the same stock transfers by the insured did not preclude application of an interrelated wrongful action provision: "the situation it describes—where different claims arise from the same act or acts of the insured—is clearly applicable to the facts of this case."  No. 00-6189 DMC, 2007 WL 842009, at *8 (D.N.J. Mar. 16, 2007), *aff'd*, 586 F.3d 247 (3d Cir. 2009), as amended (Dec. 4, 2009); *see also The One James Plaza Condo. Ass'n, Inc. v. RSUI Grp., Inc.*, No. CV 15-294, 2015 WL 7760179, at *6 (D.N.J. Dec. 2, 2015) ("[t]he pleadings in both underlying actions need not have been identical to preclude coverage").

It is therefore clear in New Jersey and beyond that "'differences in theories of recovery or the identity of parties in the proceedings do not in and of themselves preclude exclusion,' and that **'acknowledging that there are substantial areas of non-overlap does not defeat ... [the]**

---

[3] The factual nexus in the present case is far stronger than in the cases on which Pfizer relies; these cases also interpreted materially narrower policy language.  *See, e.g., Dormitory Auth. of N.Y. v. Cont'l Cas. Co.,* No. 12 civ. 281, 2013 WL 840633, at *7 (S.D.N.Y. Mar. 5, 2013) (multiple claims did not allege "same or related wrongful acts"), *aff'd in part, vacated in part,* 756 F.3d 166 (2d Cir. 2014); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Ambassador Grp., Inc.*, 691 F. Supp. 618, 623–24 (E.D.N.Y. 1988) (concluding four claims against insured directors did not arise out of the "same or interrelated acts").

*substantial overlap between [] two complaints*.'"  *Regal-Pinnacle Integrations Indus., Inc. v. Philadelphia Indem. Ins. Co.*, No. CIV.A. 12-5465 NLH, 2013 WL 1737236, at *7 (D.N.J. Apr. 22, 2013) (emphasis added) (quoting *Raytheon Co.* 426 F.3d at 497–98).  *See also Cushman & Wakefield, Inc. v. Ill. Nat'l Ins. Co.*, 14 C 8725, 2018 WL 1898339, at *18 (N.D. Ill. Apr. 20, 2018) ("although differently situated, plaintiffs in the Underlying Claims appear to be various players affected by the alleged scheme"); *Realcomp II, Ltd. v. Ace Am. Ins. Co.*, 46 F. Supp. 3d 736, 742 (E.D. Mich. 2014) (exclusion applied where "[d]ifferent plaintiffs certainly are making the allegations—but the action [the insured] is alleged to have taken is identical. The plaintiffs are merely making alternative claims for their own damages based on the same set of facts").

Pfizer's last-ditch argument is that the Consumer Actions cannot trigger the Pending and Prior Litigation Exclusion because they are not securities claims and because the exclusion "does not apply to different types of harms triggering different coverages."  Br. at 35.  There is utterly no basis in the policy language or the case law to support this argument.

Indeed, in the *Raytheon* case cited by several New Jersey courts, the First Circuit appears to have implicitly rejected Pfizer's argument by finding that a prior litigation exclusion **can** bar coverage where the suits involved different harms and different types of coverage.  In that case, the first suit was a securities class action by shareholders alleging misrepresentations regarding Raytheon's financial performance, whereas the second suit (filed five years later) was a class action under the Employee Retirement Income Security Act of 1974 ("ERISA") by former employees of the company who participated in or were beneficiaries of Raytheon's Savings and Investment Plan.  *Raytheon,* 426 F.3d at 493–94.  Although *Raytheon* recognized that the parties and legal theories in the two actions were different, and that each action contained allegations not found in the other, the court appropriately focused on the ***core facts in common*** between the two

lawsuits.   In doing so, the court held that the prior litigation exclusion applied because "comparison of the complaints reveals numerous allegations of substantially similar facts, circumstances or situations."  *Id.* at 498; *Accord Zahler v. Twin City Fire Ins. Co.*, No. 04-civ-01299, 2006 WL 846352, at *7 (S.D.N.Y. Mar. 31, 2006) (securities fraud class action and ERISA class action arose from interrelated wrongful acts because ERISA action was broadly related to the facts alleged in the prior class action).

