MCKOOL SMITH, P.C.
Robin L. Cohen (NJ Attorney ID No. 030501986)
Adam S. Ziffer (admitted *pro hac vice*)
Marc T. Ladd (admitted *pro hac vice*)
One Bryant Park, 47th Floor
New York, NY 10036
Tel: (212) 402-9400
*Attorneys for Plaintiff Pharmacia Corporation*
*n/k/a Pfizer Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHARMACIA CORPORATION N/K/A PFIZER INC., <br><br> Plaintiff, <br><br> v. <br><br> ARCH SPECIALTY INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, and LIBERTY MUTUAL INSURANCE COMPANY, <br><br> Defendants. | Civil Action No. 2:18-cv-00510-ES-MAH <br><br> **ORAL ARGUMENT REQUESTED** |

## PLAINTIFF PHARMACIA CORPORATION N/K/A
## PFIZER INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
## <u>INSURERS' MOTION FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................1

COUNTER-STATEMENT OF FACTS ....................................................6

ARGUMENT ...........................................................................................6

I.   NEW JERSEY LAW APPLIES TO THE EXCESS POLICIES ...................6

    A.   If No Conflict Of Laws Exists, New Jersey Law Applies ..................6

    B.   Neither AWAC's Choice-Of-Law Provision Nor Twin City's "New York Endorsements" Require That New York Law Applies To The Excess Policies In This Litigation...............................6

        1.   Insurers' Excess Policies Do Not Adopt The AWAC Policy's Choice-Of-Law Provision Applicable In Mandatory Arbitration ...............................................................7

        2.   The Twin City Policy's Irrelevant New York Endorsements Were A Mistake, And Do Not Imply New York Law Applies ........................................................9

    C.   New Jersey, Not New York, Has The Most Significant Relationship To The Excess Policies And This Coverage Dispute...........................................................................................11

II.   INSURERS' PPL EXCLUSIONS DO NOT APPLY TO PRECLUDE COVERAGE FOR THE G*ARBER* ACTION................................................14

    A.   The PPL Exclusions Are Only Implicated By Pending Or Prior D&O Litigation—And There Was No Such Litigation .....................14

    B.   The *Garber* Action Does Not Arise Out Of, Nor Are Its Wrongful Acts "Interrelated" With, The Consumer Class Actions...........................................................................................18

        1.   The Wrongful Acts Alleged In The Consumer Class Actions Do Not "Substantially Overlap" Or Share A "Sufficient Factual Nexus" With The *Garber* Action .............18

        2.   The Consumer Class Actions' Few References To Articles Criticizing The CLASS Study Do Not Establish That The Wrongful Acts Therein Are Causally "Related" To *Garber's*............................................................................21

i

III. THE WARRANTY LETTER DOES NOT PRECLUDE COVERAGE
FOR THE *GARBER* ACTION ........................................................30

    A.    Insurers Ignore Both The Plain Language And Intended
Purpose Of The Warranty Letter So As To Deny Coverage For
*Garber* ........................................................................................30

        1.    The Plain Text Of The Warranty Letter Requires A
Subjective, Not An Objective, Analysis ...................................30

        2.    The Warranty Letter And Prior Knowledge Exclusions
Are Intended To Exclude Coverage For The Insured's
Unknown, Undisclosed Acts—Not "Widely Publicized"
Acts ........................................................................................33

    B.    Insurers Fail To Meet Their Burden:  There Is No Evidence
That Any Insured Was Subjectively Aware Of Facts That Could
Be Expected To Give Rise To A D&O Claim ...................................35

    C.    Even Under A Mixed Subjective-Objective Analysis, There
Was No Reasonable Basis For An Insured Person To Expect
The *Garber* Action Prior To August 29, 2002 ...................................37

IV. THE EXCESS POLICIES ATTACH BECAUSE ALL OF THE
UNDERLYING POLICIES HAVE BEEN FULLY EXHAUSTED............42

    A.    Twin City's Argument That Its Policy Only Attaches If The
Underlying Insurers "Duly Admit Liability" For *Garber In
Addition To* Paying Their Full Policy Limits Should Be
Rejected ........................................................................................44

    B.    All Of The Underlying Insurers Paid The Full Limits Under
Their Underlying Policies For *Garber* Alone ...................................47

CONCLUSION ........................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Guar. & Liab. Ins. Co. v. Chicago Ins. Co.*,
105 A.D.3d 655 (1st Dep't 2013) ........................................................19

*Assicurazioni Generali, S.P.A. v. Clover*,
195 F.3d 161 (3d Cir. 1999) ...............................................................10

*AT & T v. Clarendon Am. Ins. Co.*,
2008 WL 2583007 (Del. Super. Ct. Feb. 11, 2008) ............................8

*Bell v. Federal Ins. Co.*,
2008 WL 11347931 (D. Minn. June 23, 2008) ..................................15

*Bell v. Merchs. & Businessmen's Mut. Ins. Co.*,
575 A.2d 878 (N.J. Super. Ct. App. Div. 1990) ................................11

*Bell v. USAA Cas. Ins. Co.*,
2009 WL 2524351 (D.V.I. Aug. 14, 2009) .......................................10

*Blizzard v. Fed. Ins. Co.*,
2007 WL 675346 (E.D. Pa. Feb. 27, 2007) .......................................10

*Brecek & Young Advisors v. Lloyds of London Syndicate 2003*,
715 F.3d 1231 (10th Cir. 2013) .........................................................29

*Cap. Growth Fin. LLC v. Quanta Specialty Lines Ins. Co.*,
2008 WL 2949492 (S.D. Fla. July 30, 2008) ....................................29

*Colliers Lanard & Axilbund v. Lloyd's of London*,
337 F. App'x 195 (3d Cir. 1999) .......................................................31

*Colliers Lanard & Axilbund v. Lloyds of London*,
458 F.3d 231 (3d Cir. 2006) ........................................32, 33, 35, 37

*Cont'l Ins. Co. v. Beecham, Inc.*,
836 F. Supp. 1027 (D.N.J. 1993) ......................................................13

*Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*,
2006 WL 2135782 (E.D.N.Y. July 28, 2006) ..............................32, 38

*CPA Mut. Ins. Co. of Am. Risk Retention Grp. v. Weiss & Co.*,
   80 A.D.3d 431 (1st Dep't 2001) ........................................................................32

*Darwin Nat'l Assur. Co. v. Fahy Choi, LLC*,
   2015 WL 12698440 (D.N.J. Dec. 18, 2015)...........................................33, 34, 36

*E. Allen Reeves, Inc. v. Michael Graves & Assocs., Inc.*,
   2015 WL 105825 (D.N.J. Jan. 7, 2015)..............................................................46

*First Trenton Indem. Co. v. River Imaging, P.A.*,
   2009 WL 2431649 (N.J. Super. Ct. App. Div. Aug. 11, 2009)...................18, 19

*Forest Labs., Inc. v. Arch Ins. Co.*,
   953 N.Y.S.2d 460 (Sup. Ct. N.Y. Cnty. 2012), *aff'd*, 984 N.Y.S.2d
   361 (1st Dep't 2014) ........................................................................................49

*G-I Holdings v. Hartford Fire Ins. Co.*,
   2007 WL 842009 (D.N.J. Mar. 16, 2007) ...................................................16, 26

*Gladstone v. Westport Ins. Corp.*,
   2011 WL 5825985 (D.N.J. Nov. 16, 2011) ........................................................27

*Glascoff v. OneBeacon Midwest Ins. Co.*,
   2014 WL 1876984 (S.D.N.Y. May 8, 2014) ......................................................25

*Gray v. BMW of N.A., LLC*,
   22 F. Supp. 3d 373 (D.N.J. 2014)........................................................................6

*Hammersmith v. TIG Ins. Co.*,
   480 F.3d 220 (3d Cir. 2007) ..............................................................................10

*Henderson/Vance Healthcare, Inc. v. Cincinnati Ins. Co.*,
   2013 WL 5375612 (E.D.N.C. Sept. 25, 2013) ..................................................41

*In re Enron Corp. Secs., Derivatives & "ERISA" Litig.*,
   391 F. Supp. 2d 541 (S.D. Tex. 2005).................................................................8

*In Re Pfizer Inc. Secs. Litig.*,
   No. 1:04-civ-9866 (S.D.N.Y.) ...........................................................................23

*In re Woolard*,
   269 B.R. 748 (Bankr. S.D. Ohio 2001) .............................................................46

*Ironshore Indem., Inc. v. Pappas & Wolf, LLC*,
    2018 WL 2012009 (N.J. Super. Ct. App. Div. May 1, 2018) ...........................31

*JP Morgan Chase & Co. v. Indian Harbor Ins. Co.*,
    98 A.D.3d 18 (1st Dep't 2012) ...................................................................44, 48

*Koppers Co. v. Aetna Cas & Sur. Co.*,
    98 F.3d 1440 (3d Cir. 1996) ...............................................................................43

*Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely Law
Corp.*,
    162 F. Supp. 3d 1068 (C.D. Cal. 2016) ............................................................28

*Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*,
    189 N.J. 436 (N.J. 2007) ..............................................................................31, 32

*Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*,
    2010 WL 8250837 (Del. Super. Ct. Nov. 5, 2010).........................11, 43, 47, 50

*N. River Ins. Co. v. Phila. Reinsurance Corp.*,
    831 F. Supp. 1132 (D.N.J. 1993), *rev'd sub nom.*, 52 F.3d 1194 (3d
    Cir. 1995) ..............................................................................................................8

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Ambassador Grp., Inc.*,
    691 F. Supp. 618 (E.D.N.Y. July 13, 1988) .........................................19, 21, 29

*Navigators Specialty Ins. Co. v. Scarinci & Hollenbeck, LLC*,
    2010 WL 1931239 (D.N.J. May 12, 2010).................................................passim

*Nomura Holding Am., Inc. v. Fed. Ins. Co.*,
    45 F. Supp. 3d 354 (S.D.N.Y. 2014) ...........................................................16, 28

*Old Bridge Mun. Utils. Auth. v. Westchester Fire Ins. Co.*,
    2016 WL 4083220 (D.N.J. July 29, 2016) ........................................................27

*Omega Fin. Servs. Inc. v. Aspen Specialty Ins. Co.*,
    2014 WL 4796615 (N.J. Super. Ct. Law Div. Sept. 22, 2014) .........................32

*Papalia v. Arch Ins. Co.*,
    2017 WL 3288113 (D.N.J. Aug. 1, 2017) ...................................................21, 27

*Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*,
    2010 WL 772299 (N.J. App. Div. Mar. 8, 2010) ..............................................26

*Patriarch Partners LLC v. Axis Ins. Co.*,
   758 F. App'x 14 (2d Cir. 2018) .......................................................................42

*Pfizer Inc. v. Arch Ins. Co.*,
   2019 WL 3306043 (Del. Super. Ct. July 23, 2019)............................4, 23, 25, 29

*Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*,
   2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009) .....................................................31

*Regal-Pinnacle Integrations Indus., Inc. v. Phila. Indem. Ins.*,
   2013 WL 1737236 (D.N.J. Apr. 22, 2013).......................................18, 19, 26, 29

*Seneca Ins. Co. v. Kemper Ins. Co.*,
   2004 WL 1145830 (S.D.N.Y. May 21, 2004) .....................................................27

*Shannon v. B.L. Eng. Generating Station*,
   2013 WL 6199173 (D.N.J. Nov. 27, 2013) ...........................................................9