Pfizer's argument also finds no basis in the language of the Pending and Prior Litigation Exclusion, which by its terms applies to wrongful acts or interrelated wrongful acts alleged in ***any*** litigation against ***any*** Insured.  That is, the reach of the exclusion is not limited by the nature of the earlier litigation, and there is no requirement that the earlier litigation be covered.  *See W.C. & A.N. Miller Development Co. v. Continental Cas. Co.*, 2014 WL 5812316, at *4 (D. Md. Nov. 7, 2014).  Instead, the only limitation is that the earlier litigation must have been asserted against ***any*** Insured.  This requirement is clearly met here because the earlier Consumer Actions were brought against Pharmacia, which is expressly and without limitation defined as the "Insured" under both the Twin City and Arch policies.  *See* Twin City Policy ("Insured" includes "Pharmacia Corporation") (CSOF ¶54) and Arch Policy ("Insured" means a person or entity "entitled to coverage under the [National Union Policy] at its inception" (*i.e.*, Pharmacia Corporation)) (JX10, at PFIGARB2702).

Pfizer's argument to the contrary is premised on the convoluted notion that Pfizer only constitutes an Insured under the National Union primary policy to the extent the underlying claim constitutes a securities claim.  But that claim finds no support in the language of the Twin City or Arch Policies.  *Cf. Comerica Bank v. Lexington Ins*. Co., 3 F.3d 939, 943 (6th Cir. 1993) ("The distinction which plaintiff seeks to make between the bank in its corporate capacity and

the bank in its representative capacity is not found anywhere in the terms of the policy").  As to Twin City, that argument is based on the false premise that the Twin City Policy adopts the definition of an Insured from the primary policy.  That notion is false because the Twin City Policy defines an Insured specifically to include "Pharmacia Corporation."  *See* CSOF ¶54.  As to Arch, whether the underlying claim was a securities claim is similarly irrelevant because Pharmacia unquestionably was an entity entitled to coverage under the National Union primary policy at its inception.  *See* CSOF ¶59.

   In all circumstances, Pfizer's argument that the Pending and Prior Litigation Exclusion cannot be triggered here because Pharmacia did not constitute an "Insured" with respect to the Consumer Actions is absurd.  By the clear terms of the exclusion, the nature of the earlier litigation is entirely irrelevant so long as the required factual nexus exists between the earlier and later actions.  The factual nexus between the Garber and Consumer Actions has been established here and coverage for the Garber Action is therefore not available.

### C.     The Prior Knowledge Exclusion In The Warranty Statement Precludes Coverage For The Garber Action

#### 1.     *The Relevant Inquiry Is Objective:  Whether a Known Set of Facts "Might" Give Rise to a Claim*

Pfizer does not cite any differences between New York and New Jersey law with respect to warranties or prior knowledge exclusions.  *Compare Quanta Lines Ins. Co. v. Investors Capital Corp.*, No. 06 CIV. 4624, 2009 WL 4884096, at *16 (S.D.N.Y. Dec. 17, 2009) (predicting that New York would adopt the mixed objective/subjective standard utilized in the Third Circuit), *aff'd*, 403 F. App'x 530 (2d Cir. 2010), *with Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 237 (3d Cir. 2006).  The mixed subjective/objective test finds its origin in the Third Circuit's seminal decision in *Selko v. Home Ins. Co.,* 139 F.3d 146, 151–52 (3d Cir.1998).

Thus, "the appropriate line of inquiry is whether a reasonable person would understand that, given the facts or circumstances, there may be grounds for a claim to be made under the Policy." *XL Specialty Ins. Co. v. Agoglia*, 08 CIV.3821(GEL), 2009 WL 1227485, at *8 (S.D.N.Y. Apr. 30, 2009), *aff'd sub nom. Murphy v. Allied World Assur. Co. (U.S.)*, 370 F. App'x 193 (2d Cir. 2010); *see also Colliers*, 458 F.3d at 237 (objective inquiry asks "whether a reasonable [person] in the insured's position might expect a claim or suit to result").   The objective test closely tracks the Prior Knowledge Exclusion in the Warranty Statement, which bars coverage where a putative insured had knowledge of ***any*** act, error, omission, fact or circumstance that ***might*** give rise to a claim that ***might*** fall within the scope of coverage.   The "knowledge" portion of the Prior Knowledge Exclusion indeed is subjective, asking what facts the insured knew as of August 29, 2002.   But, whether a known fact or circumstance "might" give rise to a claim that "might" fall within the scope of coverage is an objective question, answered from the standpoint of a ***reasonable*** insured.