*Travelers Cas. & Sur. Co. of Am. v. Gold, Scollar, Moshan, PLLC*,
   2018 WL 1508573 (S.D.N.Y. Mar. 14, 2018).......................................31, 33, 36

*Travelers Cas. & Sur. Co. v. Honeywell Int'l, Inc.*,
   2007 WL 8092105 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 2, 2007) ...............................9

*UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*,
   647 A.2d 182 (N.J. Super. Ct. 1994) ..................................................................43

*Univ. of Pittsburgh v. Lexington Ins. Co.*,
   2016 WL 7174667 (S.D.N.Y. Dec. 8, 2016) ...............................................33, 38

*W.C. & A.N. Miller Development Co. v. Continental Casualty Co.*,
   2014 WL 5812316 (D. Md. Nov. 7, 2014) ...................................................17, 29

*Walters v. Am. Home Assur.*,
   2011 WL 4409170 (D.N.J. Sept. 21, 2011) .........................................................10

*Weaver v. Axis Surplus Ins. Co.*,
   2014 WL 5500667 (E.D.N.Y. Oct. 30, 2014) ...............................................19, 27

*Wright v. Newman*,
   767 F.2d 460 (8th Cir. 1985) .............................................................................45

*Zahler v. Twin City Fire Ins. Co.*,
  2006 WL 846352 (S.D.N.Y. Mar. 31, 2006) ................................................. 16, 27

*Zodiac Group, Inc. v. Axis Surplus Ins. Co.*,
  542 Fed. App'x 844 (11th Cir. 2013) ................................................................. 28

*Zunenshine v. Exec. Risk. Indem. Co.*,
  182 F.3d 902 (2d Cir. 1999) ......................................................................... 16, 28

**OTHER AUTHORITIES**

Fed. R. Evid. 408 ............................................................................................ 46

Pharmacia[1] submits this memorandum of law in opposition to Insurers'
motion for summary judgment.

## PRELIMINARY STATEMENT

There is no dispute that the *Garber* Action—a shareholder class action
against Pharmacia and its directors and officers for federal securities violations—is
covered under the Insurers' Policies' grant of coverage; it is the exact type of
securities lawsuit D&O policies are sold to cover.  Nor is there any dispute that all
eight insurers who sold policies underlying Insurers' Policies paid Pharmacia the
full limits of their policies for *Garber*.  Yet, six years later, Insurers are still
denying these underlying payments, and are still invoking Policy exclusions that
do not apply to *Garber* as a matter of law.

Insurers first contend there is no conflict of state law at issue.  That means
New Jersey law applies.  But then, they argue that New York law applies, insisting
that their Excess Policies selectively adopt an underlying policy's New York
choice-of-law provision, even though their Policies' follow form language does not
adopt the provision.  Even worse, the underlying policy contains a mandatory
Bermuda arbitration provision which is cross-referenced in the clause selecting
New York law; the policy does not even contemplate domestic litigation under

---

[1] Capitalized terms contained herein have the same meaning as defined in
Pharmacia's Memorandum of Law in Support of Its Motion for Summary
Judgment, Dkt. No. 91 ("Pls. Br.").  "Ins. Br." refers to Insurers' Memorandum of
Law in Support of Summary Judgment, Dkt. No. 88.

New York law at all.  Lacking a clear choice of law for this non-Bermuda, non-arbitration, New Jersey law applies.  Insurers issued their Policies to a New Jersey insured, after underwriting meetings in New Jersey, for a New Jersey-based premium, and they provide coverage for a New Jersey lawsuit alleging misconduct in New Jersey.  New Jersey has the paramount interest in having its law applied.

Insurers next contend that coverage for *Garber* is precluded under their exclusions for prior or pending litigation ("PPL")—a "protection[]" that allegedly was "not available to incumbent lower-level insurers" on the D&O program.  Ins. Br. at 2.  Insurers offer no proof for this statement because it is not true; all of the underlying carriers, just like Insurers, had exclusions for related litigation that occurred, or was noticed, prior to their "claims-made" policy's inception.  And underlying carrier AWAC had the same exact PPL exclusion (and Warranty), and paid its full policy limit, because *Garber* did not arise out of, or involve the same Wrongful Acts as, the prior-filed Consumer Class Actions.

While Insurers argue that the PPL Exclusions must be enforced "as written," they ignore that the plain text does not apply to the Consumer Class Actions—they only apply to prior or pending *D&O* claims.  Each PPL Exclusion requires the prior action be against "an Insured," defined in the Policies as (1) a director or officer and (2) Pharmacia, but only with respect to "Securities Claims."  The Consumer Class Actions were not against any director or officer, and did not allege

2

a securities claim against Pharmacia.  Consistent therewith, no court has held a consumer lawsuit can trigger a prior litigation exclusion in a D&O policy.

To distract from the inapplicability of the actual language, Insurers focus repeatedly on the Exclusions' use of the word "any" to argue that *any* commonality between *Garber* and the Consumer Class Actions means the Exclusions apply.  But no court has endorsed such an expansive reading of these exclusions.  Rather, courts hold the exclusions require the actions have "substantial overlap" or a "sufficient factual nexus," which does not exist when the lawsuits involve "legally distinct claims that allege different wrongs to different people."

Here, the Consumer suits and *Garber* involved different plaintiffs, defendants, causes of action, legal theories, harms, and markedly different wrongful acts.  The Consumer Class Actions alleged Pharmacia and others, starting in 1999, falsely advertised to consumers that Celebrex and Vioxx were free from cardiovascular (CV) and gastrointestinal (GI) harm, resulting in CV injuries and overcharging for drugs.  *Garber*, in contrast, alleged that the false reporting to investors of the results of a clinical study (CLASS) on the GI side effects of Celebrex led to a stock drop in June 2002, losing millions of dollars in market capitalization.  The Consumer Class Actions' few paragraphs referencing articles criticizing "a study" do not a "substantial overlap" make, and *Garber*—filed in April 2003 by Pharmacia shareholders—did not "follow[] on the heels" (*id*. at 1) of

the 2001 Consumer Class Actions, which were dismissed or already had little impact when *Garber* was filed.  One court already has rejected Insurers' same arguments for "relatedness" as "strained" and "uncharacteristically broad" in an action between Arch and Pfizer, under the same exact policy language.[2]

Insurers' arguments for application of the Warranty Letter fare no better.  In the Warranty dated August 29, 2002, Pharmacia's CEO and CFO affirmed that no Insured Person knew of any facts he or she thought could lead to a D&O claim. There is no evidence that *anyone* thought *Garber* might be coming at the time, and Insurers do not argue otherwise.  Instead, Insurers are forced to graft onto the Warranty's text the view of a hypothetical "objectively reasonable" person, when the Warranty requires a subjective knowledge analysis only.  They then cite public articles, Board presentations, and emails about CLASS, all of which they claim, if "[t]aken together" (Ins. Br. at 4) show that someone could predict *Garber* was coming eight months later.  But despite Insurers' extensive discovery of the past 19 years since CLASS, there is not a single document even hinting at the potential of a D&O claim based on the misreporting of the CLASS Study's results.  Rather, the documents merely show that Pharmacia, Insurers *and* the public were aware of the "widely publicized" criticisms of CLASS that began as early as February 2001. Even Insurers, who are professional risk evaluators, did not foresee that a D&O

---

[2] *Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043, at *9 (Del. Super. Ct. July 23, 2019) (the "*Arch* Action").

claim based on CLASS would come in April 2003.  Far from a "building already on fire" (*id.* at 2), there was not even any smoke when the Warranty was signed in August 2002.  Insurers' piecing together of general "clues" with 20/20 hindsight to create a "fire" does not make the Warranty any less true now.

Insurers' last gasp to avoid coverage is their argument that their Excess Policies do not attach because not all underlying coverage was exhausted for *Garber*—even though each underlying insurer paid its full policy limit specifically for *Garber*, and specifically paid under the underlying policy.  Insurers argue for a "draconian loss of coverage" (*id.* at 32), claiming it is a necessary consequence of the law.  But where, as here, the evidence shows that each underlying carrier paid its full limit solely for *Garber*, no state law permits forfeiture of coverage.  And certainly New Jersey law does not, as it only requires an insured incur losses in excess of the policy's layer for attachment.  Finally, Twin City has no authority and no rationale supporting its position that each underlying insurer had to separately "admit liability" for *Garber in addition to* the payment of its full limit.

Insurers contend that the purpose of an excess carrier requiring underlying exhaustion is so, before a claim reaches its layer, the underlying insurers already have "reviewed and analyzed the claim, determined that there is coverage," and paid their limits.  *Id.* at 37.  That purpose was fulfilled here, and now, Insurers must be held to provide the coverage those insurers already admitted.

## COUNTER-STATEMENT OF FACTS

Pharmacia adopts and incorporates by reference herein its Statement of Undisputed Material Facts, filed separately with its opening Brief on June 28, 2019, as well as its Responses to Insurers' Statement of Undisputed Material Facts and Supplemental Statement of Undisputed Material Facts in Opposition to Insurers' Motion for Summary Judgment, filed contemporaneously herewith.

## ARGUMENT

### I. NEW JERSEY LAW APPLIES TO THE EXCESS POLICIES

#### A. If No Conflict Of Laws Exists, New Jersey Law Applies

Insurers contend that they "do not discern any material conflict of laws between New York and . . . New Jersey[,] [and] [t]hus, . . . do not believe a choice of law analysis is required." Ins. Br. at 14. Assuming Insurers and Pfizer are correct that no conflict exists between New York and New Jersey law changing the result of any issues, the law of the forum state—New Jersey—applies to the Excess Policies. *Gray v. BMW of N.A., LLC*, 22 F. Supp. 3d 373, 380 (D.N.J. 2014).

#### B. Neither AWAC's Choice-Of-Law Provision Nor Twin City's "New York Endorsements" Require That New York Law Applies To The Excess Policies In This Litigation

Insurers make two attempts to import a New York choice-of-law provision into their Excess Policies. But, they never sought or could have obtained such a provision when they negotiated the Policies' terms in 2002. First, they claim their Policies "follow form" to, and thus adopt, a choice-of-law provision included in

6

the underlying AWAC Policy that requires mandatory Bermuda arbitration.
Second, they argue endorsements relating to New York insurance regulations in
the Twin City Policy "imply" a contractual choice of law.  Both arguments are
incorrect, run afoul with their own Policies, and should be rejected.

1. Insurers' Excess Policies Do Not Adopt The AWAC Policy's Choice-Of-Law Provision Applicable In Mandatory Arbitration

Insurers never mention that the AWAC Policy mandates Bermuda
arbitration and that that is the only context in which New York law would apply.
Jt. Ex. 9 at PFIGARB2542-43.  Indeed, the provision which Insurers selectively
seek to adopt states that New York law shall not apply with deference to "the
procedural law required by [arbitration], which shall be construed and enforced in
accordance with the laws of Bermuda."  *Id.* at PFIGARB2543.  Insurers only select
one component of this provision; they wholly ignore the procedural choice of
Bermuda law.  Because this is not a Bermuda arbitration, both dispute resolution
provisions, including the choice-of-law selection, do not apply.

Insurers also ignore the specific "follow form" language in their Policies,
which does not adopt the AWAC arbitration and choice-of-law provision.  First,
the Arch Policy only provides that it follows form to the primary National Union
Policy, and the underlying excess policies to the extent they "further limit[] or
restrict[] *coverage[.]*"  Jt. Ex. 10 at PFIGARB2702 (emphasis added).  The
AWAC choice-of-law provision does not limit or restrict *coverage*; instead, it acts

7

neutrally to select a particular state's law for a mandatory foreign arbitration in Bermuda. *See, e.g.*, *In re Enron Corp. Secs., Derivatives & "ERISA" Litig.*, 391 F. Supp. 2d 541, 553-55 (S.D. Tex. 2005) (choice-of-law clause does not "restrict[] coverage" for purposes of follow form clause).