For this reason, courts addressing prior knowledge exclusions have held consistently that it is not necessary for the insured to know that it has done something wrong or know that a claim will be made against it.   Rather, all that is required is subjective knowledge of *facts* that *might* give rise to claim.   As one court explained:

> The above provisions of the application (which forms part of the parties' contract) and the policy do not require plaintiff to recognize or believe that it was negligent in the performance of its professional services. They merely require that a reasonable person . . . recognize or believe that a set of circumstances or a situation exist in which a third party may or reasonably could be expected to demand money or services and make an assertion that plaintiff was negligent. ***The [exclusion] precludes coverage where plaintiff knew of circumstances that may give rise to a claim***.

*McMillen Eng'g, Inc. v. Travelers Indem. Co.*, 744 F. Supp. 2d 416, 433 (W.D. Pa. 2010) (emphasis added).   The prior knowledge exclusion does not require "certainty" but only that,

-24-

given the insured's *subjective* knowledge of the facts, a reasonable insured "would understand that his actions 'might' be the basis of a claim.  There is no basis in law for deviating from this language by requiring a high probability or that a claim be likely."  *Westport Ins. Corp. v. Cotten Schmidt, LLP*, 605 F. Supp. 2d 796, 805 (N.D. Tex. 2009).  This point has been amplified by Pfizer's own expert in this case.  *See* L. Goanos, *What is a Warranty Letter, and Why is My Client Being Asked to Sign One,* AmWINS Group, Inc. (cautioning that "might" give rise to a claim is broad warranty language and should not hastily be signed by an insured because "almost anything *might* give rise to a claim") (CSOF at ¶61).

Pfizer nonetheless urges the Court to hold the Insurers to a purely subjective standard, such that an insured not only must know of facts that "might" give rise to a claim—the actual language used in the exclusion and enforced by courts—but also must evince a "fully" formed subjective belief that the known facts "would likely lead to a substantial D&O claim."  Br. at 41 (citation omitted).[4]  Pfizer's position stands the plain language and obvious purpose of the Prior Knowledge Exclusion on its head.  *See Selko*, 139 F.3d at 151 ("In order to properly allocate the risk, the policy sensibly puts the burden on the insured to disclose those facts known only to him, so that the costs of the risk can be evaluated with all the relevant information accessible to all parties") (quotation omitted).  A warranty seeks "just the facts" from the insureds, not their self-servingly optimistic subjective view about how likely they are to be sued.

---

[4] Pfizer's reliance here on *Imperium Ins. Co. v. Porwich,* No. A-4714-12T4, 2015 WL 807630, at *6 (N.J. Super. Ct. App. Div. Feb. 27, 2015), is misplaced. The court in *Imperium* was commenting on the facts in that case, which resulted in the appellate division reversing the trial court following a bench trial and finding for the insurer.  *Imperium* made clear that the subjective test only applied to whether *the facts* were known to the insured and did not purport to impose an absurd burden on the insurer to show the insured's subjective anticipation of a claim.  *Id.* at *4. Furthermore, the United States Court of Appeals for the Second Circuit has rejected the argument that Pfizer attempts to make here that the insured must comprehend that a potential claim would trigger the *excess* coverage.  *See Patriarch Partners, LLC v. Axis Ins. Co.,* 758 F. App'x 14, 20–21 (2d Cir. 2018).

*Liberty Surplus Insurance Corp. v. Nowell Amoroso, P.A.*, 916 A.2d 440, 445 (N.J. 2007), is inapposite.  As the Third Circuit explained in *Colliers*, "*Liberty* … expressly does not hold that the policy exclusion bars coverage only if the insured subjectively believed that a claim against it was forthcoming.  Because the parties agreed on the standard, ***the decision does not even address that issue.***"  *Colliers Lanard & Axilbund v. Lloyds of London*, 337 F. App'x 195, 200–01 (3d Cir. 2009) (emphasis added).  Thus, the Third Circuit in *Colliers* concluded that *Liberty* "is a case about the New Jersey summary judgment standard, and not about whether the typical exclusion in a "claims made" policy is to be evaluated under a subjective or objective standard." *Id.* at 200.