Second, while the Twin City Policy states that it follows the National Union Policy, "together with all the warranties, terms, conditions, exclusions and limitations contained in . . . any Underlying Excess Policy(ies)" (Jt. Ex. 11, at PFIGARB2556), if this language adopted the AWAC Policy arbitration choice-of-law provision, it also would adopt the mandatory arbitration provision. By Twin City's own actions, it clearly does not; Insurers follow form to the *National Union Policy's* ADR provision, which provides that all disputes must be submitted for arbitration or mediation under Delaware law. Jt. Ex. 2 at ARC15408; Pls. Ex. 25 at 221:6-11. Insurers submitted to ADR with Pharmacia under *that* ADR Provision, and then proceeded with this litigation, without ever invoking the AWAC arbitration provision. Twin City cannot pick and choose which conflicting dispute resolution provision to follow whenever it suits its needs.[3]

---

[3] The cases cited by Insurers do not require the opposite conclusion. In *N. River Ins. Co. v. Phila. Reinsurance Corp.*, 831 F. Supp. 1132, 1141 (D.N.J. 1993), *rev'd sub nom.*, 52 F.3d 1194 (3d Cir. 1995), the court stated generally that the reinsurer's "follow form" language in the certificate incorporated an already agreed-to stipulation between the reinsurer and reinsured that Ohio law would be applied to the reinsured's policies with the insured. The decision in *AT & T v. Clarendon Am. Ins. Co.*, 2008 WL 2583007, at*4-6 (Del. Super. Ct. Feb. 11, 2008)

Lastly, even if the AWAC provision applied to litigation, New York law would not apply to this case. Here, neither the parties nor the Policies chose New York law to apply, and none of the parties to the contracts "are citizens of New York or have a principal place of business in New York[.]" *Shannon v. B.L. Eng. Generating Station*, 2013 WL 6199173, at *7 (D.N.J. Nov. 27, 2013). Thus, New Jersey courts would refuse to follow a choice-of-law provision selecting New York law for litigation, even if one existed in the AWAC Policy. *Id.*

2.   The Twin City Policy's Irrelevant New York Endorsements Were A Mistake, And Do Not Imply New York Law Applies

Twin City also argues that New York state amendatory endorsements in its Policy "impl[y] a contractual choice of law." Ins. Br. at 16.[4] This argument fails for no less than three reasons. First, no court has held that general, state endorsements such as those in the Twin City Policy imply a contractual choice of law provision; if anything, courts, even in New York, have held the opposite.[5]

is distinguishable for several reasons. First, the court was primarily seeking consistency in applying the same law across multiple carriers—here, there is no such concern. Second, the court found the arbitration and choice-of-law provisions were separate and unrelated—here, the choice-of-law provision specifically references the arbitration; third, the case did not involve Arch's follow form language, which does not adopt the provision; and fourth, both Policies follow form to National Union's ADR provision, which Insurers admit is applicable.

[4] This does not even arguably support applying New York law to the Arch Policy.

[5] *See, e.g., Travelers Cas. & Sur. Co. v. Honeywell Int'l, Inc.*, 2007 WL 8092105, at *8 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 2, 2007) (mislabeled as NJ court) (holding that insured's headquarters was determinative of choice of law, and stating that "courts have held that [state] endorsements of the general type upon which [Twin

Second, the cases Insurers cite for this point all involved a party seeking coverage *under* that state-specific endorsement for *uninsured motorist (UIM) coverage*.[6]  *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007) (rejecting insurer's argument that cases involving UIM endorsements applied in other contexts:  "[c]ontrary to TIG's assertions, we do not think these references to New York amount to an implicit agreement between TIG and DKM that New York law should govern the late notice issue.").  This is not a UIM coverage case, and Pharmacia is not seeking coverage under any of the Policy's New York state endorsements, which have to do generally with notifications to policyholders of claims-made coverage and payment of defense costs inside policy limits.[7]

Third, the New York endorsements it points to were included by mistake in the Policy.  Twin City's own binder letter agreeing to the coverage cites the "NJ Amendatory Endorsements" it meant to include, not any New York endorsements, and even includes the "NJ Surcharge" applied to the Policy.  Defs. Ex. 6 at TC70-71; *see also* Defs. Ex. 1 at PFIGARB33993 (showing both carriers applying

---

City] relies do not provide evidence of the parties' choice-of-law intent" and "the mere fact that some of the policies contained a New York-related endorsement is insufficient to establish that the parties intended New York law to apply.").

[6] *See Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999); *Bell v. USAA Cas. Ins. Co.*, 2009 WL 2524351, at *3 (D.V.I. Aug. 14, 2009); and *Blizzard v. Fed. Ins. Co.*, 2007 WL 675346, at *2 (E.D. Pa. Feb. 27, 2007).

[7] Jt. Ex. 11 at PFIGARB2564, 70.  *See Walters v. Am. Home Assur.*, 2011 WL 4409170, at *5 (D.N.J. Sept. 21, 2011) (citing all the same cases as Insurers' brief for the proposition that choice of law may be implied *for UIM coverage*).

separate NJ surcharge and NJ tax).  The New York endorsements would not apply, as the program was bound when Pharmacia was located in New Jersey, which is why the National Union Policy contains New Jersey Endorsements (which Insurers adopt).  Jt. Ex. 2 at ARC15425.[8]  In sum, all unmistaken signs point to New Jersey.

### C.   New Jersey, Not New York, Has The Most Significant Relationship To The Excess Policies And This Coverage Dispute

Insurers strain their follow form language and cite incorrect endorsements in an effort to avoid a traditional choice-of-law analysis because New Jersey[9] has the "most significant relationship" to the Excess Policies and this dispute.[10]

As discussed in Pharmacia's opening brief, at the time of contracting, Pharmacia was headquartered in Peapack, New Jersey (where the Policies are addressed), it was alleged in *Garber* that its officers' alleged misconduct took place in New Jersey, and it litigated *Garber* and was ordered to pay a settlement in

---

[8] *See, e.g.*, *Bell v. Merchs. & Businessmen's Mut. Ins. Co.*, 575 A.2d 878, 879 (N.J. Super. Ct. App. Div. 1990) (separate New Jersey and Pennsylvania-specific endorsements that applied to property located in each of those states).

[9] As stated in Pharmacia's opening brief, courts also consider an insured's state of incorporation in Delaware a significant contact in a choice-of-law analysis, including when the contracts provide D&O coverage and involve Delaware law for ADR.  *See, e.g.*, *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837 (Del. Super. Ct. Nov. 5, 2010).  However, since there is no material difference between New Jersey and Delaware law on the issues in this case (*e.g.*, exhaustion), Pharmacia limits its discussion here to New Jersey versus New York.

[10] *See* Pls. Br. at 15 (under the most significant relationship test for choice of law, New Jersey courts consider the relevant factors derived from the Restatement (Second) Conflict of Laws, including:  (1) the "competing interests of the relevant states"; (2) the "interests of commerce among the several states; (3) the "interests of the parties"; and (4) the "interests of judicial administration.").

11

New Jersey.  Pls. Br. at 15-16; Jt. Ex. 17 § 18.  Its risk management department was in New Jersey, and the only meeting between Pharmacia and Insurers to bind the coverage took place at its headquarters in New Jersey, where Arch's and Twin City's underwriters attended the presentation.  Pls. Br. at 16; Pls. Ex. 49 at ARC14690; Defs. Ex. 35 at ARC14685.  The Excess Policies were issued in New Jersey, the National Union Policy includes New Jersey-specific endorsements, and all of the Policies in the 2002-2003 D&O Tower issued by the domestic carriers, including Insurers, charged a New Jersey tax and premium surcharge.  Pls. Br. at 16; *infra* at 10-11.  Even Twin City's internal reports for *Garber* highlight New Jersey as the "Insured['s] Residence," and list "New Jersey" as the location of the accident/loss.  Pls. Ex. 23 at TC80; Pls. Ex. 33 at TC2.

In contrast, Insurers' asserted contacts with New York are irrelevant, inconsequential, or incorrect.  Contrary to their contention, the AWAC Policy and Twin City's New York endorsements do not "signal that the parties viewed New York as having the dominant relationship with the policies."  Ins. Br. at 16.  The relevant parties here, Arch and Twin City, did not include a New York choice-of-law provision for Bermuda arbitration, and Twin City included its endorsements by mistake.  Insurers also point to Pfizer's location in New York as relevant.  Ins. Br. at 16.  But Insurers underwrote coverage for Pharmacia and its directors and officers based on Pharmacia's business; as they know, Pfizer had its own D&O

12

coverage. Arch also contends that its Policy was allegedly underwritten in New York, but Arch neglects to mention that at the time it sold the Policy, it was "not licensed in the state of New York" nor "subject to its supervision." Pls. Ex. 51 at PFIGARB935. And Pharmacia's New York broker Aon held the underwriting meeting in Pharmacia's office, in New Jersey. Pls. Ex. 49 at ARC14690.[11]

The Policies were sold to a New Jersey insured, in New Jersey, for a New Jersey premium, to cover the type of claims in *Garber*, a New Jersey case where plaintiffs alleged wrongful conduct took place in New Jersey. New Jersey law applies. *Cont'l Ins. Co. v. Beecham, Inc.*, 836 F. Supp. 1027, 1041 (D.N.J. 1993) ("the intimate connection of this policy to New Jersey[]—that Beecham was a New Jersey corporation doing business in New Jersey and that some, if not all, of the [policy] negotiation took place in New Jersey—lead inexorably to the conclusion that New Jersey has a priority interest in having its law applied in this action.").

---

[11] Insurers also cite years-old correspondence from Pharmacia's previous coverage counsel that references New York law as evidencing an "acknowledgement" that New York law applies. Ins. Br. at 17. While irrelevant, the first letter (Defs. Ex. 38) was sent to *AWAC, which has a New York choice of law provision for arbitration*, and the second was responding to the New York cases Arch cited to deny coverage. Pls. Ex. 52 at ARC5151-64. Insurers' other New York "contacts"—such as a New York law governing post-settlement disputes under the *Garber* settlement agreement—are irrelevant in a choice-of-law analysis.

## II.   INSURERS' PPL EXCLUSIONS DO NOT APPLY TO PRECLUDE COVERAGE FOR THE *GARBER* ACTION

### A.   The PPL Exclusions Are Only Implicated By Pending Or Prior D&O Litigation—And There Was No Such Litigation

Insurers insist that the PPL Exclusions must be enforced "as written," but seek to apply them where there is any overlap at all between successive lawsuits. Ins. Br. at 17-23.  Yet, *as written*, the Exclusions do not apply to the prior-filed Consumer Class Actions, which would not constitute D&O claims under Pharmacia's D&O Excess Policies in the first place.