New Jersey courts have held, since *Liberty Surplus* was decided, that the subjective standard "should be applied to the first portion of the exclusion" as far as what facts were known to the insured.  *See Imperium*, 2015 WL 807630, at *4.  Courts in other states likewise have confined the subjective standard to the insured's knowledge of facts and have not required the insurer to show that the insured subjectively expected or anticipated a claim.  *See, e.g., Platte River Ins. Co. v. Baptist Health*, 4:07-cv-0036, 2009 WL 2015102, at *13-14 (E.D. Ark. April 17, 2009) (following "majority position" after surveying case law and concluding analysis of whether insured knew of circumstances that "may result in a claim" was objective); *Rivelli v. Twin City Fire Ins. Co.*, No. 08-cv-1225, 2008 WL 5054568, at *9 (D. Colo. Nov. 21, 2008) ("which may give rise to a claim" required subjective standard for knowledge of facts, and exclusion applied because objectively reasonable CEO and CFO could not fail to appreciate possibility of claim), *aff'd* 359 F. App'x 1 (10th Cir. 2009).

In *International Insurance Co. v. Peabody International Corp.*, for example, the court construed the words "may result in" and found that they demanded an objective test.  747 F.

Supp. 477, 483-84 (N.D. Ill 1990) ("The application calls for no judgmental or subjective evaluation.  Rather it requires in traditional objective language the disclosure of any facts indicating the probability of a covered claim.  Consequently, what Peabody understood about the letters is not relevant.").  *See also Agoglia*, 2009 WL 1227485, at *3 (applying objective test where one of the three different prior knowledge exclusions at issue precluded coverage where any insured "has any knowledge of or information concerning any act, error, omission, fact, matter, or circumstance that might give rise to a Claim under this Policy").

Pfizer, thus, asks this Court to misconstrue the Prior Knowledge Exclusion in the Warranty Statement to apply a purely subjective standard rather than utilize the objective/subjective hybrid standard first framed in the Third Circuit and now widely adopted throughout the country, including in New Jersey and New York, to interpret the very language found in the Warranty Statement.  Pfizer's argument should be rejected.

> 2.  *Insured Persons Had Knowledge of Facts That Reasonably Could Give Rise to a Claim Under the 2002-03 D&O Tower*

Pfizer erroneously suggests that the Insurers are relying on so-called "constructive knowledge" of the insured entity, Pharmacia, to prove subjective knowledge of facts.  In reality, the Insurers have shown that, at the time the Warranty Statement was signed, potential insured persons of Pharmacia, ***including Mr. Hassan himself***, knew of significantly negative publicity concerning Old Pfizer's and Pharmacia's alleged misrepresentations and omissions to the public about Celebrex and the results of the CLASS Study, the Consumer Actions and FDA scrutiny concerning Celebrex:

- In April 2000, Dr. Geis, Global Vice President/a potential insured (and defendant in the Garber Action), gave a presentation to "higher level people from Pharmacia," including Mr. Hassan, explaining that only 6-months, rather than the full 12-months, of data from the CLASS Study was published.  SOF ¶73.

- In February 2001, the FDA issued a Warning Letter to Pharmacia, which was addressed to Mr. Hassan calling out Pharmacia's promotional activities regarding Celebrex and its purported GI safety as "false" and "lacking in fair balance." SOF ¶81 & DX11.

- Mr. Hassan testified that he recalls learning about issues with Pharmacia's reporting of the data from the CLASS Study "some time in 2001" through internal reports from the Research and Development department. SOF ¶90.

- *The Wall Street Journal* article, published in August 2001, reported that "a study last year purporting to prove Celebrex's milder effects on the stomach than older remedies now appears exaggerated, because [Pharmacia] didn't publish half of the study data." SOF ¶¶88-89.

- *The Washington Post* article, "Missing Data on Celebrex: Full Study Altered Picture of Drug," published August 5, 2001 stated "When all of the [CLASS Study] data were considered, most of Celebrex's apparent safety advantage disappeared." SOF ¶¶84-86. Mr. Hassan testified that he did not recall *The Washington Post* article specifically, but he knew there was "unfavorable publicity" regarding the CLASS Study. SOF ¶87.

- Pharmacia's SEC Form 10-K405, for the fiscal year ending December 31, 2001, contains disclosures related to Celebrex-related litigations, including the Consumer Actions. The form was signed by Fred Hassan and Chris Coughlin on February 20, 2002—the same individuals who signed the Warranty Statement on August 29, 2002. SOF ¶101.

- Pharmacia's SEC Form 10-Q, for the quarterly period ending on March 31, 2002, stated that Pharmacia was involved in both federal and state litigation in New Jersey relating to Celebrex prior to May 15, 2002, involving claims of misrepresentation, fraud and over-promotion of Celebrex. SOF ¶102.