The PPL Exclusions can only be triggered by certain pending or prior litigation "against any **Insured**"—as defined in the Arch and Twin City Policies. Pls. Br. at 35-36; Jt. Exs. 2, 10 and 11.[12]  Insurers ignore that the Consumer Class Actions do not constitute litigation against an "**Insured**" as that term is defined in the Excess D&O Policies.  Insurers state that the Consumer Class Actions were litigation "against Pharmacia," among others.  Ins. Br. at 7.  While that is true, the Excess Polices are *D&O* Policies—by definition, these Policies are principally directed to providing insurance for acts and omissions of individual directors and officers as "**Insureds**," and they were not defendants in the Consumer Class

---

[12] The Arch Policy defines "Insured" as a person or entity "entitled to coverage under the **Followed Policy**. . . ."  Pls. Br. at 35-36.  And the "**Followed Policy**"— the National Union Policy—provides that Pharmacia, as an "**Organization**," is defined as an "**Insured**" "only with respect to a **Securities Claim**."  *Id.*; Jt. Ex. 2. The Twin City Policy incorporates its definitions, including for "Insured," from the National Union Policy, same as Arch.  Jt. Ex. 11; Pls. Ex. 25 at 149:16-18.

Actions.  And Pharmacia itself is an "**Insured**" under the Policies, but "*only* with respect to a **Securities Claim**."  Jt. Ex. 2 at ARC15397 (italics added).  Thus, when the PPL Exclusions are read with the relevant definitions of an "**Insured**," they only apply to litigation "against [Pharmacia only with respect to a **Securities Claim**] occurring prior to, or pending as of, September 1, 2002."  Pls. Br. at 8-9.

There is no dispute that none of the Consumer Class Actions brought a securities claim against Pharmacia, or otherwise alleged a D&O claim against any Pharmacia executive.  Pls. Ex. 37 at 130:22-23 ("[they] do not allege a D&O— they're not a D&O claim"); *id.* at 133:13-15 (agreeing that none of these actions would trigger D&O coverage); Pls. Ex. 25 at 163:9-19; Pls. Ex. 19 at 145:18-146:11.  Since none of the Actions satisfy the necessary predicate of a litigation "against any **Insured**" as defined in the Policies, the PPL Exclusions do not apply to Consumer Class Actions, and do not exclude *Garber*.  For example, in *Bell v. Federal Ins. Co.*, 2008 WL 11347931, at *2 (D. Minn. June 23, 2008), the court held a PPL exclusion did not apply because it required the prior litigation be against an "Insured Person," and while the insured entity was a defendant in prior litigation, it was not an "Insured Person," as defined, in the prior litigation.

This plain-language result makes logical sense.  The clear import of the PPL Exclusion and other such exclusions for "interrelated claims"—confirmed by Insurers' expert—is to ensure that the D&O carrier is not on the hook for claims in

its policy period that are related to, or arise out of, prior claims that should have been noticed under the prior year's D&O coverage.  Pls. Ex. 37 at 153:18-155:12. Any other result would violate the insured's reasonable expectations.  *Navigators Specialty Ins. Co. v. Scarinci & Hollenbeck, LLC*, 2010 WL 1931239, at *7 (D.N.J. May 12, 2010).  Indeed, that is the reason why the Consumer Class Actions—all of which were public and disclosed to Insurers in Pharmacia's 10-Q and 10-K405—had no stated impact in the underwriters' D&O analyses.[13]

Indeed, in the decisions cited by Insurers where a PPL exclusion or exclusion for "interrelatedness" was found to preclude a D&O claim, the prior related claim was also a D&O claim.  *See* Ins. Br. at 18-21; *Zunenshine v. Exec. Risk. Indem. Co.*, 182 F.3d 902, 902 (2d Cir. 1999); *Nomura Holding Am., Inc. v. Fed. Ins. Co.*, 45 F. Supp. 3d 354, 370-71 (S.D.N.Y. 2014) (earlier and later securities claims shared overlapping plaintiffs, theories of liability, injuries, and requests for relief); *G-I Holdings v. Hartford Fire Ins. Co.*, 2007 WL 842009, at *9 (D.N.J. Mar. 16, 2007) (earlier and later actions involved stock transfer); *Zahler v. Twin City Fire Ins. Co.*, 2006 WL 846352, at *6 (S.D.N.Y. Mar. 31, 2006).

---

[13] *See* Pls. Ex. 1 at ARC14760-61; Defs. Ex. 33 at PFIGARB34740; *see* Pls. Ex. 4 (Arch underwriting file); Pls. Ex. 37 at 70:7-12.  Any argument by Insurers that a February 20, 2003 risk management due diligence report prepared by a third-party indicates a view that the Consumer Class Actions constituted D&O-related litigation ignores (1) that the report's author was not even able to determine the named defendants or specific claims' allegations, and (2) was not assessing relatedness under the standard set forth in the PPL Exclusions.

Insurers mischaracterize Pharmacia's argument as "the Consumer Actions cannot be used to trigger the [PPL] Exclusions because those claims were *not covered* under [the] prior D&O insurance program," which Insurers allege was rejected in *W.C. & A.N. Miller Development Co. v. Continental Casualty Co.*, 2014 WL 5812316 (D. Md. Nov. 7, 2014). Ins. Br. at 22 n.4 (emphasis added). Pharmacia's argument is not that the Consumer Class Actions must be "covered" under the prior year's D&O tower for the PPL to apply; the PPL Exclusions do not apply because they require the prior lawsuit be against an "**Insured**," *i.e.*, a D&O claim, and the Consumer Class Actions are not D&O claims triggering the coverage in the first place. And *W.C. & A.N. supports* Pharmacia's argument. There, the court held that an exclusion for "interrelated" claims applied to the later lawsuit even though the prior lawsuit may have been *excluded from the coverage* based on an *exclusion* for breach of contract claims. In doing so, the court specifically held as a prerequisite that "both [the prior suit] and the 2010 Lawsuit [we]re, in fact, 'Claims' as that term [wa]s defined in the Policy." *Id.* at *4.

Here, the Consumer Class Actions are *not* "D&O Claims" as defined in the Excess D&O Policies—they do not assert claims against executives, and are not **Securities Claims** against Pharmacia. Insurers' arguments that the D&O claims brought in the *Garber* Action should be precluded by the non-D&O claims brought in the Consumer Class Actions are thus in conflict with the plain language of the

Excess Policies (which they sidestep, Ins. Br. at 5-6) and are without support in the law.  Insurers' unprecedented application of the PPL Exclusions must be rejected.

**B.   The *Garber* Action Does Not Arise Out Of, Nor Are Its Wrongful Acts "Interrelated" With, The Consumer Class Actions**

Assuming the Consumer Class Actions, not against any **Insured**, still implicate the PPL Exclusions, a review of the pleadings and Insurers' cases under New Jersey and New York law reveals that the Exclusions were never intended to apply as broadly as Insurers seek here.  This is especially so in the absence of any causal relationship between the Wrongful Acts alleged in the lawsuits.

1.   The Wrongful Acts Alleged In The Consumer Class Actions Do Not "Substantially Overlap" Or Share A "Sufficient Factual Nexus" With The *Garber* Action

With respect to whether successive claims against an "**Insured**" are related, courts in New Jersey and New York offer formulations that differ slightly.  But Insurers' arguments fail under either formulation.  New Jersey law holds that coverage should only be excluded if—taking a strict and narrow view—"the insurer can show a 'substantial overlap' between the facts and claims alleged in prior and subsequent actions."  *Regal-Pinnacle Integrations Indus., Inc. v. Phila. Indem. Ins.*, 2013 WL 1737236, at *5 (D.N.J. Apr. 22, 2013) (citing *First Trenton Indem. Co. v. River Imaging, P.A.*, 2009 WL 2431649, at *4 (N.J. Super. Ct. App. Div. Aug. 11, 2009)).  "[I]n order to constitute an interrelated wrongful act" under this standard, "the allegations in the second complaint must find substantial

18

support in the first complaint, and cannot be comprised of 'legally distinct claims that allege different wrongs to different people.'" *Id.* (citation omitted).[14]

New York courts similarly look for a "sufficient factual nexus." *Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *12 (E.D.N.Y. Oct. 30, 2014).  And like New Jersey, New York courts find that actions are *not* linked by a sufficient factual nexus when they involve "legally distinct claims that allege different wrongs to different people." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Ambassador Grp., Inc.*, 691 F. Supp. 618, 623-24 (E.D.N.Y. July 13, 1988); *Am. Guar. & Liab. Ins. Co. v. Chicago Ins. Co.*, 105 A.D.3d 655, 657 (1st Dep't 2013) (claims unrelated where there were "substantial differences between the victims").

There is no legally relevant or causal connection between the Wrongful Acts in the Consumer Class Actions and *Garber*.  *Garber* was a securities class action brought by Pharmacia's shareholders alleging that they suffered injury as a result of stock price drop in June 2002.  Jt. Ex. 17.  The shareholders alleged that between April 17, 2000 and May 31, 2002, defendants misled investors as to the financial outlook of the company in part based on the results of a clinical study (CLASS) on Celebrex's GI side effects.  The harm Pharmacia's shareholders alleged was hundreds of millions of dollars in market capitalization allegedly lost

---

[14] *First Trenton*, 2009 WL 2431649, at *4, *6 (finding a lack of interrelatedness where cases were distinguishable on the basis of "(1) the parties involved, (2) the factual allegations, and (3) the claims advanced").

in the days following the June 1, 2002 *British Medical Journal* article about Pharmacia's misstatements regarding the CLASS results. *Id.* ¶¶ 1, 4-7, 11-12. The *Garber* complaint goes into great detail about the financial statements and reports released by Pharmacia regarding outlook of the company and the misstatements that allegedly "buoyed" the stock. *Id.* ¶¶ 36-68.

The three Consumer Class Actions, in contrast, were brought on behalf of individuals who took or purchased Celebrex and/or Vioxx and claimed to have suffered physical injuries from a defective product or sought economic damages for Pharmacia's (and other defendants') false marketing concerning the CV and GI safety of those drugs. *See* Pls. Ex. 39 ¶¶ 1-19; Jt. Ex. 15 ¶¶ 1-7, 22 (*Cain* plaintiffs suffered cardiac illnesses from taking Vioxx and Celebrex, and alleged the two drugs were falsely marketed as being safer than alternative pain relievers, and that the drugs enhanced risk of blood clotting, heart attacks, and other CV illnesses); Jt. Ex. 14 ¶¶ 21-26 (*Leonard* plaintiffs alleged Pharmacia, Pfizer, and Searle engaged in a fraudulent effort to obtain FDA approval for Celebrex and misled the public in advertisements regarding the GI and CV health risks of Celebrex in order to charge higher prices than alternative drugs); Jt. Ex. 13 ¶¶ 20-25 (*Astin*, same). The Consumer Class Actions did not allege D&O claims relating to securities, stock performance, or misconduct by Pharmacia executives; they brought consumer-focused claims like failure to warn, product liability, negligence, breach of

20

warranties and violation of consumer protection laws.  Pls. Ex. 39 ¶¶ 37-62 and Jt.

Ex. 15 (*Cain*) ¶¶ 49-87; Jt. Ex. 14 (*Leonard*) ¶¶ 41-97; Jt. Ex. 13 (*Astin*) ¶¶ 40-96.

The faces of the complaints highlight the distinct focus of the claims.  The

thrust of *Cain* was: "the establishment of a Court-ordered and supervised medical

monitoring program . . . for patients who have taken Vioxx or Celebrex . . . to

monitor patients for . . . increased risks that [the drugs] pose[d] by increasing the

blood's propensity to clot and to cause cardiovascular illness."  Jt. Ex. 15 ¶ 27.[15]

*Garber*'s was: when "the full truth about the CLASS study [was] finally revealed .