- *The British Medical Journal* published an article in **June 2002**, providing that the CLASS Study results contradicted published conclusions. SOF ¶¶103-05; *see also id.* ¶106 (June 2002 *Washington Post* piece comparing Pharmacia to Enron and characterizing the CLASS Study manipulations as an "Arthur Andersen-type trick").[5]

- Pharmacia's proffered expert, Larry Goanos, conceded that Mr. Hassan knew about issues concerning disclosure of data from the CLASS study. SOF ¶127.

Indeed, the widely publicized allegations concerning Pharmacia's misrepresentations and

omissions to the public and the FDA about Celebrex and the results of the CLASS Study were

---

[5] Pfizer's brief (at 44) incorrectly states that the negative publicity about the CLASS Study stopped in 2001. The negative publicity obviously continued into mid-2002, shortly after which Messrs. Hassan and Coughlin executed the Warranty Statement on behalf of Pharmacia.

elevated to the attention of Pharmacia's Board of Directors and its subcommittees:

- Mr. Hassan was present at a Pharmacia Board presentation where a slideshow referred to a failure of the CLASS study to achieve the primary endpoint. *See* SOF ¶83. *See also* SOF ¶¶98-99 (noting reduced long-term value and sales potential "due to primary endpoint miss in CLASS").

- A September 2001 email from Philip Needleman indicates that the Science Committee gave an overview of the issues with the CLASS Study to the Board. SOF ¶94 ("Fred H. has requested that we use the Science and Technology Subcommittee meeting on Monday Sept 24, 2001… to review the Celebrex issues, ie *6 vs 12 month* and the cardiovascular story, with the comm. Then Bengt (the comm chair) will present a brief overview to the Board in their executive session the next day. The committee members include: Samuelsson, Leder, Parfet, Peters, sometimes Hassan, Ando and me. In a subsequent Board meeting we are asked to present to the Social Policy subcomm and focus on these same issues-including the Wash Post, JAMA articles and related matters… *these issues are amongst the biggest drivers of the company status* and we need lots of communications.") (emphasis added).

- A Custodial Report from Garber defendant Cox (also a potential insured) to investor relations states that "A Pharmacia/Pfizer corporate response team has been engaged to *address the ramifications of this media attention*, both in the US and worldwide. *Fred Hassan has informed the board about these issues in recent weeks* and updates will also be given at our upcoming board meeting… A separate issue was addressed in the *Washington Post* article that identified published CLASS data in JAMA where data from the six-month time period rather than data from the 12-month time point at study completion. This *article has raised questions about the integrity of the clinical trial data supporting Celebrex and the credibility of Pharmacia* in providing six-month data for publication, while 12-month data had been provided to the FDA." SOF ¶93 (emphasis added).

- Minutes of the Product Executive Committee dated December 13, 2001, indicate that the Committee discussed "response to FDA on CLASS, we will take the following approach: Delete reference to CLASS. Insert 'study did not meet primary endpoint' in label language." SOF ¶100.

- On September 25, 2001, the Board discussed the CLASS Study and the issue surrounding the reporting of 6-months versus 12-months of data. This issue, according to Pharmacia's CEO, Mr. Hassan, was important enough to discuss with the Board of Directors because it "*brought the integrity of the Company into question*." SOF ¶97 (emphasis added).

Neither the language in the Warranty Statement nor applicable law requires that the signatory of the Warranty Statement themselves hold the relevant knowledge—the Warranty Statement explicitly refers to all persons proposed for coverage. The plain meaning of the

Warranty Statement indicates that the two signatories were warranting on behalf of all potential insureds that there were no known pre-existing issues, and that claims arising out of any such known pre-existing issues would not be covered if any potential insured had the relevant knowledge.  Thus, although it is clear from the evidence that Mr. Hassan held knowledge of prior alleged misrepresentations and omissions by Pharmacia regarding the safety and efficacy of Celebrex, including with respect to the CLASS Study, it is sufficient that *any* potential insured had such knowledge for coverage to be excluded.

Given (1) the mounting negative publicity about Pharmacia's manipulation of the CLASS Study data into 2002, (2) the Consumer Actions, which alleged misrepresentations and omissions to the public about Celebrex and the CLASS Study data; and (3) the fact that these issues called the very "integrity" of the company into question and thus commanded the attention of Pharmacia's CEO, Board and committees—there can be no genuine dispute that many potential insureds had knowledge of the alleged misrepresentations and omissions concerning Celebrex and the CLASS Study.  Whether Arch or Twin City also had *some* of this knowledge is irrelevant, because the Warranty Statement concerns the potential insureds' knowledge, not knowledge possessed by the Insurers.  Accordingly, based on the facts discussed above and pursuant to the clear and unambiguous terms of the Prior Knowledge Exclusion in the Warranty Statement, there is no coverage for the Garber Action.  At the very least, given this evidence, Pfizer has not and cannot meet its summary judgment burden of showing that the Prior Knowledge Exclusion does not apply.