. . investors realized that Pharmacia's . . . product had no demonstrable advantages

. . . [and] Pharmacia's stock tumbled from $40.596 . . . to $36.563 just a few

trading days later."  Jt. Ex. 17 ¶ 71.  They do not "substantially overlap," share a

"sufficient factual nexus," they are not "logically or causally" connected or involve

"substantially the same matters."  Jt. Ex. 11; *Papalia v. Arch Ins. Co.*, 2017 WL

3288113, at *11 (D.N.J. Aug. 1, 2017).  They "involve legally distinct claims that

allege different wrongs to different people."  *Nat'l Union*, 691 F. Supp. at 623.

> 2.   The Consumer Class Actions' Few References To Articles Criticizing The CLASS Study Do Not Establish That The Wrongful Acts Therein Are Causally "Related" To *Garber's*

In order to get around the obvious differences between the distinct Wrongful

Acts which are the focus of the Actions, Insurers employ a twofold strategy to

---

[15] *See also, e.g.*, Jt. Ex. 14 ¶¶ 21-26 (*Leonard's* accusations about Celebrex advertisements and promotional materials); Jt. Ex. 13 ¶¶ 20-25 (*Astin*, same).

show "relatedness."  The first step is to repeatedly and selectively emphasize the

Exclusions' use of the word "any" to apply the Exclusions broadly where there is

*any* overlapping fact or circumstance at all in the lawsuits.  *See* Ins. Br. at 5-6 (the

Arch PPL Exclusion "excludes coverage for any claim arising out of . . . '*[a]ny*

Wrongful Act' that gave rise to "*[a]ny* litigation [prior to 9/1/02] … or '*any* other

Wrongful Act[s] . . . [that] constitute . . . Interrelated Wrongful Acts[, defined as] .

. . 'Wrongful Acts' that ha[ve] as a common nexus *any* fact, circumstance. . . .").[16]

Second, Insurers then exaggerate the significance of two or three paragraphs from

the Consumer Class Action complaints that reference articles criticizing "a study"

(CLASS) (*id*. at 22), ignoring the different wrongful acts that underpin the

consumer and shareholder lawsuits.  Both of these attempts at showing relatedness,

however, are improper and already have been rejected by another court in a case

involving these same parties and same policy language.

In the pending *Arch* Action (*supra* at 4 n.2), Pfizer is seeking insurance

coverage for amounts it paid to settle a federal securities class action brought by

shareholders against Pfizer executives, alleging a stock drop resulted from

misrepresentations and omissions about the CV safety of Celebrex and Bextra

---

[16] *See also id.* at 6 ("Similarly, the [PPL Exclusion] in the Twin City Policy bars coverage for any claim made against any Insured "arising from *any* act of an *Insured*" which gave rise to "*any* litigation . . . against *any* **Insured** occurring prior to, or pending as of, 9/01/02.").

coming to light ("*Morabito*"[17]).  2019 WL at 3306043, at *1-3.  Arch and another

insurer denied coverage for *Morabito* on the ground, *inter alia*, that the action

arose out of, or was "interrelated" with, the wrongful acts alleged in *Garber* (and

the Consumer Class Actions), under the same language at issue here in Arch's PPL

Exclusion and other similar "relatedness" exclusions.  And they focused on

*Morabito*'s multiple references to "misrepresent[ing] the results of the CLASS

Study."[18]  The court rejected Arch's unreasonable reading of the exclusions:

> Defendant Insurers emphasize the use of 'any' and encourage the
> Court to read the exclusion as precluding coverage so long as
> [*Morabito* and *Garber*] 'share any commonality.'  This reading is
> strained, uncharacteristically broad, and runs afoul of this Court's
> prior interpretation standards set forth in previous cases.

2019 WL 3306043, at *9.  The court acknowledged *Morabito*'s specific allegations

regarding the CLASS Study and its misrepresentations of GI effects at the center of

*Garber*, but held that this and other "thematic similarities" did not change the fact

that *Garber* and *Morabito* were, "in all relevant aspects, different."  *Id.* at *10.

Same here, the fundamental differences between *Garber* and the Consumer

Class Actions discussed above are not negated by the fact that one or two

---

[17] *In Re Pfizer Inc. Secs. Litig.*, No. 1:04-civ-9866 (S.D.N.Y.) ("*Morabito*").

[18] *See* Pls. Ex. 53 (*Morabito* Compl.) at ¶¶ 180-191; *id.* ¶ 185 ("Incredibly, the
CLASS JAMA Article . . . failed to mention that the actual CLASS Study trials
encompassed 12-16 month periods, respectively, and that when the full trial results
were analyzed, the purported GI advantage for Celebrex entirely evaporated."); *id.*
¶ 191 ("in a June 2002 article . . . . the BMJ stated that the full CLASS Study
results 'clearly contradict the published conclusions.'").

paragraphs in each of the Consumer Class Actions reference CLASS-related articles.  Insurers argue that *Garber* and the Consumer Class Actions "each alleged that Pharmacia manipulated the CLASS Study protocol specifically to mislead the public into believing Celebrex was safer and more effective than other NSAIDs." Ins. Br. at 22.  They do not.  *Garber* does, but the Consumer Class Actions merely reference an August 22, 2001 *Wall Street Journal* article "report[ing] that 'a study last year purporting to prove Celebrex's milder effects on the stomach . . . now appears exaggerated.'"  Jt. Ex. 14 ¶ 36; Jt. Ex. 13 ¶ 35.  They do not even cite CLASS by name; rather, like the *Morabito* complaint, the consumer plaintiffs tacked-on references to "a study" for incendiary effect; the "study" has nothing to do with their product defect and consumer claims that they suffered CV injury (*Cain*) from, or paid too much money (*Leonard*, *Astin*) for, Celebrex and Vioxx.

For example, Insurers reliance on the *Cain* Action's reference to the "August 2001 Washington Post article and a June 2002 piece in the British Medical Journal" (Ins. Br. at 22) regarding CLASS fails to show a sufficient overlap with *Garber*.  All CLASS-related allegations in *Cain* did not appear until the Second Amended Complaint, filed on September 18, 2002, *almost three weeks <u>after</u> the September 1, 2002 date for the PPL Exclusions*.  For the first year and a half, *Cain* said nothing at all about CLASS, and when it was amended after the PPL date to reference CLASS-related articles, the basis for the lawsuit and causes of action did

not materially change.  *Compare* Jt. Ex. 15 *with* Pls. Ex. 39.  Thus, the passing

references to articles critical of CLASS had *no effect* on the wrongful acts alleged

against *consumers* at issue in *Cain* (and *Leonard* and *Astin*).

Insurers' repeated observation that the *Garber* and Consumer Class Actions

all reference Celebrex's "safety and efficacy," the FDA, and certain articles

discussing the CLASS Study does "not [show] a sufficient factual nexus" when the

claims otherwise "do not share parties, legal theories, or requests for relief."

*Glascoff v. OneBeacon Midwest Ins. Co.*, 2014 WL 1876984, at *7 (S.D.N.Y. May

8, 2014).  Insurers make repeated use of the New York rule, cited in *Glascoff*, that

claims may share a sufficient factual nexus even if they do not "involve precisely

the same parties, legal theories, Wrongful Acts, or requests for relief."  *Id.* at *5.

But this rule simply means that successive lawsuits need not *perfectly* overlap.

The overlap must still be *substantial*, and as *Glascoff* held, there is no

interrelatedness when claims "do not share parties, legal theories, or requests or

relief"—even when they both reference and "ostensibly relate," in *Glascoff*'s case,

to "oversight" of an employee.  *Id.* at *7.[19]

In contrast, a review of Insurers' cited authority only confirms further that

Insurers have failed to find a single case supporting application of a PPL or similar

exclusion precluding a D&O claim, subject to a D&O policy, based on a prior

---

[19] Or, as stated by the court in the *Arch* Action, "relatedness" is found where the
actions "involve[] the exact 'same subject.'"  2019 WL 3306043, at *10.

consumer-product claim.  Most of the cases involved claims with near-total

overlap, and they indicate that a D&O claim can be precluded on relatedness

grounds only when it is fair to treat both actions as "one claim" that could have

been "first made under the preceding D&O policy."  *G-I Holdings*, 2007 WL

842009, at *9.  In *G-I Holdings*, the three successive lawsuits were all based

entirely on the same 1997 fraudulent transfer and made all the same allegations and

had the same causes of action, which the insured even conceded in its complaint.

*Id.* at *8 (actions "all brought as a result of Heyman's transfer of ISP stock that

allegedly shielded hundreds of millions of dollars from asbestos claimants.").

In *Regal-Pinnacle*, the "[plaintiff] herself, in fact, acknowledged the

substantial overlap between the two claims in her civil complaint," which was

simply "a progression of" her earlier claim, and "all the allegations contained in

[the plaintiff's] administrative pleading [were] also included in her subsequent

civil pleading."  2013 WL 1737236, at *7.  Similarly, the later claim at issue in

*Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 2010 WL

772299, at *2 (N.J. App. Div. Mar. 8, 2010) was simply a progression of the earlier

claim:  "the 2000 lawsuit revived claims of unfair competition and abuse of the

police power which were first made in 1997 but extended the scope of those claims

to include additional examples."[20]  Finally, in *Papalia* the court found a "nexus of logically or causally related facts" where the claims involved "the same misrepresentations, the same types of welfare benefit plans, and the same result." 2017 WL 3288113, at *11, 13.[21]

The New York cases cited by Insurers likewise provide them no help, and *Weaver* did not expand the scope of "relatedness" as broad as possible to "any" commonality (*see* Ins. Br. at 18); rather, the related actions in *Weaver* involved identical injuries to identical parties involving identical conduct—activity directed to the prospective customers of the company's business.  2014 WL 5500667, at *12.  In *Zahler*, the D&O complaints (one securities, one ERISA) revealed "that the facts alleged in the two actions are in many cases identical"—the same conduct gave rise to the same injury, a drop in company stock following misstatements of the value of a subsidiary investment.  2006 WL 846352, at *6; *Seneca Ins. Co. v.*

---

[20] The later and earlier claims at issue in *Gladstone v. Westport Ins. Corp.*, 2011 WL 5825985, at *9 (D.N.J. Nov. 16, 2011) likewise involved a near-total overlap: "The 2007 [claim] alleged that Mr. Gladstone's work on the Hopewell Zoning matter constituted negligence . . . The 2009 [claim] alleged that Mr. Gladstone's work on the Hopewell Zoning Matter constituted 'negligen[ce] and professional malpractice.'"  The court in *Old Bridge Mun. Utils. Auth. v. Westchester Fire Ins. Co.*, 2016 WL 4083220, at *4-5 (D.N.J. July 29, 2016) found substantial overlap in "(1) the parties involved, (2) the factual allegations, and (3) the claims advanced," noting again the second action "grows out of the same []foundation" as the first.

[21] If anything, the *Papalia* case is principally noteworthy for recounting Arch's "dubious" history of taking "conflicting positions" on these types of "relatedness" provisions (broad versus narrow) depending upon whether or not it will "inure[] to Arch's benefit to have the claims be related."  *Id.* at *10.

27

*Kemper Ins. Co.*, 2004 WL 1145830, at *9 (S.D.N.Y. May 21, 2004) (later complaint drafted by the same attorney for the same client "itself detail[ed] numerous logically connected facts and circumstances between" the claims—the same legal theory of liability, same injury, and same request for relief).