### D.   **Pfizer Has Not Met Its Burden Under the Insurers'  Policies To Show Full Exhaustion of Underlying Limits**

Pfizer has the threshold burden as the insured to demonstrate that the Garber Action meets all conditions precedent to coverage under the Excess Policies.  *See, e.g., Polarome Int'l,*

*Inc. Greenwich Ins. Co.*, 961 A.2d 29, 38-39 (N.J. Super. Ct. App. Div. 2008); *Fruchthandler v. Tri-State Consumer Ins. Co.,* 96 N.Y.S.3d 649, 650 (App. Div. 2019).  Under the Arch and Twin City policies, Pfizer must establish that it has exhausted in full all underlying coverage through the actual payment of all underlying insurance.  *See* p.8, *supra*.  In the case of the Twin City Policy, Pfizer must establish the critical additional requirement that all underlying insurers have "duly admitted liability."  *Id.*  Pfizer contends that it can satisfy its burden to show coverage under the Excess Policies by introducing proof of payments by the underlying insurers totaling $130 million (the attachment point of the Arch Policy).  This showing, however, is inadequate, for the reasons discussed below.

*1.    This Court Should Enforce the Exhaustion Provisions Strictly as Written*

As noted in the Insurers' opening brief, New Jersey courts interpret insurance policies, like other contracts, strictly as written when the terms are clear and unambiguous; and courts are not permitted to write a better contract for the insured to find coverage.  *See, e.g., Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010); *Mem'l Props., LLC v. Zurich Am. Ins. Co*., 46 A.3d 525, 532-33 (N.J. 2012).  This is true especially for D&O policies, where policyholders "are particularly knowledgeable insureds, purchasing their insurance requirements through sophisticated brokers" and thus are "much better able to deal with the insurers on an equal footing."  *See Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, PA, 129 A.3d 1069, 1081 (N.J. 2016) (citation omitted).  For such "sophisticated clientele," requiring strict compliance with express conditions precedent to coverage is both reasonable and consistent with the parties' expectations when entering into the insurance contract.  *Id.*

Although New Jersey has not specifically interpreted exhaustion and attachment point provisions such as those in the Excess Policies, New York courts have had multiple occasions to do so.  And New York courts have strictly enforced the terms of underlying exhaustion

provisions that are substantively identical to the provisions contained in the Excess Policies.  *See, e.g., Ali v. Fed. Ins. Co.*, 719 F.3d 83, 91-94 (2d Cir. 2013); *JP Morgan Chase & Co. v. Indian Harbor Ins. Co.*, 947 N.Y.S.2d 17, 20-23 (App. Div. 2012); *In re Rapid-Am. Corp.*, No. 13-10687, 2016 WL 3292355, at *11 (Bankr. S.D.N.Y. June 7, 2016); *Forest Labs., Inc. v. Arch Ins. Co.*, 953 N.Y.S.2d 460, 465-66 (Sup. Ct. 2012), *aff'd*, 984 N.Y.S.2d 361 (App. Div. 2014). Indeed, as the Insurers noted in their opening brief, the clear trend in the law throughout the United States is to enforce exhaustion provisions as written even when doing so may result in complete loss of coverage to the insured.  *See* Insurers Br. at 32 & n.8.

> ### 2. *The Twin City Policy Expressly Requires Pharmacia To Show Both Underlying Claim Payments "and" that Each Underlying Insurer Admitted Liability*

Under the Twin City Policy (JX11), Twin City can be required to pay losses only after Pfizer establishes that the primary and all underlying excess insurance carriers beneath Twin City have (i) admitted liability for the losses under their policies, ***and*** (ii) paid the full amount of their respective liability under their policies.  SOF ¶11-12; *see JP Morgan Chase*, 947 N.Y.S.2d at 22 ("the plain language of this attachment provision, the underlying insurers' admission of liability ***and*** the payment of the full amount of their liability were ***conditions precedent*** to Twin City's liability under its policy") (emphasis added).  The *JP Morgan* case thus recognized explicitly that Twin City's excess policy language employed two separate and independent conditions precedent to coverage.