The court in *Nomura* held that a review of the earlier and later securities claims "reveal[ed] that the relevant complaints contain overlapping (and frequently identical) factual allegations, arising from strikingly similar circumstances, alleging similar claims for relief." 45 F. Supp. 3d at 370. The same was true for *Zunenshine*, where earlier and later securities claims shared overlapping plaintiffs, theories of liability, injuries, and requests for relief, and were based on the same "fact[s], circumstance[s], situation[s], transaction[s], [and] event[s]." 182 F.3d at 902. Insurers' New York cases only buttress Pharmacia's argument that a D&O claim will only be precluded by an earlier D&O claim that alleged the same or similar theory of liability, injury, and request for relief.

The cases cited by Insurers from other districts are no better. In *Liberty Ins. Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*, 162 F. Supp. 3d 1068, 1079 (C.D. Cal. 2016), same as in *G-I Holdings*, the claims at issue were "virtually identical," and the insureds' "own court filings indicate[d] that they themselves consider[ed] the claims in these cases to be 'virtually identical.'" Similarly, the earlier and later suits in *Zodiac Group, Inc. v. Axis Surplus Ins. Co.*, 542 Fed.

App'x 844, 849 (11th Cir. 2013) were virtually identical and involved overlapping plaintiffs, defendants, factual allegations, legal theories, and requests for relief.[22]

All of these cases stand in stark contrast to the facts here.  The Consumer Class Actions did not cause, or lead to, *Garber* being commenced.  Nor is *Garber* a progression of, or in scheme with, the Consumer Class Actions; *Garber* does not even mention the consumer suits and has no relationship to them.  Courts interpret insurance contracts, including PPL exclusions, "to accord with the objectively reasonable expectations of the insured."  *Navigators*, 2010 WL 1931239, at *7.  The court in *Arch* agreed with Pfizer, that no reasonable insured would expect an exclusion for related litigations to apply where, same as here, the earlier and later actions involve "legally distinct claims that allege different wrongs to different people."  *Arch*, 2019 WL 3306043, at *9 n.81; *Regal-Pinnacle*, 2013 WL 1737236, at *5; *Nat'l Union*, 691 F. Supp. at 623.  While the Consumer Class Actions may be related to *each other*, none allege the same wrongful acts as at issue in *Garber*.  The *Garber* and Consumer Class Actions involved different plaintiffs, defendants, causes of action, legal theories, harms, and conduct.  They are not related.

---

[22] *See also, e.g.*, *W.C.*, 2014 WL 5812316, at *6 (involving causally connected claims that shared the same scheme, "the same claimant, the same fee commission, the same contract and the same real estate transaction"); *Brecek & Young Advisors v. Lloyds of London Syndicate 2003*, 715 F.3d 1231, 1238 (10th Cir. 2013) (involving claims with overlapping respondents, allegations, misconduct, and theories of liability); *Cap. Growth Fin. LLC v. Quanta Specialty Lines Ins. Co.*, 2008 WL 2949492, at *5 (S.D. Fla. July 30, 2008) (successive unauthorized trading claims "related in time, place, opportunity, and pattern").

29

## III.   THE WARRANTY LETTER DOES NOT PRECLUDE COVERAGE FOR THE *GARBER* ACTION

Insurers spend the entirety of their argument on summary judgment ignoring the plain language of the Warranty Letter and citing innocuous public articles and documents as their "proof" that the Warranty was breached in this case—most of which Insurers had in their possession when they sold the Excess Policies to Pharmacia.  But not a single document or article shows what the Warranty Letter actually requires:  that any Insured Person, much less signatories Messrs. Hassan and Coughlin, believed or thought (or was told) the allegedly-misstated clinical results of Celebrex's effect on GI side effects versus ibuprofen in CLASS could result in a federal securities lawsuit, over two years after the FDA already had published the Study's full data.  The Warranty was true when it was signed by Messrs. Hassan and Coughlin, and it never applied to deny coverage.

### A.   Insurers Ignore Both The Plain Language And Intended Purpose Of The Warranty Letter So As To Deny Coverage For *Garber*

#### 1.   The Plain Text Of The Warranty Letter Requires A Subjective, Not An Objective, Analysis

Insurers contend that the Warranty Letter's prior knowledge exclusion applies "when an objectively reasonable insured would perceive that a claim *might* be brought based on facts known to *any* insured person."  Ins. Br. at 3.  That is not what the Warranty Letter says.  The Letter provides, in relevant part, that:

> No person for whom this insurance is intended has any knowledge or information of any act, error, omission, fact or circumstance that may

give rise to a claim that may fall within the scope of the proposed insurance.

Jt. Ex. 12.  The words "objectively reasonable insured" do not appear in the Letter. That language may signify an objective inquiry, but the language here does not address an objective analysis; it is only "subjective in nature." *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*, 189 N.J. 436, 445 (N.J. 2007); *Ironshore Indem., Inc. v. Pappas & Wolf, LLC*, 2018 WL 2012009, at *2 (N.J. Super. Ct. App. Div. May 1, 2018) (language asking if attorney "kn[ew] of any circumstance, situation, act . . . that could result in a professional liability claim" required subjective analysis).  Language that an insured "had no reasonable basis to . . . foresee that a claim would be made," raises an objective inquiry.  *Liberty*, 189 N.J. at 446.

Insurers' cases address prior knowledge exclusions that specifically include the kind of language identified in *Liberty Surplus* as raising an objective inquiry. *See Colliers Lanard & Axilbund v. Lloyd's of London*, 337 F. App'x 195, 198, 200 (3d Cir. 1999) (*Liberty Surplus* was consistent with court's holding for objective analysis where "plain language" of exclusion asked whether the "act, error or omission *might reasonably be expected* to result in a claim"); *see also Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*, 2009 WL 4884096, *17 (S.D.N.Y. Dec. 17, 2009) ("knowledge *or* reasonable basis"); *Travelers Cas. & Sur. Co. of Am. v. Gold, Scollar, Moshan, PLLC*, 2018 WL 1508573, at *2 (S.D.N.Y. Mar. 14, 2018) ("basis to believe that [facts] might reasonably be expected to be the basis of a

31

Claim").[23]  Cases recognize the distinction between "knowledge," which signifies only a subjective inquiry, and "reasonable basis," which requires the objective inquiry.  *Omega Fin. Servs. Inc. v. Aspen Specialty Ins. Co.*, 2014 WL 4796615, at *13 (N.J. Super. Ct. Law Div. Sept. 22, 2014) (distinguishing *Liberty Surplus* and holding language at issue was an objective standard because it read "knew **or** could have reasonably foreseen").  So do Insurers; they implicitly concede the need for such language by repeatedly inserting it into the Warranty.  *See* Ins. Br. at 27.

The "subjective standard is more rigorous for [the insurer] to meet." *Liberty*, 189 N.J. at 446, 448 (subjective standard met only where court would be forced to "ignore reality" to conclude insured had no knowledge claim might be brought).[24]  The Warranty Letter is directed only to subjective "knowledge," and thus, Insurers must prove that a Pharmacia director or officer had knowledge that the claims in *Garber* were, in the words of Insurers' expert, "already brewing" in August 2002.  Pls. Ex. 37 at 184:7-22; *id.* at 85:1-5.

---

[23] *CPA Mut. Ins. Co. of Am. Risk Retention Grp. v. Weiss & Co.*, 80 A.D.3d 431, 431 (1st Dep't 2001) ("believe[d] or [had] a basis to believe"); *Coregis Ins. Co. v. Lewis, Johs, Avallone, Aviles & Kaufman, LLP*, 2006 WL 2135782, at *4 (E.D.N.Y. July 28, 2006) ("could have reasonably foreseen"); *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 237 (3d Cir. 2006) (plain language "might reasonably be expected to result in a claim" was objective).

[24] When there is doubt as to which standard is triggered by the language at issue, "the subjective standard" is applied "based on the well-settled principle that insurance policy interpretation should be construed against the insurer."  *Id.*

2.      The Warranty Letter And Prior Knowledge Exclusions Are Intended To Exclude Coverage For The Insured's Unknown, Undisclosed Acts—Not "Widely Publicized" Acts

The "manifest purpose" of a prior knowledge exclusion like the Warranty Letter's is to "protect [the insurer] . . . against the [insured] who, recognizing his past error or omission, rushes to purchase a 'claims made' policy before the error is discovered and a claim asserted [is] against him." *Darwin Nat'l Assur. Co. v. Fahy Choi, LLC*, 2015 WL 12698440, at *8 (D.N.J. Dec. 18, 2015). This "moral hazard" poses a threat because "[a]n insurer cannot properly evaluate the risk of taking on an insured if it is not aware of the possibility of future claims." *See id.*; *Colliers*, 458 F.3d at 239. Thus, the Warranty Letter and prior knowledge exclusions are concerned with, and only apply to, "facts known only to [the Insured]." *Navigators*, 2010 WL 1931239, at *16. For if Insurers are aware of the facts at issue, there is no moral hazard and "the costs of the risk can be evaluated with all the relevant information accessible to all parties." *Id.*[25]

Insurers admit, as they must, that they "had some . . . knowledge" of the relevant facts related to CLASS-related problems, but insist that their knowledge is "irrelevant" for application of the Warranty. Ins. Br. at 31. They ignore that the law holds otherwise. And Insurers' own files belie they only had "some"

---

[25] *Travelers*, 2018 WL 1508573, at *9 (applying exclusion when a failure to disclose "effectively conceal[ed] [the] misconduct"); *Univ. of Pittsburgh v. Lexington Ins. Co.*, 2016 WL 7174667, at *5 (S.D.N.Y. Dec. 8, 2016) ("the basic structure of risk distribution" is balanced when both parties have the information).

33

knowledge; rather, at the time they were underwriting the risk for the D&O

Policies, Arch's underwriter, for example, had in her files, in June 2002, the article

allegedly forming the basis of the *Garber* plaintiffs' lawsuit for securities fraud:

the June 1, 2002 *British Medical Journal* article on CLASS, which the *Garber*

plaintiffs alleged, once it was read and absorbed by the market, caused

Pharmacia's stock to "drop[] from $40.596 to $36.563 in a few trading days,

wiping out millions of dollars in market capitalization."  Jt. Ex. 17 ¶¶ 11, 12, 71.

**Pharmacia Corporation [PHA]**

| Date | Headline |
|------|----------|
| 6/14/2002 - 5:04:00 AM | Pharmacia: Study Results Show Comparable Efficacy Between Celecoxib and Diclofenac for the Treatment of Ankle Sprains |
| 6/14/2002 - 4:04:00 AM | Pharmacia: Study Shows Investigational COX-2 Specific Inhibitor Valdecoxib Causes Fewer Gastroduodenal Ulcers than the Non-Specific NSAID Diclofenac for Rheumatoid Arthritis |
| 6/14/2002 - 3:21:00 AM | Telecom Equipment Maker Moves Holmdel, N.J., Center into Middletown Building |
| 6/13/2002 - 12:18:00 PM | Miravant, Bausch & Lomb Consider Deal to License Eye Drug |
| 6/13/2002 - 10:00:00 AM | Wall Street Journal: Gleevec's success spurs new cancer drugs |
| 6/13/2002 - 5:25:00 AM | Pharmacia criticized by British Medical Journal for silence on Celebrex study |
| 6/13/2002 - 5:25:00 AM | Pharmacia criticized by British Medical Journal for silence on Celebrex study |
| 6/12/2002 - 3:43:00 PM | Bausch & Lomb Feeler Helps Goleta, Calif., Biotech Firm's Outlook |
| 6/12/2002 - 3:58:00 AM | St. Louis Post-Dispatch David Nicklaus Column |
| 6/12/2002 - 3:23:00 AM | Delay on Painkiller's Approval Hurts Merck's Stock Price |

Pls. Ex. 4 at ARC15373 (highlighting added; access date of June 17, 2002).