The Insurers' opening brief (at 34-35) identified five settlement agreements between Pfizer and underlying insurers where ███████████████████████████████. Pfizer does not quibble with the contents of these agreements, and they stand as undisputed facts.

What Pfizer instead asks this Court to do is to ignore *JP Morgan's* explicit holding and to deem full payment of limits to be the same as admitting liability.  This ignores the explicit

*additional* requirement in the Twin City Policy and renders the "admit liability" clause superfluous.  Pfizer's argument cannot be squared with New Jersey law, which requires the Court to give effect to "all parts of the writing and *every word of it*."  *See Washington Constr. Co. v. Spinella*,  84 A.2d 617, 619 (1951), *quoted in Sosa v. Massachusetts Bay Ins. Co.,* 206 A.3d 1011, 1017 (N.J. Super. Ct. App. Div. 2019) (emphasis added).  A court thus is not free to read express conditions out of the policy or to assume them to be redundant.

 Pfizer's resort to "public policy" is equally unavailing.  In *Templo*, *supra*, the New Jersey Supreme Court noted that "equitable concerns" are irrelevant where, as here, the court is asked to "enforce the plain and unambiguous terms of a negotiated Directors and Officers insurance contract entered into between sophisticated business entities."  *Templo*, 129 A.3d at 1081.  Here, as in *Templo*, Pharmacia was represented by a sophisticated insurance broker (Aon), which negotiated the Excess Policies with Arch and Twin City.  SOF ¶3.  Aon certainly could have requested an endorsement amending the policies but did not.

Pfizer also could have attempted a global settlement with all carriers in the Pharmacia D&O tower, or it could have asked Twin City to waive the "admit liability" requirement.  Pfizer instead pursued its own agenda of piecemeal settlements with underlying insurers, in several cases ███████████████████████████████████████████████ in exchange for ostensible "full limits" settlement payments.  Pfizer was represented by counsel in all these discussions—there is no suggestion that Pfizer did not understand Twin City's policy language.  It just did not choose to comply with it.

The purported absurdities noted in Pfizer's brief (at 28-29) are not only irrelevant where the policy language is clear, but they are largely moot at this point.  The Twin City Policy was issued in September 2002.  Over the past seventeen years, excess D&O policies have evolved

and typically do not contain the same conditions to coverage—a reflection of the negotiating strength of corporate policyholders like Pfizer and their multinational insurance brokers like Aon (which represented Pharmacia) and Marsh (which represented Pfizer) to negotiate changes in key policy terms.   These legally adept and well-heeled policyholders do not need to throw themselves upon the mercy of the courts to overcome what they perceive as draconian policy language.  When Twin City's corporate witness testified in his deposition that he personally had never admitted liability on behalf of Twin City, this reflects the vintage of the Twin City Policy language and nothing more.  But the unusual nature of Twin City's policy language by today's standards is hardly a reason to decline to enforce unambiguous language that two sophisticated parties freely chose when they long ago entered into an insurance contract.

>   3.   *Pfizer Has Not Shown That All Underlying Limits Were Actually Paid for the Garber Action*

In *JP Morgan,* two excess insurers paid ***more*** than their respective policy limits to the insured, yet, the court declined to find those policies exhausted.  947 N.Y.S.2d at 20-23.  This was because each insurer's payment was part of a settlement agreement releasing multiple policies.  With multiple policies released by a single unallocated settlement payment, "there [was] no way to determine that [the underlying insurer] paid the full limit of its liability under its [insured's] tower policy because the settlement provided for no allocation of the [settlement] payment."  *Id.*  The court enforced the attachment provisions strictly as written without resort to extrinsic evidence or public policy.[6]

---

[6] Pfizer asserts (without citation) that underlying carriers in *JP Morgan* "admittedly paid less than their full polic[ies]."  Br. at 26.  This statement is false.  The problem was the unallocated structure of the settlement agreement, which "render[ed] it impossible for plaintiff to prove the amount, if any, paid by Zurich with respect to the Zurich policy underlying the Twin City Policy in the Bank One Program," not that Zurich paid less than its limit.  *JP Morgan,* 930 N.Y.S.2d 175 (Sup. Ct. 2011).

The same result should occur here. ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████. For example:



- In the National Union settlement agreement, ███████████████

- In the Continental settlement agreement, ███████████████

As in *JP Morgan*, ████████████████████████████████
████████████████████████████████. Accordingly, Pfizer cannot demonstrate

compliance with an express condition precedent to coverage under the Excess Policies.