Prior knowledge exclusions "must not be interpreted without being mindful

of their clear import and intent."  *Darwin*, 2015 WL 12698440, at *9.  Insurers

cannot ignore the Warranty's purpose, as excluding coverage under the Warranty

Letter based on facts that were known to Insurers would "violate public policy."

34

*Colliers*, 458 F.3d at 240.  Insurers here evaluated "the costs of the risk . . . with all the relevant information accessible to all parties," and agreed to provide coverage for claims like those brought in *Garber*.  *Navigators*, 2010 WL 1931239, at *16. Denial of coverage for *Garber* now under the Warranty Letter is pure revisionism.

### B.   Insurers Fail To Meet Their Burden:  There Is No Evidence That Any Insured Was Subjectively Aware Of Facts That Could Be Expected To Give Rise To A D&O Claim

For the exclusion in the Warranty to apply, Insurers must prove that, as of August 29, 2002, a Pharmacia director or officer was subjectively aware not only of certain facts, but also aware that those facts could give rise to the *Garber* Action.  Pls. Ex. 37 at 85:1-5.  Right up until the day the *Garber* Action was filed on April 7, 2003, there was no D&O claim brewing based on the results of the CLASS Study.  And following extensive discovery in this litigation of the 19 years since the CLASS Study was published in 2000, Insurers have adduced no evidence that Messrs. Hassan, Coughlin, or any other Pharmacia executive had subjective knowledge, on August 29, 2002, that a D&O claim was likely to be filed against them based on CLASS.  And Insurers do not argue otherwise.  Ins. Br. at 28-31.

Rather, Insurers suggest that Mr. Hassan, or another defendant in *Garber*, Dr. Geis, had knowledge, in a vacuum, of certain facts—*i.e.*, the "6-versus-12 month issue" associated with CLASS.  *See* Ins. Br. at 28-30.  Indeed, everyone, including Insurers, had knowledge of this fact over a *year* before the Policies were

issued.  But, the relevant question under the Warranty language is whether there is evidence that anyone at Pharmacia had knowledge that those facts "may give rise to a claim that may fall within the scope of the proposed insurance."  Jt. Ex. 12. And the answer is "no."  This is confirmed by Insurers' expert, who reviewed all of Insurers' evidence and testified that he did not see that Messrs. Hassan, Coughlin or anyone at Pharmacia believed a D&O claim could result from CLASS.[26]

This is not a case of a company or CEO receiving an SEC subpoena and then failing to disclose it on their financials or the insurance application as a potential claim.  *Garber* was allegedly triggered by a stock drop caused by a June 2002 BMJ article criticizing a clinical study published ten months prior to the lawsuit, and Insurers' underwriters had in their files this exact article.  *Infra* at 34.  There is no question, therefore, that these were neither "facts known only to [the Insured]," *Navigators*, 2010 WL 193123, at *16, nor facts that were "effectively conceal[ed]" from Insurers.  *Travelers*, 2018 WL 1508573, at *9.  These well-known facts relating to the CLASS Study thus posed no conceivable threat to the "manifest purpose" of the Warranty Letter (*Darwin*, 2015 WL 12698440, at *8), and "the costs of the risk [were necessarily] evaluated with all the relevant information accessible to all parties."  *Navigators*, 2010 WL 193123, at *16.

---

[26] Pls. Ex. 37 at 89:21-90:13 ("I didn't see them conclude that it may give rise to a claim."); *id.* at 88:20-89:3 ("I saw nothing that they affirmatively said they thought it may give rise to a claim.").

Insurers' suggestion that coverage should be excluded under the Warranty Letter in these circumstances—for a purported failure to disclose to Insurers widely publicized facts that Insurers themselves already knew—reflects an "unrealistic and inadequate" reading and application of the Warranty that would "violate public policy." *Colliers*, 458 F.3d at 240.  The exclusion does not apply.

### C.   Even Under A Mixed Subjective-Objective Analysis, There Was No Reasonable Basis For An Insured Person To Expect The *Garber* Action Prior To August 29, 2002

There was no outright threat of a claim, or statement from anyone showing a belief that a D&O claim could result from CLASS Study.  Insurers' argument depends entirely on inserting an "objective" standard into the Warranty, and "evidence" they claim a hypothetical reasonable person could have strung together to predict *Garber* was coming—when their own underwriters, armed with the same information as Pharmacia, did not predict the claims in *Garber*.

Under a mixed subjective-objective analysis, the question is "whether a reasonable professional in the insured's position might expect a claim or suit to result." *Colliers*, 458 F.3d at 237.  The cases cited by Insurers reflect the kind of evidence necessary to satisfy this objective inquiry.  In *Navigators*, there was evidence that an attorney had "made several direct accusations of fraud and threats of litigation (both oral and written) to [the insureds] based on" the subjectively known facts.  2010 WL 1931239, at *15.  In *Coregis*, there was an insured's "on-

the-record remarks to the state court regarding the possibility of a legal malpractice claim" coming against the insured.  2006 WL 2135782, at *12.  In *University of Pittsburgh*, the court faced evidence that the insured had sent an email stating that the claim ultimately filed was "inevitable," and had elsewhere admitted in court briefing that the claim was "reasonably likely."  2016 WL 7174667, at *1, 2, 5.

Considering that exclusions are applied narrowly, the case law confirms that the level of evidence necessary for Insurers to satisfy any objective inquiry here is substantial—it must rise to the level of an express threat of D&O litigation, or an admission that D&O litigation is likely.  Insurers have adduced no such evidence; instead, they point to a handful of documents—mostly publicly-available articles and financial disclosures—which tend to show, at best, that Mr. Hassan or Dr. Geis was aware of the problems with the CLASS Study or the Consumer Class Actions. Ins. Br. at 28-29.  These documents show nothing more than, as Insurers agree, the CLASS-related facts were "widely publicized" (*id.* at 29) more than a year before the Warranty Letter was signed in August 2002.  None of these documents discuss, suggest, or even hint at the possibility of a claim against directors and officers, let alone that a $130+ million D&O claim based on the CLASS Study would be filed months later in April 2003, well (or *years*) after the dust had already settled.  Nor do they provide any other objectively reasonable basis to anticipate the *Garber* Action.  Indeed, if Insurers truly believed each of these documents triggered the

Warranty Letter, they would have denied coverage in *2003* when they received the *Garber* complaint—after all, the *Washington Post* and *British Medical Journal* articles are quoted extensively in the *Garber* complaints.[27]

Internal Pharmacia presentations and emails do not change the conclusion; there was no D&O claim "brewing" based on CLASS.  Pls. Ex. 37 at 184:7-12. First, internal emails in mid-2001 between different researchers working in, or in conjunction with, Pharmacia's *research and development* department discussing the scientific merits of reporting the first six-month results from CLASS (Ins. Br. at 30) only reiterate the same facts and justifications for CLASS's reporting that were in the public articles.  They do not reflect that any director or officer was anticipating a D&O claim.[28]  Second, Insurers then turn to a handful of internal emails and reports which, they note, show that the "widely publicized" facts relating to the CLASS Study's 6-month versus 12-month issue in the press "were brought to the attention of Pharmacia's Board and its subcommittees" in 2001:

---

[27] Indeed, Twin City had no response for why it waited nine years to deny coverage for *Garber* under the Warranty Letter, based on the exact same articles quoted in *Garber*.  Pls. Ex. 25 at 136:25-140:1; Pls. Ex. 22 at TC75.

[28] Moreover, Insurers' conduct belies the emails' significance; these emails were quoted in the underlying *Garber* plaintiffs' briefing as early as *2006*.  Pls. Ex. 54 at PFIGARB17473.  Only after Pharmacia's counsel's presentation regarding the prospect of a significant settlement in late 2011 (Pls. Ex. 26), did Twin City cite all these emails together as proof that "Pharmacia" (not any individual D&O) had knowledge breaching the Warranty.  *See* Pls. Ex. 22 at TC75.

- A Custodial Report indicating that a Pharmacia "corporate response team has been engaged *to address the ramifications of this media attention*, both in the US and worldwide. *Fred Hassan has informed the board about these issues in recent weeks* ...." The Report also noted that the August 2001 *Washington Post* article "*has raised questions about the integrity of the clinical trial data supporting Celebrex and the credibility of Pharmacia* in providing six-moth data for publication, while 12-month data had been provided to the FDA." *Id.*

- Evidence that, on September 25, 2001, the Board discussed "the CLASS Study and the issue surrounding the reporting of 6-months versus 12-months of data." The issue was discussed by the Board because, according to Mr. Hassan, it "*brought the integrity of the Company into question*." *Id.*

Ins. Br. at 30. The quotes above bolded by Insurers confirm they have not come anywhere close to establishing breach of the Warranty. They simply show that, as Pharmacia agrees, Mr. Hassan and the Board were likely aware—along with Insurers and the general public—of the published articles calling into question CLASS reporting. *Id.* The Board was understandably interested in "this media attention, both in the US and worldwide." *Id.* But, what is critically missing from this evidence, is any hint or suggestion from *anybody*—Board-level or otherwise— of a brewing D&O claim. Indeed, this evidence *undercuts* Insurers' argument: when Mr. Hassan and the Board became aware of the CLASS-related issues in 2001, these documents show that they did not turn to the legal team to prepare for a D&O claim (there was no reasonable basis for that); instead they turned to the science and social policy subcommittees to review the issues and prepare public relations responses to protect the company's hard-earned "status," "credibility," and "integrity" in the media. *Id.* Any impact on Pharmacia stock relating to

CLASS would have manifested in 2001 or 2002, during the *prior years'* policy periods.[29]  But nothing happened, and there is no evidence that any of the seven renewal D&O carriers had any concerns about the debate over CLASS.

Indeed, that CLASS-related issues were not a D&O concern is confirmed by a simple observation.  Not only did Insurers potentially know *more* than Mr. Hassan about CLASS-related issues as of June-August 2002, but they had more expertise than the hypothetical reasonable person standing in Mr. Hassan's shoes at evaluating D&O risk.  They had the articles discussing the CLASS Study, and they understood that this media attention had brought the company's "integrity" into question.  And yet, in August 2002, they too did not anticipate that *Garber* was coming, for if they had, they likely would have sought to exclude CLASS-related issues, or refused to provide coverage at all.  *See* Pls. Ex. 37 at 36:18-39:8.

As noted, the case law requires evidence that rises to the level of an express threat of D&O litigation, or an admission that D&O litigation is likely. *Navigators*, 2010 WL 1931239, at *15; *see, e.g.*, *Henderson/Vance Healthcare, Inc. v. Cincinnati Ins. Co.*, 2013 WL 5375612, at *3 (E.D.N.C. Sept. 25, 2013) ("courts have found such [prior knowledge] exclusions to apply where . . . the

---

[29] According to Mr. Hassan, "by and large, there was a sense [at the Board level] that the data and CLASS was quite favorable for Celebrex."  Pls. Ex. 45 at 96:17-20.  In fact, on June 7, 2002—two months before the Warranty—the FDA "approved labeling changes for Celebrex" based on the "valuable safety data from CLASS" showing that higher doses of Celebrex did not increase rates of serious cardiovascular events.  Pls. Ex. 46 at PFIGARB475-76.

conduct forming the basis of a later suit is so egregious that suit is likely [*e.g.*, client embezzlement] . . . or where notice of a future claim is . . . clear."). As an example, in *Patriarch Partners LLC v. Axis Ins. Co.*, 758 F. App'x 14, 16-21 (2d Cir. 2018), the court held the insured's sole officer had breached the Warranty she signed dated August 12, 2011, because she was aware of and could reasonably foresee (but did not disclose), a subpoena coming from the SEC, where Patriarch and its employees had been the subject of multiple SEC investigatory letters and orders for *two years*, had met with the SEC and spent $390,000 in legal fees to comply with the investigations, and the SEC specifically "had advised Patriarch in August" the very subpoena it received months later would be forthcoming.