Pfizer's argument to avoid satisfying these clear conditions precedent depends largely on

convincing this Court that New Jersey courts, unlike those in New York and elsewhere

throughout the country, would disregard unambiguous contract language in the Excess Policies.

Pfizer thus argues (Br. at 22) that, rather than enforce the actual policy language as the courts in

New York have done, this Court should adopt a rule that, so long as the underlying liability

numerically exceeds the amount of underlying insurance, the underlying insurance will be

deemed exhausted.  Pfizer's argument cannot be squared with New Jersey authorities.

Pfizer attempts to rely on a series of New Jersey cases discussing settlement credits in

environmental insurance coverage disputes—but none of those cases involve D&O policies like

the Excess Policies here or remotely similar attachment point language.  Without discussing

policy language at all, those courts held that excess general liability insurers are entitled to full

credit for any underlying policy limits settled, even if the underlying insurer settled for less than policy limits.  *See UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 647 A.2d 182, 190-91 (N.J. Super. Ct. Law Div. 1994) (holding that excess general liability insurer not entitled to discovery of underlying settlements because excess insurer will receive a full settlement credit for the underlying primary limits); *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.,* 177 F.3d 210, 227 (3d Cir. 1999) (predicting that New Jersey Supreme Court would adopt reasoning of *UMC* regarding settlement credit).[7]

Because the cases cited in Pfizer's brief do not interpret the policy language that the parties selected in the Excess Policies, they are irrelevant to this Court's analysis.  Certainly they provide no indication that this Court should depart from core interpretive principles recently reiterated in *Templo* requiring courts to strictly enforce conditions precedent to coverage for sophisticated insureds purchasing sophisticated insurance products like Pharmacia did here. New Jersey law thus is entirely consistent with the law cited in the Insurers' opening brief.

Pfizer's other response to the Insurers' argument is to say that, based on checks and wire transfers, "each insurer paid its full policy limit, under its underlying 2002-2003 D&O policy, for *Garber* alone."  Br. at 25.  But Pfizer's assertion is rebutted with the settlement agreements, which speak for themselves as to what insurance policies were released with each insurer's settlement payment.  Take the National Union settlement agreement as an example.  ████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

---

[7] *See also Nat'l Union Fire Ins. Co. v. Becton Dickinson & Co.*, No. 14-4318, 2019 WL 1771996, at *4 (D.N.J. Apr. 23, 2019) (holding that underlying settlement terms were relevant in context of that particular environmental coverage dispute under general liability policies); *Carpenter Tech. Corp. v. Admiral Ins. Co*., 800 A.2d 54, 64 (N.J. 2002) (following *UMC* holding that New Jersey insurance guaranty fund was entitled to a credit for the full maximum amount payable by the Pennsylvania fund rather than amount actually paid).



As Pfizer concedes in its brief (at 11), it incurred over $200 million in defense costs and settlement for the Garber Action—meaning that (if Pfizer were correct in all of the arguments it makes here as to Arch and Twin City) then Pfizer should have ████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████. Not only does Pfizer's assertion defy common sense and reality, it is not a fair reading of the National Union settlement agreement.

## IV.    CONCLUSION

For the foregoing reasons, Pfizer's motion for summary judgment should be denied.

Dated: August 14, 2019

**WHITE AND WILLIAMS LLP**

/s/ Erica Kerstein
Erica Kerstein, Esq. (ID No. 1879-2001)
Andrew Hamelsky, Esq.
WHITE AND WILLIAMS LLP
7 The Legal Center, One River Front Plaza
1037 Raymond Blvd. Suite 230
Newark, New Jersey 07102
201-368-7206
kersteine@whiteandwilliams.com
*Attorneys for Defendant*
*Arch Specialty Insurance Company*

**CLYDE & CO US LLP**

/s/ Marianne May
Marianne May, Esq. (ID No. 4703-1997)
Marianne.May@clydeco.us
200 Campus Drive, Suite 300
Newark, NJ 07932
(973) 210-6700

Douglas Mangel (admitted *pro hac vice*)
Gabriela Richeimer (admitted *pro hac vice*)
1775 Pennsylvania Ave, N.W., Suite 400
Washington, D.C. 20006
(202) 747-5100
Doug.Mangel@clydeco.us
Gaby.Richeimer@clydeco.us
*Attorneys for Defendant*
*Twin City Fire Insurance Company*