There is absolutely nothing like that here: nothing from the SEC, no subpoena, no threat or anticipation of securities litigation, no shareholder demand, no derivative suit, no whistleblower, no investigation, no firings, no causally-related stock drop from the CLASS results. As a matter of law, there was no basis in August 2002 for *anyone* to reasonably foresee the April 2003 *Garber* Action.

## IV.   THE EXCESS POLICIES ATTACH BECAUSE ALL OF THE UNDERLYING POLICIES HAVE BEEN FULLY EXHAUSTED

Insurers' last excuse to get out from the coverage they owe is that their Policies do not attach because the underlying coverage is not exhausted—even though every underlying carrier in the tower paid its full limit for *Garber*. This dispositive fact is proven by undisputed evidence of policy payment used every

day in the insurance industry, proof which Twin City's claims handler confirmed at the time.  Pls. Exs. 29, 30.  Pls. Ex. 24 at TC1121-22, 1128 (reporting that "[a]ll underlying layers [beneath Arch] have paid their full limits" and all that was left for Twin City Policy to attach was Arch "exhaust[ing] their underlying limits.").

To detract from the undisputed facts, Insurers argue to the Court that the "clear trend in the law" is to strictly enforce exhaustion provisions even if it results in a "draconian loss of coverage."  Ins. Br. at 32.  But, the *applicable* law—New Jersey—holds that if the insured incurs liability above the excess policy's layer, the coverage attaches even if an underlying carrier paid less than its full limit.  *See* Pls. Br. at 21-22; *UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 647 A.2d 182, 190 (N.J. Super. Ct. 1994).  The law is clear in *this* Circuit on the issue of underlying exhaustion:  because the excess insurer's liability is completely unchanged whether the insured received all of the underlying payments or not, "settlement with the [underlying] insurer functionally 'exhausts' primary coverage and therefore triggers the excess policy."[30]

And, Insurers' standard finds no support in New York or anywhere else.  No court has endorsed the "draconian loss of coverage" Insurers advocate for here, where every single underlying carrier paid its *full* policy limit for *Garber*.

---

[30] *Koppers Co. v. Aetna Cas & Sur. Co.*, 98 F.3d 1440, 1454 (3d Cir. 1996) (Pennsylvania law); *Mills*, 2010 WL 8250837 at *10 (Delaware law).

Insurers' attempt at a windfall is contrary to the law, the facts, and even Insurers' technical reading of their Policies, and should not be countenanced by the Court.

### A. Twin City's Argument That Its Policy Only Attaches If The Underlying Insurers "Duly Admit Liability" For *Garber In Addition To* Paying Their Full Policy Limits Should Be Rejected

Twin City first contends that all underlying carriers payment of their full limits for *Garber* is insufficient because its Policy language required them to also separately "admit liability." Ins. Br. at 33. ████████████████

████████████████████████████████████████

████████████████████ Twin City claims its Policy never attaches. The argument is based on one New York court's decision under Illinois law, *JP Morgan Chase & Co. v. Indian Harbor Ins. Co*., 98 A.D.3d 18 (1st Dep't 2012). But neither *JP Morgan* nor Twin City's Policy language supports the extreme ruling it seeks, which in practice would only lead to a host of absurd results.

In *JP Morgan*, an excess carrier had the same policy language as Twin City here, and the court held that the policy did not attach on the additional ground that underlying carrier Zurich Insurance Company's ("Zurich") settlement agreement with the policyholder stated that its payment "shall not constitute . . . an admission of liability." 98 A.D.3d at 21-22. However, it was undisputed that Zurich's settlement agreement released multiple policies and claims and did not clarify how payment was to be allocated among them, and thus, it was not clear that Zurich

even had liability for the claim at issue.  Contrary to Twin City's contention, the court did not hold what Twin City seeks here, that (1) payment of full limits and (2) "admitting liability" were "separate and independent conditions to coverage" because the court was never faced with the question—Zurich did not pay its full policy limit specifically for the claim at issue.  Ins. Br. at 33.[31]

An alternative, reasonable interpretation of Twin City's attachment language is that an underlying carrier's actual payment of its policy's full limit constitutes an admission of liability.  And here that happened:  when the underlying insurers paid the full limits of their policies for *Garber*, they admitted liability for *Garber*. Indeed, Twin City's claims handler admitted that his Policy would be "triggered" for *Garber* as soon as Arch "exhaust[ed] their underlying limits"—not when Arch "duly admitted liability."  Pls. Ex. 36 at TC626.  This is consistent with the fact that three of Pharmacia's underlying insurers paid the full policy limits but did so without any agreement.  *See* Dkt. No. 58 (Lloyd's, Federal and U.S. Specialty).

Moreover, the use of Pharmacia's *settlement agreements* with the underlying carriers as evidence to "disprove" their liability for *Garber* runs contrary to not

---

[31] To bolster its unreasonable reading of *JP Morgan*, Twin City vaguely claims the court in *Wright v. Newman*, 767 F.2d 460 (8th Cir. 1985) "upheld a similar attachment clause" (Ins. Br. at 34), but that case is inapposite.  While the policy provided it "shall not attach unless and until the Primary and Underlying Excess Insurers shall have admitted liability . . ." the court never held an "admission of liability" was needed on top of full payment.  The issue was never analyzed because the policies were canceled before the accident even occurred.  *Id.* at 461.

only the law, but also common sense.  *See* Ins. Br. at 34-35.  Federal Rule of

Evidence 408 strictly prohibits the use of settlement agreements to determine the

liability (or lack thereof[32]) of any relevant party, including third-parties.  *E. Allen*

*Reeves, Inc. v. Michael Graves & Assocs., Inc.*, 2015 WL 105825, at *3 (D.N.J.

Jan. 7, 2015).  Moreover, Twin City cannot pick and choose what portions of the

settlement agreements it wants to use as evidence of a "fact."  ██████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ Defs. Ex. 40

at PFIGARB33; Defs. Ex. 42 at PFIGARB15; Defs. Ex. 44 at PFIGARB28.

Twin City's position even forces it to argue that AWAC is still somehow

"denying liability" to this day because it did not "formally withdraw" its initial

denial (Pls. Ex. 38 at 28, Pls. Ex. 37 at 158:16-159:7)—even though Twin City's

claims handler reported in 2015, accurately, that AWAC "withdrew its denial"

after it had ████████████████████ Pls. Ex. 55 at TC605.  Twin City's

unreasonable interpretation of the Policy's attachment language is not simply

"draconian"; it frustrates settlement, leads to absurd results, serves no legitimate

purpose and is unheard of in the insurance industry.  *See* Pls. Br. at 29 (Twin City's

---

[32] *See In re Woolard*, 269 B.R. 748, 752 (Bankr. S.D. Ohio 2001) ("The purpose of Rule 408 is to encourage 'nonlitigious solutions to disputes.'. . . To achieve this objection, statements made during settlement negotiations may not be offered as evidence of liability or the absence of liability.")

representative admitting he has never "admitted liability" nor been ever been asked to do so).  It should not be endorsed by the Court.[33]

## B.    All Of The Underlying Insurers Paid The Full Limits Under Their Underlying Policies For *Garber* Alone

After all the underlying insurers paid their policy limits for *Garber*, expressly under the underlying policies, Pharmacia provided to Insurers proof of that payment—in the form of copies of checks and wire transfers—evidence more than sufficient in the insurance industry to show underlying exhaustion.  Pls. Exs. 29, 30; Pls. Br. at 23.  Under any applicable state law, Pharmacia carried its burden of proving underlying exhaustion.  Nevertheless, again relying solely on *JP Morgan*, Insurers argue that the underlying coverage has not been exhausted because some of the underlying insurers' settlement agreements "released multiple policies for a single, unallocated sum[.]"  Ins. Br. at 35.  This is not the case, and not supported by the text of the agreements, proof of payment, or applicable law.

In *JP Morgan*, the court concluded that the insured could not prove that the underlying policy was exhausted because the settlement agreement at issue released multiple policies across different years, included claims other than the

---

[33] *See, e.g.*, *Mills*, 2010 WL 8250837, at *10 ("The court is not interested in scrutinizing a business deal in a vacuum simply to vindicate a theoretical right, as if this coverage question were a game of "Gotcha.". . . . the insurance company is only relying on the exhaustion clause because it could defeat coverage, thereby allowing the insurance company to avoid paying benefits that it otherwise owes to its customer for a covered loss.").

claim at issue, and did not specify how the payment should be allocated to each policy or claim.  98 A.D.3d at 22.  That is not the case here:  as the proof of payment also showed (*see* Pls. Ex. 29), they all specifically paid for *Garber* alone under 2002-2003 underlying D&O policies.  *See* Defs. Exs. 40-44.





Because Pharmacia collected the full underlying limits from its insurers for *Garber* and did not "fill any gaps" itself, even under the most strict enforcement of attachment provisions, the limits are exhausted and the Excess Policies attach.  Ins. Br. at 32 (citing, *inter alia*, *Forest Labs., Inc. v. Arch Ins. Co.*, 953 N.Y.S.2d 460 (Sup. Ct. N.Y. Cnty. 2012), *aff'd*, 984 N.Y.S.2d 361 (1st Dep't 2014) (holding that language required each underlying insurer—and not the insured—pay the full limit before its policy can be considered exhausted).



Insurers conclude their brief justifying their grounds for "strict" enforcement of their attachment language according to industry custom and practice.  Namely, that the provisions help ensure that only a covered claim reaches their layer "after being subjected to the claims adjustment process of the underlying insurers such that the underlying insurers have reviewed and analyzed the claim, ***determined that there is coverage***, and determined . . . to pay the settlement amount."  Ins. Br. at 37 (citation omitted).[36]  All the underlying carriers in the 2002-2003 D&O "follow form" Tower had the same or similar language and defenses as Arch and Twin City here (including exhaustion language[37]), and AWAC had the *exact* same language and Warranty.  And, as "gatekeepers," they all "review[ed] [the] claim and determin[ed] that it [wa]s reasonable to pay the policy limits" (Ins. Br. at 36), and did so.  With no barriers remaining, it is Arch and Twin City's turn to pay.

## <u>CONCLUSION</u>

For the foregoing reasons, and those stated in Pharmacia's opening brief, Pharmacia respectfully requests that the Court grant Pharmacia's Motion for Summary Judgment and deny Insurers' Motion for Summary Judgment.

---

[36] The insurer in *Mills* made this exact argument.  2010 WL 8250837, at *10.

[37] *See, e.g.*, Jt. Ex. 8 at PFIGARB2690 (XL Policy attachment language).

Dated: New York, NY
August 14, 2019

MCKOOL SMITH, P.C.

By: s/ Robin L. Cohen
Robin L. Cohen (NJ Attorney ID No. 030501986)
Adam S. Ziffer (admitted *pro hac vice*)
Marc T. Ladd (admitted *pro hac vice*)
One Bryant Park, 47th Floor
New York, NY 10036
Tel: (212) 402-9400

*Attorneys for Plaintiff Pharmacia Corporation n/k/a Pfizer Inc.*