MCKOOL SMITH, P.C.
Robin L. Cohen (NJ Attorney ID No. 030501986)
Adam S. Ziffer (admitted *pro hac vice*)
Marc T. Ladd (admitted *pro hac vice*)
One Bryant Park, 47th Floor
New York, NY 10036
Tel: (212) 402-9400
*Attorneys for Plaintiff Pharmacia Corporation*
*n/k/a Pfizer Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PHARMACIA CORPORATION N/K/A PFIZER INC., <br><br>         Plaintiff, <br><br>    v. <br><br> ARCH SPECIALTY INSURANCE COMPANY, TWIN CITY FIRE INSURANCE COMPANY, and LIBERTY MUTUAL INSURANCE COMPANY, <br><br>         Defendants. | Civil Action No. 2:18-cv-00510-ES-MAH <br><br> **ORAL ARGUMENT REQUESTED** |

## PLAINTIFF PHARMACIA CORPORATION N/K/A
## PFIZER INC.'S MEMORANDUM OF LAW IN SUPPORT
## <u>OF ITS MOTION FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................... 1

STATEMENT OF FACTS ..................................................................... 6

    A.    The Parties, D&O Policies And Relevant Policy Provisions ........... 6

    B.    The *Garber* Action .................................................................. 9

    C.    Pharmacia's Garber Claim And Insurers' Coverage Denial .......... 11

ARGUMENT ..................................................................................... 14

  I.  APPLICABLE STANDARDS ....................................................... 14

    A.    Summary Judgment .................................................................. 14

    B.    Rules Of Insurance Policy Interpretation ................................... 14

  II.  NEW JERSEY LAW APPLIES TO THE EXCESS POLICIES ............ 15

    A.    Under New Jersey Choice-Of-Law Rules, New Jersey Has The "Most Significant Relationship" To The Excess Policies ............. 15

    B.    Insurers' Excess Policies Do Not Incorporate The AWAC Policy's Arbitration Choice-Of-Law Provision ........................... 17

  III.  THE EXCESS POLICIES ATTACH TO PROVIDE COVERAGE BECAUSE ALL UNDERLYING COVERAGE IS EXHAUSTED .......... 21

    A.    Under New Jersey Law, The Excess Policies Attach As Pharmacia Incurred Loss Exceeding The Policies' Attachment Points ...................................................................................... 21

    B.    Even Under New York Law, The Underlying Coverage Is Exhausted And The Excess Policies Attach To Provide Coverage ................................................................................. 22

    C.    *JP Morgan* Does Not Undermine The Excess Policies' Attachment ............................................................................. 24

        1.    Each Underlying Insurer Specifically Paid Its Policy's Full Limit Under That Underlying Policy, For *Garber* Alone ....... 24

        2.    The Twin City Policy Does Not Require Underlying Insurers To Affirmatively "Admit Liability" For Garber *In Addition To* Already Paying Their Full Policy Limits For Garber ............. 26

IV.  THE INSURERS' PPL EXCLUSIONS DO NOT APPLY TO
     PRECLUDE COVERAGE FOR THE GARBER CLAIM ............................29

     A.   There Is No "Substantial Overlap" Or "Sufficient Factual
          Nexus" Between The *Garber* Action And The Consumer Class
          Actions ................................................................................30

     B.   The Language Of The PPL Exclusions Confirms That They
          Only Exclude Coverage For Successive D&O Claims ......................35

V.   THE WARRANTY LETTER DOES NOT PRECLUDE COVERAGE
     FOR THE GARBER CLAIM ..............................................................37

     A.   The Warranty Letter Requires Proof That An Insured Individual
          Director Or Officer Was Subjectively Aware That Known Facts
          Could Give Rise To A D&O Claim .........................................39

          1.   The Exclusion Applies Only To A Director Or Officer's
               Knowledge—Not The Company's "Constructive
               Knowledge" ...............................................................39

          2.   The Exclusion Only Applies To Facts Subjectively Known
               Only To The Insured Director Or Officer ...............................39

          3.   The Exclusion Requires Knowledge That A D&O Claim  Is
               "Brewing" Based On The Known Fact ..................................41

     B.   There Is No Evidence That Messrs. Hassan And Coughlin, Or
          Any Other Insured Director Or Officer, Was Subjectively
          Aware That Known Facts Could Give Rise To The *Garber*
          Action ................................................................................42

     C.   Even Under A Mixed Subjective/Objective Analysis, The
          Warranty Letter Still Does Not Apply Because There Was No
          Reasonable Basis To Expect *Garber* At The Time It Was
          Signed ................................................................................47

CONCLUSION ..............................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adron, Inc. v. Home Ins. Co.*,
    679 A.2d 160 (N.J. Super. Ct. App. Div. 1996) ...................................................14

*Breeze Acupuncture, P.C. v Allstate Ins. Co.*,
    58 Misc. 3d 1217(A), (N.Y. Civ. Ct. Feb. 1, 2018)...........................................23

*Carpenter Tech. Corp. v. Admiral Ins. Co.*,
    800 A.2d 54 (N.J. 2002) ....................................................................................22

*Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*,
    177 F.3d 210 (3d Cir. 1999) ........................................................................21, 22

*Colliers Lanard & Axilbund v. Lloyds of London*,
    458 F.3d 231 (3d Cir. 2006) ........................................................................passim

*Collins v. Mary Kay, Inc.*,
    874 F.3d 176 (3d Cir. 2017) ...............................................................................19

*Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*,
    143 A.3d 273 (N.J. 2016) .............................................................................14, 20

*Dooley v. Scottsdale Ins. Co.*,
    2015 WL 685811 (D.N.J. Feb. 18, 2015)............................................................49

*Dormitory Auth. v. Cont'l Cas. Co.*,
    756 F.3d 166 (2d Cir. 2014) ...............................................................................32

*E. Allen Reeves, Inc. v. Michael Graves & Assocs., Inc.*,
    2015 WL 105825 (D.N.J. Jan. 7, 2015)..............................................................28

*First Trenton Indem. Co. v. River Imaging, P.A.*,
    2009 WL 2431649 (N.J. Super. Ct. App. Div. Aug. 11, 2009)..........................31

*Flomerfelt v. Cardiello*,
    997 A.2d 991 (N.J. 2010) ...................................................................................14

*Forest Labs., Inc. v. Arch Ins. Co.*,
  953 N.Y.S.2d 460 (Sup. Ct. N.Y. Cnty. 2012), *aff'd*, 984 N.Y.S.2d
  361 (1st Dep't 2014) ...........................................................................22

*Henderson/Vance Healthcare, Inc. v. Cincinnati Ins. Co.*,
  2013 WL 5375612 (E.D.N.C. Sept. 25, 2013) ....................................49

*Imperium Ins. Co. v. Porwich*,
  2015 WL 807630 (N.J. Super. Feb. 27, 2015)................................40, 41

*In re Enron Corp. Secs., Derivatives & "ERISA" Litig.*,
  391 F. Supp. 2d 541 (S.D. Tex. 2005)..................................................20

*In re Woolard*,
  269 B.R. 748 (Bankr. S.D. Ohio 2001) .................................................28

*John Crane, Inc. v. Admiral Ins. Co.*,
  2009 WL 908576 (Ill. Cir. Mar. 10, 2009) ...........................................23

*JP Morgan Chase & Co. v. Indian Harbor Ins. Co.*,
  98 A.D.3d 18 (1st Dep't 2012) .......................................21, 24, 25, 27

*Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*,
  916 A.2d 440 (N.J. 2007) ..............................................................40, 47

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Ambassador Grp., Inc.*,
  691 F. Supp. 618 (E.D.N.Y. July 13, 1988) .....................................32, 34

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Becton, Dickinson &
  Co.*,
  2019 WL 1771996 (D.N.J. Apr. 23, 2019)...........................................22

*Navigators Specialty Ins. Co. v. Scarinci & Hollenbeck, LLC*,
  2010 WL 1931239 (D.N.J. May 12, 2010)..............................40, 41, 45

*Newark Publishers' Ass'n v. Newark Typographical Union*,
  126 A.2d 348 (N.J. 1956) ....................................................................14

*OKK USA Corp. v. Gen. Tool Specialties, Inc.*,
  2011 WL 5117854 (D.N.J. Oct. 27, 2011) ...........................................15

*Old Bridge Mun. Utils. Auth. v. Westchester Fire Ins. Co.*,
  2016 WL 4083220 (D.N.J. July 29, 2016) .......................................15, 38

*Pfizer, Inc. v. Emp'rs Ins. of Wausau*,
   712 A.2d 634 (N.J. 1998) ............................................................................ 15, 16

*Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*,
   2009 WL 4884096 (S.D.N.Y. Dec. 17, 2009) ............................................. 30, 41

*Regal-Pinnacle Integrations Indus., Inc. v. Phila. Indem. Ins.*,
   2013 WL 1737236 (D.N.J. Apr. 22, 2013) ........................................................ 31

*Shannon v. B.L. Eng. Generating Station*,
   2013 WL 6199173 (D.N.J. Nov. 27, 2013) ........................................................ 19

*Township of Haddon v. Royal Ins. Co. of Am.*,
   1996 WL 549301 (D.N.J. Sept. 19, 1996) .......................................................... 14

*UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*,
   647 A.2d 182 (N.J. Super. Ct. 1994) ........................................................... 21, 22

*Waldorf Holding Corp. v. Chartis Claims Inc.*,
   2016 WL 4651436 (N.J. Super. Ct. App. Div. Sept. 7, 2016) ............................. 17

*Weaver v. Axis Surplus Ins. Co.*,
   2014 WL 5500667 (E.D.N.Y. Oct. 30, 2014) ............................................... 31, 34

## OTHER AUTHORITIES

Fed. R. Evid. 408 ...................................................................................................... 28

Pharmacia Corporation ("Pharmacia") n/k/a Pfizer Inc. ("Pfizer"; together, referred to as Pharmacia) submits this memorandum of law in support of its motion for summary judgment against Arch Specialty Insurance Company ("Arch") and Twin City Fire Insurance Company ("Twin City"; together, "Insurers").[1]

## PRELIMINARY STATEMENT

This action arises out of two Insurers' refusal to pay Pharmacia's loss that it incurred when it settled the *Garber* securities class action.[2]  Each of Pharmacia's directors' and officers' ("D&O") insurers, starting with the primary insurer and followed by successive excess carriers up the tower, paid its respective policy's full applicable limits until it came time for Insurers to pay.  Notwithstanding that their excess policies provide the same coverage as the insurers directly below them, they refused.  None of the bases they used to justify their denials caused any underlying insurer to pay less than the full limit of their policies, and based on the undisputed facts of the case, none bar coverage under Insurers' polices here.

Insurers first seek to upend the parties' expectation that New Jersey law would apply to their policies.  Both policies were sold to a company headquartered in Peapack, NJ, concern coverage for allegations of misconduct in New Jersey, in

---

[1] Following the filing of the Complaint, Pharmacia and Liberty Mutual Insurance Company settled their dispute.  Dkt. No. 46.

[2] *Robert L. Garber v. Pharmacia Corp., et al.*, No. 03-1519 (AET) (D.N.J.), later consolidated and captioned *Alaska Electrical Pension Fund, et al. v. Pharmacia Corp., et al.*, No. 03-1519 (AET) (D.N.J.) (the "*Garber* Action").

an action litigated in this New Jersey court.  Insurers distort their policies' follow

form language in an effort to adopt for this *litigation* a choice-of-law provision in

an underlying policy that applies New York law as part of *mandatory arbitration*

(which did not discourage *that* insurer from paying its full policy limits on this

claim).  Implicitly understanding the overreach of that argument, Insurers also

point to inconsequential New York contacts (*e.g.*, the broker's location, and

*Pfizer's* location), although New Jersey has the most significant interest in this

dispute for an underlying New Jersey action against a New Jersey insured.

 Insurers strain to get New York law to apply for one reason—they believe

(incorrectly) that New York law credits their argument that the underlying limits

are not fully exhausted for their excess policies to attach.  Not so.  Neither state's

law helps them in this regard.  The undisputed facts are that every underlying

insurer paid Pharmacia's *Garber* Action losses to its policy's full limit.  This is

unequivocally demonstrated by contemporaneous documentation of full payment,

proof Twin City's claims handler admitted exceeded what he typically relies upon.

 Faced with these facts (and the undisputed fact that New Jersey law only

requires that a policyholder incur loss exceeding an excess policy's layer for

excess coverage to attach), Insurers concoct two arguments based on one New

York decision under Illinois law to justify their position.  First, they argue their

policy language relieves them of all coverage obligations where a policyholder

settles with an underlying insurer and releases additional claims or policies without allocation to the claim at issue.  But, here, Pharmacia's proof of payment confirms that each insurer paid its specific policy's limit for *Garber* alone. █████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

Second, Twin City argues that even payment of full limits is not enough for its coverage to attach; rather, each insurer must additionally "duly admit liability" in written form.  Not only is such a requirement unsupported by applicable law or insurance industry custom, it would provide Twin City with a windfall.  No party—let alone insurer—would ever "admit liability"; many of Pharmacia's insurers simply paid the full limits of their policies, with no written agreement.  It would let Twin City off the hook for a covered claim and punish the policyholder where underlying carriers capitulated and paid their full limits, merely because they did so without written admission.  Payment of full limits *is* the admission.

Insurers' next position—that coverage for *Garber* is precluded under their "pending and prior litigation" ("PPL") exclusions because it is "related" to three

consumer product liability lawsuits[3]—also constitutes a proposition unprecedented in law.  Pharmacia found no court which ever held that consumer claims relate to securities claims to trigger this exclusion in a D&O policy.  This case demonstrates why:  the *Garber* Action does not arise out of, and is not based upon, substantially the same matters as those alleged in the Consumer Class Actions, nor do they allege wrongful acts that share a "common nexus" or are "causally connected."

*Garber* was a securities class action brought by Pharmacia's shareholders alleging that they suffered injury from misstatements or omissions that resulted in an inflated stock price which dropped following revelations of a clinical study on the drug Celebrex.  The Consumer Class Actions were brought on behalf of individuals who took and purchased Celebrex and Vioxx and claimed to have suffered physical injuries from a defective product or sought economic damages for Pharmacia's and other drug companies' false marketing.  The Actions involve different:  plaintiffs, defendants, causes of action, alleged harms, alleged dangers, and, dispositively, different conduct.  The plain language of the exclusions reinforces this conclusion, as they are not written to apply across all different types of harms and claims triggering different coverages—they only exclude coverage

---

[3] *Cain v. Merck & Co., et al.*, No. 1:01-CV-03441 (E.D.N.Y. filed May 29, 2001) ("*Cain* Action"); *Leonard v. Pharmacia Corp., et al.*, No. 3:01-CV-04104 (D.N.J. filed Aug. 27, 2001) ("*Leonard* Action"); and *Astin v. Pharmacia Corp., et al.*, No. L-1322-01 (N.J. Super. Ct., Law Div. filed Aug. 27, 2001) ("*Astin* Action") (collectively, the "Consumer Class Actions").

for D&O claims based on prior claims triggering the same coverage, *i.e.*, prior D&O claims.

In a last-ditch effort to avoid the coverage obligations accepted by every underlying carrier, Insurers reach outside the policies to argue that a "warranty letter" excludes coverage because Pharmacia knew *Garber* was coming at least eight months before it was filed.  In the letter, Pharmacia's CEO and CFO affirmed that no director or officer was aware of circumstances that could give rise to a D&O claim that could generate over $130 million in losses.  Not only is there no proof that anyone had the requisite subjective knowledge to implicate the letter's effect as a prior knowledge exclusion, but the signatories testified to the contrary and established as a matter of law that no reasonable person could have anticipated the *Garber* Action.  Indeed, over a year before the letter was signed, all of the alleged "misstatements" at issue in *Garber* had already been disclosed (including to Insurers).  Insurers' position that a Pharmacia officer should have anticipated a securities claim years later based on those disclosures fails as a matter of law.

At bottom, every insurer in the D&O insurance tower—including the insurer immediately beneath the Insurers' policies that had the same exact prior and pending litigation exclusion and warranty—paid the full limits of their policies toward *Garber* until Defendants Arch and Twin City, who were determined to extract a discount by raising meritless defenses that no other underlying insurer

used to refuse payment.  Each "ground" for denial of coverage fails as a matter of law, and the Court should grant Pharmacia's motion for summary judgment.

## STATEMENT OF FACTS

### A. The Parties, D&O Policies And Relevant Policy Provisions

In 2002, Pharmacia was a pharmaceutical company incorporated in Delaware with its principal place of business in Peapack, New Jersey.  Pls. Ex. 1 at ARC14751.  For the 2002-2003 policy period, Pharmacia purchased $200 million in D&O coverage in 12 layers of insurance (the "2002-2003 D&O Tower") that, with certain exceptions, all follow the same scope of coverage as the policy issued by the primary insurer, National Union Fire Insurance Co. of Pittsburgh, Pa. (the "National Union Policy").  Jt. Exs. 1-11.  Above the previous year's total limit of $105 million, Pharmacia secured $95 million in additional coverage from several new carriers on the program, including the first three up the tower:  Allied World Assurance Company ("AWAC"), which issued sixth-excess layer Policy No. C000875 (the "AWAC Policy"), with limits of $25 million excess of $105 million; Arch, which issued seventh-layer excess Policy No. 12DOX0520500 (the "Arch Policy") with limits of $10 million excess of $130 million; and Twin City, which issued eighth-excess layer Policy No. DA 0211966-02 (the "Twin City Policy"; together with the Arch Policy, the "Excess Policies") with limits of $10 million excess of $140 million.  Jt. Exs. 9-11.

As part of the underwriting process in May and June 2002, the proposed carriers coordinated with, and received information and presentations from, Pharmacia's broker Aon Northeast Risk Services ("Aon") and Pharmacia's then-Chief Financial Officer Christopher Coughlin.  Pls. Exs. 2, 3.  As part of this analysis, underwriters were provided with, and would have reviewed, extensive documentation on Pharmacia's business transactions, products, financial outlook, current litigations or potential claims and liabilities, and news reports regarding the same.  *Id*; Pls. Ex. 4; *see* Pls. Ex. 5 at 115:6-9, 125:6-9, 184:16-23.

Pharmacia completed renewal applications and questionnaires for its primary coverage with National Union and first-two excess carriers, Zurich American Insurance and Continental Casualty Company.  Pls. Ex. 6; *id.* at PFIGARB33781.  In lieu of requiring a main form application and a broad exclusion for "prior acts," the new excess carriers on the D&O Tower—including Arch and Twin City—requested a warranty statement and a pending and prior litigation exclusion.  Pls. Ex. 7 at PFIGARB33821.  Pharmacia's then-CEO Fred Hassan and Mr. Coughlin executed the following letter, dated August 29, 2002:

Directors & Officers Liability Policy

> No person for whom this insurance is intended has any knowledge or information of any act, error, omission, fact or circumstance that may give rise to a claim that may fall within the scope of the proposed insurance.

It is agreed that any claim based upon, arising from, or in any way related to any act, error, omission, fact or circumstance of which any such person has knowledge or information will be excluded from coverage under the proposed insurance.

Jt. Ex. 12 (the "Warranty Letter").  The new excess carriers' pending and prior litigation exclusions were given the date of the beginning of the policy period.  The Arch Policy PPL Exclusion provides, in relevant part, that:

1. The **Excess Insurer** shall not be liable to make any payment in connection with a **Claim** arising out of, based upon or attributable to:

a. any litigation . . . against any **Insured** occurring prior to, or pending as of, September 1, 2002;

b. any subsequent litigation . . . against any **Insured** arising from or based on any matter alleged in such prior or pending litigation. . . .; or

c. any **Wrongful Act** which gave rise to such prior or pending litigation . . . against any **Insured**, or any other **Wrongful Act** whenever occurring, which, together with a **Wrongful Act** described above, constitute **Interrelated Wrongful Acts**.

2. "**Wrongful Act**" means any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act.

3. "**Interrelated Wrongful Acts**" means **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

Jt. Ex. 10 at PFIGARB2706.  Twin City's PPL Exclusion provides that:

Underwriters shall not be liable to make any payment for loss in connection with any claim made against any Insured:

1. arising from any litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured

8

occurring prior to, or pending as of, 9/01/02, of which any Insured had received notice or otherwise had knowledge as of such date;

2. arising from any subsequent litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured arising from, or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured; or

3. arising from any act of an Insured which gave rise to such prior or pending litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees or judgments against any Insured.

Jt. Ex. 11 at PFIGARB2560.  The Excess Policies each provide when it is triggered for coverage based on underlying exhaustion.  The Arch Policy provides that:

The insurance coverage afforded by this Policy shall apply only after exhaustion of the Underlying Limit solely as a result of actual payment, in legal currency, under the Underlying Insurance in connection with Claim(s). . . .

Jt. Ex. 10 at PFIGARB2702.  The Twin City Policy provides:

It is expressly agreed that liability for any loss shall attach to [Twin City] only after the Primary and Underlying Excess Insurers shall have duly admitted liability and shall have paid the full amount of their respective liability. . . .

Jt. Ex. 11 at PFIGARB2555.

## B.   The *Garber* Action

On April 7, 2003, eight months after policy issuance, Pharmacia shareholders filed the *Garber* Action against Pharmacia and three executives (including Mr. Hassan).  The Consolidated Complaint (the "Complaint") followed

9

six months later on October 27, 2003.  Jt. Exs. 16, 17.[4]  The Action was "brought on behalf of all those who purchased Pharmacia" securities between April 17, 2000 and May 31, 2002.  Jt. Ex. 17 ¶ 1.  The Complaint alleged that Pharmacia commissioned a clinical drug study called Celecoxib Long-Term Arthritis Safety Study (the "CLASS Study") to compare the gastrointestinal ("GI") side effects of Celebrex versus ibuprofen or diclofenac with the principal aim of getting the Food and Drug Administration ("FDA") to remove Celebrex's GI warning label.  *Id.* ¶ 4.

Plaintiffs claimed Pharmacia misrepresented the Study's results to investors and financial analysts alike by only reporting the trial's first six months instead of the Study's results for the original endpoints of twelve and fifteen months, which allegedly did not demonstrate that Celebrex had a superior GI safety profile than the other two drugs.  *Id.* ¶¶ 5-6.  Plaintiffs claimed that, "[w]ith the investing public unaware of the truth," the Pharmacia defendants' "announcements that Celebrex had been proven to cause fewer GI side effects buoyed Pharmacia's stock price." *Id.* ¶ 7.  Plaintiffs alleged the truth came to light on June 1, 2002, when the British Medical Journal ("BMJ") published an article concluding that, "based on the CLASS study data" that had not been originally published, Celebrex provided no GI advantage over ibuprofen.  *See id.* ¶ 11.  Plaintiffs claimed this conduct resulted

---

[4] On April 16, 2003 Pharmacia merged with Pfizer.  Pls. Ex. 8; Pls. Ex. 9 at PFIGARB22308.

in an artificially inflated share price for Pharmacia's stock, and sought claims for violations of federal securities laws.  *See id.* ¶¶ 80-89.

Following discovery, motions, dismissal, appeal and reversal, in October 2012, Pharmacia moved for preliminary approval of a $164 million settlement of *Garber*, which was approved with the case's dismissal in January 2013.  Jt. Ex. 18; Pls. Ex. 10.  Pharmacia incurred approximately $207 million in total defense and indemnity costs.  *Id.*; Pls. Ex. 11 at PFIGARB1320-39 (showing defense costs).

### C.    Pharmacia's Garber Claim And Insurers' Coverage Denial

On or about April 14, 2003, Pharmacia gave notice of the *Garber* Action to its insurers under the 2002-2003 D&O Tower (the "Garber Claim").  Pls. Ex. 12. National Union accepted coverage for the Garber Claim and began paying the defense costs above the retention (Pls. Ex. 13), and Pharmacia held calls with the 2002-2003 D&O Tower to provide them with status updates in the *Garber* Action. *See* Pls. Ex. 14 at ARC2; Pls. Ex. 15 at ARC15454.  National Union eventually exhausted its coverage in 2011, after which time first-layer excess insurer Zurich took over Pharmacia's defense in *Garber*.  *See* Pls. Ex. 16 at TC1148, 1153.

However, by January 2006, Arch already had grown dissatisfied with Pharmacia's "excessive defense costs" for *Garber*, and its request that insurers not use materials it shared from *Garber* to deny coverage, which Arch called "a deal breaker."  Pls. Ex. 15 at ARC15455.  Arch retained counsel, who denied coverage

on August 11, 2006, stating they had "discovered the existence" of three consumer lawsuits against Pharmacia involving Celebrex that fell under the PPL and Warranty Letter Exclusions.  Pls. Ex. 17 at PFIGARB955.  According to Arch, the Consumer Class Actions had "a common nexus of facts" with *Garber*, and "by virtue of the [Actions], the Insureds, as of August 29, 2002, had notice of the acts . . . that form the basis of the Garber"—even though *Leonard* and *Astin* had been dismissed for years.  Pls. Ex. 18; Pls. Ex. 1 at ARC14761.  Arch did not even have the *Astin* complaint when it denied coverage.  Pls. Ex. 19 at 153:12-154:8.

Twin City, on the other hand, reserved its rights under the Warranty Letter (Pls. Ex. 20 at TC418)—as was standard practice, Pls. Ex. 21 at 72:12-73:2—but did not deny coverage until nine years later.  Pls. Ex. 22 at TC72.  Rather, Twin City's claims handler, Patrick Maloney, monitored the *Garber* Action through discovery and dismissal at the trial court level, updating regularly his claim status reports ("CSR") that evaluated both the *Garber* Action and Twin City's liability for the same, including that the claim was considered "$0W('weak')" with respect to Twin City's exposure.  *See, e.g.*, Pls. Exs. 16, 23, 24; Pls. Ex. 25 at 86:24-87:25.

However, on October 3, 2011, Pharmacia's defense counsel held a presentation for insurers to encourage participation in a possibly significant settlement at mediation.  Pls. Ex. 26.  And on October 19, 2011, Twin City learned that underlying insurer AWAC's lawyers found a copy of the long-dismissed

*Leonard* Action complaint, and had used it as the basis to deny coverage.  Pls. Ex. 27 at TC513.  Eight days later, Twin City asked Pharmacia for the emails cited at the October 3 meeting in which Pharmacia researchers discussed in 2001 the use of the 6-month results from CLASS.  Pls. Ex. 28 at TC88.  Mr. Maloney then denied coverage for *Garber* based on his analysis of the *wrong* policy that wrongly included a "Prior Acts" exclusion, which Mr. Maloney even cited to exclude coverage.  Pls. Ex. 25 at 141:12-143:5.  Twin City also denied coverage under (1) the PPL Exclusion based on *Leonard*, and (2) the Warranty Letter based on articles on CLASS and the above-referenced internal Pharmacia emails.  Pls. Ex. 22.

Following National Union's payment of the full limits of the primary policy towards defense of the *Garber* Action, and the court's final order approving the settlement, all seven insurers whose policies underlie Arch's and Twin City's Policies paid Pharmacia their policies' limits for *Garber*, including AWAC, which had the same exact defenses as Insurers here, but withdrew its denial and paid its full limit.  Pls. Exs. 29, 30; Pls. Ex. 24 at TC1120.  Insurers maintained their denials for years, even, in the case of Twin City, under the wrong policy.  Pls. Ex. 31.  Pursuant to an Alternative Dispute Resolution ("ADR") Provision which required binding arbitration or mediation, on September 14, 2017, the parties conducted mediation, which was unsuccessful.  After the ADR Provision's 120-day waiting period for filing suit expired, Pharmacia filed this lawsuit.  Dkt. No. 1.

**ARGUMENT**

## I.   APPLICABLE STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Township of Haddon v. Royal Ins. Co. of Am.*, 1996 WL 549301, at *1 (D.N.J. Sept. 19, 1996).  Issues of insurance policy interpretation are routinely resolved through summary judgment.  *See Adron, Inc. v. Home Ins. Co.*, 679 A.2d 160, 165 (N.J. Super. Ct. App. Div. 1996).

### B.   Rules Of Insurance Policy Interpretation

In reviewing a contract, the court may consider extrinsic evidence to determine the existence of an ambiguity if the evidence illuminates the meaning of the language used.  *See Newark Publishers' Ass'n v. Newark Typographical Union*, 126 A.2d 348, 353 (N.J. 1956).  If the language of a policy will support two meanings, the interpretation favoring coverage should be applied.  *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 143 A.3d 273, 280 (N.J. 2016).

Exclusions to coverage, such as the Warranty Letter and PPL Exclusions, are construed narrowly against the insurer.  *Flomerfelt v. Cardiello*, 997 A.2d 991, 996-97 (N.J. 2010).  In order to prevail on an exclusion, Insurers must show that the exclusions are not ambiguous, clear and unmistakable, and that they are clearly

14

and unmistakably triggered on these facts.  *Old Bridge Mun. Utils. Auth. v. Westchester Fire Ins. Co.*, 2016 WL 4083220, at *4 (D.N.J. July 29, 2016).

## II.   NEW JERSEY LAW APPLIES TO THE EXCESS POLICIES

### A.   Under New Jersey Choice-Of-Law Rules, New Jersey Has The "Most Significant Relationship" To The Excess Policies

New Jersey choice-of-law analysis involves "a two-step process," with the first step being to determine if an actual conflict of law exists.  *OKK USA Corp. v. Gen. Tool Specialties, Inc.*, 2011 WL 5117854, at *3 (D.N.J. Oct. 27, 2011).  If no conflict exists, "the law of the forum state applies."  *Id.*  Thus, New Jersey law will apply to the Excess Policies to the extent there is no conflict between New Jersey law and New York law.  Assuming there is a conflict, a choice-of-law analysis also necessitates that New Jersey law applies to the Excess Policies, as it has "the 'most significant relationship' to the claim" at issue.  *OKK*, 2011 WL 5117854, at *3.  In making this determination, courts consider the relevant factors derived from the Restatement (Second) Conflict of Laws, including:  (1) the "competing interests of the relevant states"; (2) the "interests of commerce among the several states"; (3) the "interests of the parties"; and (4) the "interests of judicial administration."  *Pfizer, Inc. v. Emp'rs Ins. of Wausau*, 712 A.2d 634, 639 (N.J. 1998).

The first factor "require[s] courts to consider whether application of a competing state's law . . . 'will advance the policies that the law was intended to promote,'" while the second factor asks whether "application of a competing

15

state's law would frustrate the policies of other states." *Id*. at 640.  Pharmacia was headquartered in New Jersey, where the Excess Policies were issued, its alleged misconduct took place in New Jersey, and Pharmacia litigated *Garber*, and was ordered to pay a settlement, in this New Jersey court (*supra* at 11; Jt. Ex. 17 ¶ 18); applying New York law under these facts would frustrate New Jersey policy.

Moreover, the interests of the parties focuses on the parties' "justified expectations and their needs for predictability of result," and considers the "places of incorporation, business, contracting, and performance" in assessing those expectations. *Pfizer*, 712 A.2d at 640.  As above, these relevant contacts point to New Jersey—the Excess Policies were issued to Pharmacia at its headquarters in Peapack, where its risk management and executives were located.  Pls. Ex. 7 at PFIGARB33821; Jt. Exs. 10, 11.  The National Union Policy includes a New Jersey surcharge (Pls. Ex. at ARC14539), and Twin City's CSRs for the Garber Claim highlight New Jersey as the "Insured['s] Residence," and list "New Jersey" as the location of the accident/loss.  Pls. Ex. 23 at TC80; Pls. Ex. 33 at TC2.[5]

In contrast, Arch previously argued New York has the most significant relationship based on *Pfizer's* location (although it did not purchase the Policy), the

---

[5] Additionally, factor four, the interests of judicial administration, requires "a court to consider whether the fair, just, and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen." *Pfizer*, 712 A.2d at 640.  Since all of the other factors favor New Jersey, applying New Jersey law to the claims raised in this New Jersey forum will undoubtedly foster the "[e]fficient administration" of this case.  *See id.*

location of broker Aon and the fact that Arch has New York (in addition to New Jersey) offices.  Dkt. No. 47 at 7.  These contacts do not alone override the clear interest New Jersey has in this dispute, and New Jersey law applies.[6]

### B.    Insurers' Excess Policies Do Not Incorporate The AWAC Policy's Arbitration Choice-Of-Law Provision

Because New Jersey law applies to the Excess Policies under the traditional choice-of-law analysis provided above, Insurers are forced to argue that New York law applies because the Excess Policies "follow form" to, and thus incorporate, a purported choice-of-law provision contained in a policy issued by AWAC—the immediately underlying insurer that paid its full policy limit for *Garber* despite having the same exact policy language (and warranty letter) as Insurers here.

But, the AWAC Policy does not contain a choice-of-law provision that applies to litigation because the AWAC Policy requires *mandatory arbitration* for coverage disputes.[7]  Thus, the "choice-of-law" provision Insurers seek to adopt

---

[6] *See, e.g.*, *Waldorf Holding Corp. v. Chartis Claims Inc.*, 2016 WL 4651436, at *2 (N.J. Super. Ct. App. Div. Sept. 7, 2016) (affirming lower court's holding that insured's incorporation and address in New York at time policies were issued, as well as place of underlying lawsuit and settlement in New York, outweighed broker's and insured's new location in New Jersey).  Pharmacia's state of incorporation in Delaware also is considered a relevant contact in a choice-of-law analysis, including when the contracts provide D&O coverage.  However, since there is no material difference between New Jersey and Delaware law on the issues, Pharmacia limits its discussion here to New Jersey and New York law.

[7] Jt. Ex. 9 at PFIGARB2542 ("Any and all disputes . . . shall be finally and fully determined in Hamilton, Bermuda under the provisions of The Bermuda International Conciliation and Arbitration Act of 1993[.]").

only provides for New York law in the context of arbitration.  Indeed, the section heading for "Choice of Law" immediately following the Policy's "Arbitration" section explicitly integrates the two sections, stating that New York law applies, except to as to the procedural rules for the arbitration.  Jt. Ex. 9 at PFIGARB2543.[8]

If the Insurers believed that New York law applied by following form to the AWAC Policy's choice-of-law provision, then they would have also followed form to, *inter alia*, the mandatory arbitration provision as well and insisted on arbitrating this coverage dispute pursuant to that provision.  Here, they did the opposite.  The Insurers admit they follow form to the *National Union Policy's* ADR Provision (*e.g.*, Jt. Ex. 2 at ARC15408; Pls. Ex. 25 at 221:6-11), which provides that all disputes must be submitted for arbitration or mediation under Delaware law, and willingly participated in the latter before litigating this action in this Court.  Dkt. No. 1 ¶¶ 47-48.  The Insurers cannot follow both arbitration provisions or pick and choose at different times to follow different aspects of each as it may suit their needs at the expense of all other provisions.

Even if the AWAC Policy's choice-of-law provision was capable of being divorced from the arbitration agreement, it should still be disregarded.  In this Circuit, courts look to the choice-of-law rules of the forum state in order to "decide which body of substantive law to apply to a contract provision, even where the

---

[8] The AWAC Policy states its headings "are inserted solely for convenience and do not constitute any part of the terms or conditions" of the Policy.  *Id.*

contract contains a choice-of-law clause," and "[p]arties' freedom to choose the law applicable to their agreements is not without boundaries in New Jersey law." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183-84 (3d Cir. 2017).  Where "no party to the contract has a 'substantial relationship' with New York," New Jersey courts "will not enforce [a] choice-of-law clause" selecting New York law.  *Shannon v. B.L. Eng. Generating Station*, 2013 WL 6199173, at *7 (D.N.J. Nov. 27, 2013). Here, because neither Pharmacia, Arch nor Twin City "are citizens of New York or have a principal place of business in New York," and because the Policies did not expressly select New York law, New Jersey courts would disregard the AWAC choice-of-law clause even if it could apply beyond the contemplated arbitration.

Lastly, neither the Arch nor the Twin City Policy follow-form provisions would incorporate the AWAC choice-of-law provision.  Arch's coverage applies:

> in conformance with the terms and conditions of the [National Union Policy] and in conformance with any terms and conditions *further limiting or restricting coverage* in this Policy or in any other **Underlying Insurance**.  In no event shall this Policy grant broader *coverage* than that provided by the most restrictive policy included in the **Underlying Insurance**.

Jt. Ex. 10 at PFIGARB2702 (italics added).  The Arch Policy follows form to the National Union Policy and "conform[s]" to underlying policies' terms to the extent they limit the *grant of coverage*.  A choice-of-law provision does not limit or restrict coverage; it neutrally selects application of a particular state law without respect to impact on coverage.  Courts have held that this follow form language

does *not* incorporate choice-of-law provisions in underlying policies. *See In re Enron Corp. Secs., Derivatives & "ERISA" Litig.*, 391 F. Supp. 2d 541, 553-55 (S.D. Tex. 2005) (choice-of-law clause does not "restrict[] coverage").

The Twin City Policy provides that it is "subject to the same warranties terms, conditions, definitions, exclusions and endorsements" as contained in the National Union Policy, "together with all the warranties, terms, conditions, exclusions and limitations contained or added by endorsement to any Underlying Excess Policy(ies)." Jt. Ex. 11, at PFIGARB2556. Here, there is a conflict between the arbitration provisions in the AWAC and National Union policies that the Twin City Policy does not address. National Union's arbitration provision selects Delaware law, but for litigation defers to the law that would apply in accordance with the applicable choice of law rules. Twin City's failure to specify in its Policy whether the terms of the National Union or "other" excess policies take precedence in the face of a conflict between the two creates an ambiguity on that issue, which is resolved in favor of Pharmacia. *Cypress Point*, 226 N.J. at 280.

As with every other policy on the 2002-2003 D&O Tower, there is no litigation choice-of-law provision contained in the Excess Policies. Accordingly, New Jersey choice-of-law rules govern here, and New Jersey law applies because it has the most significant relationship to the parties and the Excess Policies.

## III.  THE EXCESS POLICIES ATTACH TO PROVIDE COVERAGE BECAUSE ALL UNDERLYING COVERAGE IS EXHAUSTED

The reason for Insurers' efforts to have New York law apply is transparent: one of the reasons they have denied coverage, lack of underlying exhaustion, does not even get off the ground under New Jersey law.  But New York law is of no help either, because it is undisputed that every underlying insurer paid its full policy limit for *Garber*.  Yet Arch and Twin City maintain that even full payment is not enough to get their Policies to attach, based on a single New York court's prediction of Illinois law.[9]  Under applicable New Jersey law, and even a New York court's decision under Illinois law, all of the coverage underlying Insurers' Excess Policies is exhausted and their payment obligations have attached.

### A.  Under New Jersey Law, The Excess Policies Attach As Pharmacia Incurred Loss Exceeding The Policies' Attachment Points

Even though every underlying insurer paid its full limit for *Garber*, that fact is not necessary for underlying exhaustion under New Jersey law.  Under New Jersey law, underlying coverage is considered exhausted for the purposes of excess policy attachment where the policyholder incurs loss in excess of the excess policy's attachment point—regardless of lack of payment by an underlying carrier. *See UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, 647 A.2d 182 (N.J. Super. Ct. 1994); *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177

---

[9] *JP Morgan Chase & Co. v. Indian Harbor Ins. Co.*, 98 A.D.3d 18 (1st Dep't 2012).

F.3d 210, 227 (3d Cir. 1999); *see also Carpenter Tech. Corp. v. Admiral Ins. Co.*, 800 A.2d 54 (N.J. 2002). In *UMC*, the New Jersey Superior Court addressed the issue of underlying exhaustion:

> As long as the underling liability exceeds the primary limits in a vertical exhaustion, it does not matter how much the primary paid plaintiffs. If there is any dollar difference between the primary layer of coverage and the amount of the settlement, plaintiffs will have to pay that difference before expecting to obtain any reimbursement from excess insurance companies since plaintiffs do not contend that these are 'drop down' policies. It is therefore irrelevant what the exact dollar figure was in the settlement.[10]

Here, the Arch and Twin City Policies attach at $130 million and $140 million, respectively (excess Pharmacia's $10 million SIR), and it is undisputed that Pharmacia paid well in excess of those amounts in defense and settlement costs for *Garber*. *Supra* at 11, 13. Under New Jersey law, the underlying limits are exhausted, and the Excess Policies are due to cover Pharmacia's *Garber* losses.

### B. Even Under New York Law, The Underlying Coverage Is Exhausted And The Excess Policies Attach To Provide Coverage

Even if the Court finds that New York law applies in this litigation, the underlying policy limits are still exhausted and the Excess Policies attach. Insurers have cited *Forest Laboratories, Inc. v. Arch Insurance Co.*, 953 N.Y.S.2d 460 (Sup. Ct. N.Y. Cnty. 2012), *aff'd*, 984 N.Y.S.2d 361 (1st Dep't 2014) for the

---

[10] 647 A.2d at 190; *Chem. Leaman*, 177 F.3d at 227 (*UMC* is a statement of New Jersey law on exhaustion); *see Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Becton, Dickinson & Co.*, 2019 WL 1771996, at *4 n.3 (D.N.J. Apr. 23, 2019).

proposition that New York law requires each underlying insurer to pay its full limit under the Excess Policies' attachment language.  Dkt. No. 54 at 4.  Even if that was the case (and it is not), here, Pharmacia did not fill any gaps in coverage with its own payment; every underlying insurer *did* pay its full policy limit for *Garber*.

Excess insurers contest underlying exhaustion only where an underlying policy limit was not fully paid, whether because the insured accepted less than full underlying limits in settlement, or when an underlying insurer is insolvent.  That did not happen here.  Here, Arch and Twin City have long had documentation —copies of checks and wire transfers—showing that (1) the exact amount of each underlying insurer's policy limit was paid (2) under that insurer's 2002-2003 policy (3) for Garber.  Pls. Exs. 29, 30.  The documentation provided by Pharmacia is more than sufficient to prove that the underlying policies have been exhausted.[11] *See* Pls. Ex. 25 at 37:22-25, 38:6-14 (Twin City's claims handler for *Garber*: "[T]here comes a point where . . . we will be advised that the carrier below us has paid out its limit . . . In some cases, it's just advice by the broker. . . .We don't always get checks.").  After receiving proof of the underlying limits exhaustion, Twin City reported in its internal CSR that "[a]ll underlying layers [beneath Arch]

---

[11] *See Breeze Acupuncture, P.C. v Allstate Ins. Co.*, 58 Misc. 3d 1217(A), at *3-4 (N.Y. Civ. Ct. Feb. 1, 2018) (unrebutted evidence of policy exhaustion established by copies of insurer's checks); *John Crane, Inc. v. Admiral Ins. Co.*, 2009 WL 908576 (Ill. Cir. Mar. 10, 2009) ("Crane produced checks, wire transfers, and other supporting documents . . . to support the payment and allocation amounts").

have paid their full limits" and all that was left for the Twin City Policy to attach, was Arch "exhaust[ing] their underlying limits."  Pls. Ex. 24 at TC1121, 1128.

None of the carriers below Arch and Twin City contested underlying exhaustion before paying their full policy limits—even though they had the same or similar attachment language.  *See, e.g.*, Jt. Ex. 8 at PFIGARB290 (XL Policy attachment language).  Each underlying carrier paid its policy limits for *Garber*, and there is nothing in Insurers' Excess Policies' attachment language that gets them out of paying for an obviously covered claim.

## C.    *JP Morgan* **Does Not Undermine The Excess Policies' Attachment**

### 1.    Each Underlying Insurer Specifically Paid Its Policy's Full Limit Under That Underlying Policy, For *Garber* Alone

In *JP Morgan*, the policyholder entered into settlement agreements with some of its underlying carriers that included releases for additional insurers' policies for other program years and included payment for claims other than the claim at issue.  98 A.D.3d at 21.  Certain of the policyholder's excess carriers argued that the underlying carriers had not paid their full policy limits.  The court concluded under Illinois law that because the settlement agreements did not specify how the settlement payments were to be allocated among the various policies and claims resolved therein, the insured had failed to show that the relevant underlying carriers had paid their full limits for the claim at issue.  *Id.* at 22-23.

*JP Morgan* is completely distinguishable from the facts here, primarily, as discussed *supra* at 23, because the copies of checks and wire transfers themselves specifically show that each underlying insurer paid its full policy limit specifically for *Garber*. Pls. Exs. 29, 30. And, even though the settlement agreements with some of the underlying carriers (many paid without any agreement) are irrelevant to showing underlying exhaustion, they confirm the same: each insurer paid its full policy limit, under its underlying 2002-2003 D&O policy, for *Garber* alone.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ In *JP Morgan*, the court held the insured failed to show the underlying policy was exhausted because the settlement agreement at issue released multiple policies across different years, included claims other than the claim at issue, and provided only a lump sum with no allocation to each policy or claim. *Id.* at 22.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

 In *JP Morgan*, the excess carriers

disputed exhaustion because the underlying carriers settled and admittedly paid

less than their full policy.  Arch underwrote its excess coverage to attach after the

underlying $130 million in limits had been paid—and here, the underlying $130

million in limits was paid by the underlying insurers for the covered Garber Claim.

Insurers have no grounds to argue lack of full payment preventing attachment.

> 2.  The Twin City Policy Does Not Require Underlying Insurers To Affirmatively "Admit Liability" For Garber *In Addition To* Already Paying Their Full Policy Limits For Garber

According to Twin City, even if every underlying insurer in the 2002-2003

D&O Tower paid its full policy limit for *Garber* (and they did), Pharmacia still has

no coverage because its Policy language requires the underlying carrier to

separately "duly admit liability" in addition to paying its full limit for the claim.

This argument, too, is based solely on Twin City's reading of *JP Morgan*, defeats

the strong public policy favoring settlement, and would improperly provide Twin

City with a windfall.

In *JP Morgan,* the court addressed Twin City's attachment language here, which provides that coverage attaches when the underlying carriers "shall have duly admitted liability and shall have paid the full amount of their respective liability." *Id.* at 22.  The court held that the Twin City policy did not attach on the additional ground that underlying carrier Zurich Insurance Company ("Zurich")'s settlement agreement with the policyholder stated, as a matter of course, that its payment "shall not constitute . . . an admission of liability." *Id.*

Again, Twin City's argument ignores the context of *JP Morgan*.  The *JP Morgan* court was grappling with the ambiguity in Zurich's settlement agreement, which released multiple policies and claims and did not clarify how payment was to be allocated among them.  *Id.* at 21.  Because it was not clear that Zurich paid under its policy for the claim, it also was not clear if Zurich had liability for the claim.  Recognizing that, the court turned to the language of Zurich's settlement agreement as further evidence that its coverage was not exhausted.

Here, there is no ambiguity as to whether each underlying insurer admits liability for *Garber* because each underlying insurer paid its full policy limit solely for *Garber*.  And *JP Morgan* did not hold the patently unreasonable interpretation that Twin City seeks here—that its Policy still does not attach to provide coverage even where the underlying carrier paid its full limit, unless the carrier also separately "duly admit[s] liability."  The language does not unambiguously require

27

a separate, additional "admission of liability" on top of full payment.  It is more reasonably read to require that for Twin City's Policy to attach, it is not sufficient for the underlying carrier to acknowledge it is on the hook for the claim; the carrier must actually pay its policy's full limits first before Twin City attaches.

Twin City knows that its limited reading of the Policy language is untenable. First, such a reading would effectively prohibit any settlement with an underlying carrier, even for full policy limits, since settlement agreements are, by design, compromises to resolve a dispute and always provide that payments thereunder do not constitute admissions of liability.  In fact, that is why Federal Rule of Evidence 408 strictly prohibits the use of settlement agreements or communications for the purposes of proving liability or non-liability[12] on behalf of any party to the agreement, including third-parties to the litigation.  *E. Allen Reeves, Inc. v. Michael Graves & Assocs., Inc.*, 2015 WL 105825, at *3 (D.N.J. Jan. 7, 2015).

Second, aside from its settlement agreements with five carriers, three of the underlying excess insurers—Lloyd's, Federal and U.S. Specialty—paid their full policy limits for *Garber* without any agreement or statement as to "liability" at all; they just paid.  *See* Dkt. No. 58.  When Pharmacia asked whether such carriers' full

---

[12] *See In re Woolard,* 269 B.R. 748, 752 (Bankr. S.D. Ohio 2001) ("The purpose of Rule 408 is to encourage 'nonlitigious solutions to disputes.'. . . To achieve this objection, statements made during settlement negotiations may not be offered as evidence of liability or the absence of liability.")

limit payments were insufficient to "admit liability" under Twin City's Policy, Twin City effectively refused to answer.  Pls. Ex. 35 at 12.

Following Twin City's extreme interpretation leads to a host of absurd results and forces Twin City to take bizarre positions divorced from insurance industry custom and practice.  For example, Twin City's claims handler, Mr. Maloney, ultimately stated it was Twin City's position that Pfizer had to go back to the underlying carriers that paid their full limits for *Garber* and obtain "admissions of liability," and if the carriers refused, Pharmacia forfeited Twin City's coverage. Pls. Ex. 25 at 250:22-253:24.  Mr. Maloney stated this, even though he confessed that in his career, he had never "admitted liability" on behalf of Twin City, or had ever been asked to do the same.  *Id.* at 240:18-241:4.

However, in *2015*, Mr. Maloney wrote that his Twin City Policy would be "triggered" for *Garber* as soon as Arch "exhausted their underlying limits"—not when Arch "duly admitted liability"—because that was how the Policy worked. Pls. Ex. 36 at TC626.  Twin City's argument now that all eight insurers must "admit liability" or the Policy (for which Pharmacia paid a substantial premium) never provides coverage is unreasonable, nonsensical and must be rejected.

## IV.   THE INSURERS' PPL EXCLUSIONS DO NOT APPLY TO PRECLUDE COVERAGE FOR THE GARBER CLAIM

There was never any evidence to support Arch's earlier claim to the Court that its PPL Exclusion was "negotiated specific[ally] . . . to protect itself against . .

. Pharmacia's pre-existing issues and course of conduct concerning Celebrex." Dkt. No. 17-12 at 2.[13]  But Insurers—by arguing that the *Garber* securities action is based on unrelated personal injury and consumer protection lawsuits because they all involve generally the "safety and efficacy of Celebrex" (*see* Dkt. No. 17-2 at 23)—still seek to turn their PPL Exclusions into broad "Celebrex Exclusions" for which they never could have negotiated.  *See* Pls. Ex. 38 ¶ 85.

The PPL Exclusions must be "narrowly construed" in favor of coverage, and Insurers have the burden of proving "that the exclusions [are] stated in clear and unmistakable language, [are] subject to no other reasonable interpretation, and appl[y] in the particular case."  *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006); *Quanta Lines Ins. Co. v. Inv'rs Capital Corp.*, 2009 WL 4884096, at *9 (S.D.N.Y. Dec. 17, 2009).  No court, under New Jersey or New York law, has held that an exclusion for "related" or "interrelated" claims applies *this* broadly—across different plaintiffs, defendants, claims, harms, and triggering different insurance—and it should not be not be endorsed here.

### A.   There Is No "Substantial Overlap" Or "Sufficient Factual Nexus" Between The *Garber* Action And The Consumer Class Actions

In general, Insurers' PPL Exclusions only apply if the *Garber* Action arises out of or is based upon (1) the Consumer Class Actions; (2) the matters or

---

[13] Pls. Ex. 37 at 70:7-12 (Insurers' expert admitting that "[t]he[] [PPL Exclusions] were not specifically tailored to address Celebrex.").

substantially the same matters as alleged in the Consumer Class Actions; or (3)

acts or wrongful acts alleged in the Consumer Class Actions, such that they are

"interrelated" with those in *Garber* and share a "common nexus" or are "causally

connected." *See supra* at 8-9.[14]  New Jersey law holds that "coverage should only

be excluded" under related wrongful act and prior and pending litigation

exclusions if—taking a strict and narrow view—"the insurer can show a

'substantial overlap' between the facts and claims alleged in prior and subsequent

actions." *Regal-Pinnacle Integrations Indus., Inc. v. Phila. Indem. Ins.*, 2013 WL

1737236, at *5 (D.N.J. Apr. 22, 2013) (citing *First Trenton Indem. Co. v. River

Imaging, P.A.*, 2009 WL 2431649, at *4 (N.J. Super. Ct. App. Div. Aug. 11,

2009)).  "Moreover, in order to constitute an interrelated wrongful act" under this

standard, "the allegations in the second complaint must find substantial support in

the first complaint, and cannot be comprised of 'legally distinct claims that allege

different wrongs to different people.'"  *Id.* (citation omitted).[15]

New York courts similarly look for a "sufficient factual nexus" between the

litigations.  *See Weaver v. Axis Surplus Ins. Co.*, 2014 WL 5500667, at *12

(E.D.N.Y. Oct. 30, 2014).  And like courts in New Jersey, New York courts find

---

[14] While the wording of the two PPL Exclusions differs slightly, they do not differ
in application; Insurers' expert agreed.  Pls. Ex. 37 at 68:3-9.  And, Twin City
concedes that the PPL's first prong does not apply.  Pls. Ex. 25 at 156:18-157:1.

[15] *See First Trenton*, 2009 WL 2431649, at *4, *6 (finding a lack of
interrelatedness where cases were distinguishable on the basis of "(1) the parties
involved, (2) the factual allegations, and (3) the claims advanced").

that actions are *not* linked by a sufficient factual nexus when they involve "legally distinct claims that allege different wrongs to different people." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Ambassador Grp., Inc.*, 691 F. Supp. 618, 623-24 (E.D.N.Y. July 13, 1988); *Dormitory Auth. v. Cont'l Cas. Co.*, 756 F.3d 166, 170 (2d Cir. 2014) (finding actions not related when they involved "problems [that] ultimately manifested themselves at different times and resulted in different types of damage [and t]he solutions to each issue were wholly different").

Here, there is no such connection, and certainly no "substantial overlap" between the *Garber* Action and the Consumer Class Actions. *Garber* was a securities class action brought by Pharmacia's shareholders alleging that they suffered injury as a result of an inflated stock price that dropped. Jt. Ex. 17. Specifically, the shareholders alleged that for the class period of April 17, 2000 to May 31, 2002, defendants misled investors as to the results of the clinical CLASS Study regarding Celebrex's GI side effects, and hundreds of millions of dollars in market capitalization were lost in the days following the June 1, 2002 BMJ article about Pharmacia's alleged misstatements of CLASS. *Id.* ¶¶ 1, 4-7, 11-12.

The three Consumer Class Actions, in contrast, were brought on behalf of individuals who took and/or purchased Celebrex and Vioxx and claimed to have suffered physical injuries from a defective product or sought economic damages for Pharmacia's and other pharmaceutical company defendants' false marketing

concerning the cardiovascular and GI safety of those drugs.  *See* Pls. Ex. 39 ¶¶ 1-19; Jt. Ex. 15 ¶¶ 1-7, 22 (*Cain* plaintiffs suffered cardiac illnesses from taking Vioxx and Celebrex, and alleged the two drugs were falsely marketed as being safer than alternative pain relievers, and that the drugs enhanced risk of blood clotting, heart attacks and other cardiovascular illnesses); Jt. Ex. 14 ¶¶ 21-26 (*Leonard* plaintiffs alleging Pharmacia, Pfizer and Searle engaged in a fraudulent effort to obtain FDA approval for Celebrex and misled the public in advertisements regarding the GI and cardiovascular health risks of Celebrex in order to charge higher prices than alternative drugs); Jt. Ex. 13 ¶¶ 20-25 (*Astin*) (same).

Moreover, the Consumer Class Actions do not allege D&O or securities claims, anything about Pharmacia's stock performance, or any misconduct by Pharmacia executives.  Rather, they sought (1) injunctive relief in the form of medical monitoring for those people who took Vioxx and Celebrex, and included consumer claims against various pharmaceutical companies for (2) failure to warn; (3) strict product liability; (4) negligence; (5) breach of warranties; (6) restitution and (7) violation of state consumer protection statutes.  *See* Pls. Ex. 39; Jt. Ex. 15 (*Cain*) ¶¶ 49-87; Jt. Ex. 14 (*Leonard*) ¶¶ 41-97; Jt. Ex. 13 (*Astin*) ¶¶ 40-96.

The *Garber* Action and the Consumer Class Actions do not "substantially overlap," nor do they share a "sufficient factual nexus" to fall within the PPL Exclusions.  Rather, they "involve legally distinct claims that allege different

wrongs to different people." *Nat'l Union*, 691 F. Supp. at 623.  They involve different:  plaintiffs (shareholders versus consumers); defendants (Pharmacia and executives versus manufacturers and distributors); causes of action (federal securities claims versus state consumer claims); harms (loss in stock value versus consumption and purchase of defective products); drugs (Celebrex versus Celebrex and Vioxx); alleged dangers (GI risks versus cardiovascular and/or GI risks); and conduct (misrepresentations to investors and the SEC relating to company value versus misrepresentations to consumers relating to purchased products).

All of these fundamental differences are not negated by the fact that the Consumer Class Actions all, in some way, involved misstatements about Celebrex's safety, or even because the Actions' complaints tacked on references to the published articles criticizing the CLASS Study.  The Actions, notably, never even cite the "CLASS Study" by name because the Study is irrelevant to their claims.  The *Cain* Action's claims are based entirely on cardiovascular injuries from taking Vioxx and Celebrex.  Jt. Ex. ¶¶ 7, 32-34.  Yet, Insurers maintain that *Garber*—a stock drop based on revelations of the CLASS Study's results for Celebrex's GI effects—somehow arose out of the Consumer Class Actions.

While New York law does not require that claims involve "precisely the same parties, legal theories . . . or requests for relief" to be "related" (*Weaver*, 2014 WL 5500667, at *12), here, *Garber* and the Consumer Class Actions did not

involve *any* of the same legal theories or requested relief and had only one party in common.  Rather, they involved legally distinct claims that allege very different wrongs to different people, and are not related under New Jersey or New York law.

**B.    The Language Of The PPL Exclusions Confirms That They Only Exclude Coverage For Successive D&O Claims**

The reason that no court has ever applied exclusions for "related" claims as advocated by Insurers is in the language of the PPL Exclusions, which does not apply to different types of harms and claims triggering different coverages.

The Arch Policy PPL Exclusion excludes claims based on prior litigations "against any **Insured**" under its Policy.  *Supra* at 8.  The Arch Policy defines "**Insured**" as a *person* or *entity* "entitled to coverage under the [National Union Policy] at its inception."  Jt. Ex. 10 at PFIGARB2702.  The National Union Policy, in turn, makes clear that (1) the *persons* entitled to coverage are directors and officers against whom a D&O claim has been brought, whereas (2) *entity* coverage, is limited:  an *entity* or "**Organization**" is considered an "**Insured**" entitled to coverage "only with respect to a **Securities Claim**."  Jt. Ex. 2 at ARC15397. Thus, the prior or pending litigation in clause 1.a.—litigation against "any **Insured**" entitled to coverage under the National Union Policy—reaches only (1) D&O claims brought against a Pharmacia executive, or (2) a securities claim against Pharmacia.  And clauses 1.b. and 1.c. are both expressly limited to litigation arising from or acts giving rise to "such prior or pending litigation"—that

35

is, the prior litigation in clause 1.a.  The same reading applies to the Twin City Policy, where all three clauses of its PPL Exclusion apply only where there is an underlying prior or pending litigation "against an[] Insured."[16]

The plain-language analysis is the same for both PPL Exclusions:  because both require that the prior or pending litigation be against an "Insured," neither can be triggered in the absence of a prior or pending:  (1) D&O claim against an insured director or officer; or (2) a securities claim against Pharmacia.  This makes good sense; as stated by Insurers' expert, the purpose of the PPL Exclusion is so the D&O carrier is not on the hook for claims in its policy period that are related to, or arise out of, prior claims that should have been noticed under the prior year's coverage (Pls. Ex. 37 at 153:18-155:12)—*i.e.*, prior D&O claims.

Here, it is undisputed that none of the Consumer Class Actions trigger coverage under a D&O policy, and none satisfy the necessary predicate of being litigations against "any Insured" as defined in the Excess Policies.  Pls. Ex. 37 at 130:22-23 ("[they] do not allege a D&O—they're not a D&O claim"); *id.* at 133:13-15 (none of these actions would trigger D&O coverage); Pls. Ex. 25 at 163:9-19; Pls. Ex.19 at 145:18-146:11.  The Actions do not name as defendants or assert any claims (let alone D&O claims) against a Pharmacia director, and while

---

[16] Jt. Ex. 11 at PFIGARB2560.  The Twin City Policy does not independently define "Insured," so the definition of that term is adopted and incorporated from the National Union Policy, same as Arch.  Pls. Ex. 25 at 149:16-18.

Pharmacia is a defendant, none of Consumer Class Actions assert securities claims against Pharmacia.  Pls. Ex. 37 at 133:18-20.  None of these actions, therefore, constitutes a prior or pending litigation against an "Insured" entitled to D&O coverage under the Excess Policies, as required by the PPL Exclusions.

Indeed, these consumer suits did not even impact Pharmacia's D&O risk in 2002.  Rather, once it became clear that Pharmacia would incur costs in the *Garber* Action impacting the excess layers, insurers searched for any basis to avoid their obligations, went back and dug up these Consumer Class Action complaints as an excuse to deny coverage.  *See supra* at 11-13.  Insurers' reliance on the PPL Exclusions should be rejected as a matter of law.

## V.   THE WARRANTY LETTER DOES NOT PRECLUDE COVERAGE FOR THE GARBER CLAIM

As with the PPL Exclusion, Arch had alleged that the Warranty Letter was specifically negotiated in light of its concern for Pharmacia's pre-policy issues with Celebrex.  Dkt. No. 17-12 at 2-3.  Again, that was not true; the Letter says nothing about Celebrex, and no evidence tied the two together.  Pls. Ex. 37 at 73:5-21.  Rather, typically with new carriers, the insured may provide a warranty in lieu of filling out a dense policy application containing the same warranties, *i.e.*, that there is no knowledge of an impending D&O claim.  Pls. Ex. 40 at 29:22-31:5; Pls. Ex. 38 ¶ 51; Pls. Ex. 37 at 42:14-43:6; Pls. Ex. 21 at 72:19-73:2.  That is what happened here.  Pls. Ex. 7 at PFIGARB33821.  The Warranty Letter provides:

No person for whom this insurance is intended has any knowledge or information of any act, error, omission, fact or circumstance that may give rise to a claim that may fall within the scope of the proposed insurance.

It is agreed that any claim based upon, arising from, or in any way related to any act, error, omission, fact or circumstance of which any such person has knowledge or information will be excluded from coverage under the proposed insurance.

Insurers admit that the Warranty Letter acts as an exclusion to coverage, similar to a prior knowledge exclusion. Dkt. No. 17-12 at 2-3; Pls. Ex. 37 at 42:25-43:6. As such, it must be "narrowly construed" in favor of coverage, and Insurers have the burden of proving that the exclusion is stated in clear and unmistakable language and is subject to no other reasonable interpretation. *Old Bridge*, 2016 WL 4083220, at *4. By its plain terms, in order to be breached, the Warranty Letter requires specific proof that, as of August 29, 2002, (1) a Pharmacia director or officer (2) was subjectively aware (3)(a) of certain facts, (3)(b) that those facts could give rise to a D&O claim, and (3)(c) that this D&O claim could generate over $130 million in losses, reaching Insurers' layers.

Despite all of the Insurers' efforts over the years to retrofit this Exclusion, not a single document or piece of testimony shows that any insured director or officer at Pharmacia had any anticipation as of August 29, 2002 that a federal securities lawsuit may be filed in April 2003, based on an unrelated and alleged stock drop in June 2002, that was allegedly based on withheld results from the

CLASS clinical study that was published in full in February 2001.  Insurers cannot carry their burden to show the Warranty Letter excludes coverage.

**A.    The Warranty Letter Requires Proof That An Insured Individual Director Or Officer Was Subjectively Aware That Known Facts Could Give Rise To A D&O Claim**

      1.    The Exclusion Applies Only To A Director Or Officer's Knowledge—Not The Company's "Constructive Knowledge"

Insurers have taken the position that the Exclusion may be triggered based on facts "known to *Pharmacia*"—not the knowledge of any one specific director or officer.  *See* Pls. Ex. 25 at 171:2-172:16.  The Exclusion, however, states that the relevant knowledge is of a "person for whom this insurance is intended," and that "any claim . . . of which any such person has knowledge" may be excluded.  Jt. Ex. 12.  Had the Warranty meant the constructive, assumed "knowledge" of the company, it would have said so; indeed, Insurers' own Excess Policies differentiate between "person" and "entity" in defining the term "Insured."  Jt. Ex. 10 at PFIGARB2702.  The Exclusion applies only to an individual *person's* knowledge.

      2.    The Exclusion Only Applies To Facts Subjectively Known Only To The Insured Director Or Officer

Prior knowledge exclusions, such as contained in the Warranty Letter here, have the potential, if drafted and read too expansively, to "provide unrealistic and inadequate coverage" that would "violate public policy."  *See Colliers*, 458 F.3d at 240.  To avoid that result, first, the exclusion is constrained to embody its proper purpose:  the exclusion is "reasonable and not a violation of public policy" only

when "properly designed to prevent the 'moral hazard'" that is posed by an insured "recognizing his past error" and "rush[ing] to purchase a 'claims made' policy before the error is discovered." *Id.* This means the exclusion "sensibly" applies to those "facts known only to [the insured]"—for if the insurer is already aware or could be aware of the facts at issue, then there is no moral hazard and "the costs of the risk can be evaluated with all the relevant information accessible to all parties." *Navigators Specialty Ins. Co. v. Scarinci & Hollenbeck, LLC*, 2010 WL 1931239, at *16 (D.N.J. May 12, 2010) (citation omitted).

Second, New Jersey courts also recognize that prior knowledge inquiries which ask whether an insured had "knowledge of any circumstance, act, error, or omission that could result in a professional liability claim," for example, are "subjective in nature." *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*, 916 A.2d 440, 445 (N.J. 2007). That is, only "subjective knowledge of the possible claim" will trigger an exclusion with such language. *Imperium Ins. Co. v. Porwich*, 2015 WL 807630, at *6 (N.J. Super. Feb. 27, 2015); *see also id.* (prior knowledge exclusion triggered "because [the insured] was fully aware that his actions would likely lead to [a] claim against him"). This "rigorous" analysis stands in contrast to exclusionary language that purports to consider whether the insured "had no <u>reasonable</u> basis to . . . foresee that a claim would be made," which raises an "objective" inquiry. *Liberty Surplus*, 916 A.2d at 446.

### 3. The Exclusion Requires Knowledge That A D&O Claim Is "Brewing" Based On The Known Fact

The Warranty Letter here is *not* an exclusion drafted to capture the elements of a "mixed" subjective/objective analysis—such as one providing, for example, that "the insured had no knowledge of any suit, or any act or error or omission" (a subjective inquiry), "which might reasonably be expected to result in a claim" (an objective inquiry). *Colliers*, 458 F.3d at 237.[17]  It does not contain the "reasonably expected," "reasonable basis," or "should have known" language that courts hold raises an objective inquiry. *See Colliers*, 458 F.3d at 237, 243 n.12.  Instead, it contains only the subjective requirement that a director or officer had "knowledge or information" of facts that may give rise to a D&O claim falling within the scope of these Excess Policies.  Jt. Ex. 12.  Thus, there must be proof that a Pharmacia executive "was fully aware that" the facts at issue "would likely lead to [a substantial D&O] claim" under the policy.  *Imperium*, 2015 WL 807630, at *6.[18]

This subjective-knowledge requirement also makes good sense—knowledge of *any fact at all*, completely untethered to that person's knowledge of whether the fact may relate to a potential D&O claim years later is not a reasonable reading of the Exclusion.  Rather, as the Insurers' expert admitted, the Exclusion here is

---

[17] *Navigators*, 2010 WL 1931239, at *10 ("knew or could have reasonably foreseen"); *Quanta*, 2009 WL 4884096, at *15 ("knowledge or reasonable basis upon which to anticipate").

[18] Insurers' own witnesses confirmed this reading.  *See* Pls. Ex. 37 at 85:1-5 ("Q. They must know that a D&O claim may arise [for the Warranty]? ... A. Yes.").

designed to exclude only those D&O "claims that are *already brewing* based on known events."  Pls. Ex. 37 at 184:7-22 (emphasis added); Pls. Ex. 38 ¶ 53.

### B.   There Is No Evidence That Messrs. Hassan and Coughlin, Or Any Other Insured Director or Officer, Was Subjectively Aware That Known Facts Could Give Rise To The *Garber* Action

This subjective-knowledge requirement is fatal to the Insurers' arguments based on the Warranty Letter.  Right up until the day the *Garber* Action was filed on April 7, 2003, there was no D&O claim brewing based on the CLASS Study.  Following discovery in this litigation of the 19 years since the CLASS Study was published in 2000, Insurers have adduced no evidence, and provided no argument, that Messrs. Hassan, Coughlin, or any other Pharmacia executive had subjective knowledge, on August 29, 2002, that a D&O claim was likely to be filed against them based on CLASS.  Not a single document shows that *anyone* believed or thought (or was told) the allegedly-misstated clinical results of Celebrex's effect on GI side effects versus ibuprofen in CLASS would result in a federal securities lawsuit over two years after the FDA already had published the Study's full data.

Indeed, Insurers' own expert has conceded as much based on his review of the evidence in the case.  Pls. Ex. 37 at 89:2-3 ("I saw nothing that they affirmatively said they thought it may give rise to a claim.") and at 90:11-13 ("I didn't see them conclude that it may give rise to a claim").  An example of some of

the "evidence" Insurers have repeatedly cited in support of their denial of coverage

under the Warranty Letter (Dkt. No. 17-12 at 28-30) confirms this conclusion:

- A February 1, 2001 Warning Letter from the FDA addressed to Mr. Hassan that concerned "promotional activities that minimize the potentially serious risk of using Celebrex and Coumadin (warfarin) concomitantly."  Pls. Ex. 41 at PFIGARB22101.  This Letter had nothing to do with the CLASS Study;

- Pharmacia's Annual Report to Shareholders, disseminated in March 2001, noting that the CLASS Study results were currently "under review with the U.S. Food and Drug Administration."  Dkt. No. 17-11;

- An August 5, 2001 *Washington Post* article cited by *Garber* that discussed the results of the CLASS Study, including the differences between the results at 6 months at those at 12 months.  Pls. Ex. 42 at PFIGARB9816;

- An August 22, 2001 *Wall Street Journal* article that similarly mentioned the results of the CLASS Study, including the differences between the results at 6 months at those at 12 months.  Pls. Ex. 43.

- A June 1, 2002 BMJ article cited by *Garber* that referenced the *Washington Post* article and the results of the CLASS Study at 6 and 12 months, and Pharmacia's response to the same.  Pls. Ex. 44 at PFIGARB9759; and

- Pharmacia's SEC Form 10-K405 for the fiscal year ending December 31, 2001 that described allegations in the *Cain*, *Astin*, and *Leonard* Consumer Class Actions filed in summer of 2001.  Pls. Ex. 1 at ARC14760-61.

This evidence falls far short of meeting Insurers' burden to prove that any

Pharmacia executive had subjective knowledge, on August 29, 2002, that a D&O

claim potentially generating over a hundred million dollars in loss was likely to be

asserted eight months later during the coverage term of September 1, 2002 to

September 1, 2003.  These simply show—at most—that, as of August of 2002, the

public at large, including the Insurers, were, or could have been, aware of a "fact"

or "circumstance" *for the entire past year* that differences had been reported

between the results of the CLASS Study at 6 months and 12 months.  None of the

articles, reports, and filings identified by Insurers, however, makes any mention of

any individual D&O knowing of any possible D&O claim against any Pharmacia

executive generally, or of a possible securities claim more specifically.  Insurers'

expert agreed that the articles discussing the CLASS Study to which Insurers point

provide no "evidence of knowledge of a claim."  Pls. Ex. 37 at 106:3-8.[19]

Indeed, Mr. Hassan stated that while he understood the issues with the

CLASS Study, it was a "complex trial" subject to debate, and "the same database

could have been interpreted in different ways by different scientists depending on

what you're looking at."  Pls. Ex. 45 at 88:8-11, 90:10-13.  Moreover, all of the

publications criticizing CLASS were in early-to-mid *2001*.  A year later in August

of 2002, he certainly did not expect a D&O claim having anything to do with the

CLASS Study:  "by and large, [at the board level], there was a sense that the data

and CLASS was quite favorable for Celebrex."  *Id.* at 96:17-20.[20]  In fact, on June

7, 2002, three months before the Warranty Letter, the FDA acknowledged the

Study's GI results, but nevertheless "approved labeling changes for Celebrex"

based on the "valuable safety data from CLASS" showing that higher doses of

---

[19] *See also id.* at 103:23-104:1 ("This doesn't have evidence for a D&O claim.").

[20] *See also id.* at 50:18-22 ("I was aware that there were other interpretations from
this study but I was assured by the R&D people who came from Monsanto that the
profile was quite good for Celebrex.  The safety profile was quite good.").

Celebrex did not increase rates of serious cardiovascular events as compared to lower doses of ibuprofen or diclofenac.  Pls. Ex. 46 at PFIGARB475-76.

The other signatory to the Warranty Letter, Mr. Coughlin, testified that he did not recall the issue involving the CLASS Study or the *Garber* Action.  Pls. Ex. 47 at 16:12-17:15.  However, same as Mr. Hassan, he confirmed that inquiry into any prior acts that could trigger D&O coverage would have been vetted by Pharmacia's legal and risk management, and that his representation in the Warranty Letter was true—there was no knowledge of a potential claim.  *Id.* at 29:8-30:2; *see* Pls. Ex 45 at 129:12-22, 132:7-133:3.

As to the Consumer Class Actions, those similarly gave Mr. Hassan no reason to expect a *D&O claim* potentially generating $130-150 million *in D&O* loss—indeed, he had no recollection of these Actions.  Pls. Ex. 45 at 115:19-21, 118:8-11, 119:17-120:1.  As discussed *supra* at 12, after being filed in 2001, two of three actions fizzled out quickly with barely any litigation, and none had anything at all to do with D&O coverage or D&O claims.

Indeed, these articles, reports, and filings upon which the Insurers based their denial of coverage under the Warranty Letter were all public knowledge and/or disclosed to the Insurers—not "facts known only to [the Insured]." *Navigators*, 2010 WL at 1931239, at *16.  Insurers identify no "moral hazard" to invoke the Warranty Letter.  *Colliers*, 458 F.3d at 240.  There was no *discovery*

needed, the alleged "error or omission" relating to the CLASS Study was widely publicized—and the Insurers were and easily could have been well aware of it more than a year before Messrs. Hassan and Coughlin signed the Warranty.

The same is true for Insurers' expected reliance on certain "internal" emails from Pharmacia's R&D department discussing that the Study as initially published only talked about the first six months instead of including the latter half that involved statistically significant drop outs and no longer showed the same Celebrex GI advantages. *See* Pls. Ex.48 at PFIGARB24438 ("we are also cherry-picking the data…"). These opinions were said in mid-*2001*, among researchers, and not a single one mentions, anywhere, knowledge of any possible securities violation, claim or any type of D&O concern based on the allegedly incomplete data—data published by the FDA in full in February 2001 anyway. And Insurers may also cite to certain Pharmacia executive-level presentations in 2001 that mention, among many other things, the criticism of CLASS and their responses for the same, but these too suffer the same fate: not a single one (all based on public knowledge *known* to Insurers) expresses any concern of a potential D&O claim from CLASS, let alone a claim that did not come until almost two years later.

As confirmed by Messrs. Hassan, Coughlin, the discovery disclosed in this case and Insurers' own expert, there is no evidence whatsoever showing that Messrs. Hassan, Coughlin, "or any other insured person knew that a D&O claim or

securities claim . . . would result from the CLASS study."  Pls. Ex. 37 at 89:21-

90:5.  Accordingly, the Warranty Letter does not apply to deny coverage.

> ### C.     Even Under A Mixed Subjective/Objective Analysis, The Warranty Letter Still Does Not Apply Because There Was No Reasonable Basis To Expect *Garber* At The Time It Was Signed

The Warranty Letter requires actual knowledge or information that a claim

may arise, and not merely a "reasonable expectation" for such a belief, or that the

director or officer "should have known" a claim was coming.  *See, e.g.*, Pls. Ex.37

at 80:7-8; *Liberty Surplus*, 916 A.2d at 446.  But even if the Exclusion covered

D&O claims that might have been "reasonably foreseen" by a hypothetical person

standing in Messrs. Hassan, Coughlin or another officer's shoes, there still is no

evidence that there was a reason to believe the *Garber* Action would be brought.

Under a mixed subjective-objective analysis, the second part asks "whether a

reasonable professional in the insured's position might expect a claim or suit to

result."  *Colliers*, 458 F.3d at 237.  Again, Insurers' "evidence" discussed *supra* at

43, falls far short of showing knowledge that a D&O claim might reasonably be

brought based on the results of the CLASS Study.  For example, the three articles

addressing the differing 6-versus-12-month results from the CLASS Study simply

demonstrated that the issue was widely publicized as early as August 5, 2001.  *Id.*

This means that any impact on Pharmacia stock relating to the disclosure of this

issue would necessarily have manifested itself by *that* time, and there is no

evidence of any such impact.  Similarly, the SEC forms disclosing the filing of the Consumer Class Actions in the summer of 2001 provide the Insurers no help—they did not involve D&O coverage or name as defendants any executives and provided no reasonable basis to expect an unrelated securities litigation.  And, again, none of Pharmacia R&D discussions in 2001 about the decision to publish the Study's first six months rise to the level of an executive reasonably anticipating that a shareholder securities lawsuit could be filed.

By August 29, 2002—over a year later—there would have been no reasonable basis to expect a securities claim in April 2003 for a non-existent impact on Pharmacia stock that, if it had occurred, would have occurred sometime in 2001.  Indeed, a review of Insurers' underwriting file and Aon's brokering documents show there was absolutely no concern by anyone that statements on CLASS from years earlier could somehow lead to a D&O claim.  Not only were Celebrex sales were as strong as ever at the time (Pls. Ex. 3 at ARC15103-07), Aon's May 2002 presentation to the underwriters concluded that "[t]he overall consensus of Wall street analysts currently, is a buy on [Pharmacia] stock."  Pls. Ex. 2 at ARC14725.  Nothing changed in the next three months before the Warranty was signed—except on June 7, 2002, the FDA *approved* new labels for Celebrex based on "valuable safety data from CLASS."  Insurers knew (or should have known) about Celebrex, CLASS, and the 6-versus-12-month issue before

48

binding.  If the CLASS Study was a concern to underwriters, there would have been *something* stating that in the files (*see* Pls. Ex. 37 at 36:18-37:3) but there is nothing showing that was case.

    In cases where a court has held that the insurer met the high burden of showing that there was a reasonable basis to conclude a potential claim may arise, it was in situations where "the conduct forming the basis of a later suit is so egregious that suit is likely . . . or where notice of a future claim is . . . clear." *Henderson/Vance Healthcare, Inc. v. Cincinnati Ins. Co.*, 2013 WL 5375612, at \*3 (E.D.N.C. Sept. 25, 2013) (citing as an example *Navigators*, 2010 WL 1931239, at \*15, where the court held plaintiffs' "several direct accusations of fraud and threats of litigation (both oral and written)" were sufficient to satisfy objective test). Whether a reasonable person in a director or officer's shoes could foresee a D&O claim based on the CLASS Study is based on the knowledge and circumstances at the time of the events; not with the benefit of 20/20 hindsight.  *Dooley v. Scottsdale Ins. Co.*, 2015 WL 685811, at \*7 (D.N.J. Feb. 18, 2015) ("when evaluating the objective reasonableness of an individual's behavior, one must look at how an ordinary reasonable person would have acted *at that time*.").

    Here, there was nothing from the SEC, no subpoena, no threat of litigation or anticipation of the same, no shareholder demand, no derivative suit, no whistleblower claim, no investigation, no criminal or fraudulent conduct alleged by

a director or officer, and no causally-related stock drop from the CLASS results.

There was no basis in 2002 to reasonably foresee the April 2003 *Garber* Action,

resulting from the statements made years earlier concerning the CLASS Study.

Insurers' attempt to avoid coverage almost two decades later by retrofitting every

statement as "knowledge" of a potential claim must be rejected as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Pharmacia respectfully requests that the Court

grant Pharmacia's Motion.

Dated: New York, NY
June 28, 2019

MCKOOL SMITH, P.C.

By: s/ Robin L. Cohen
Robin L. Cohen (NJ Attorney ID No. 030501986)
Adam S. Ziffer (admitted *pro hac vice*)
Marc T. Ladd (admitted *pro hac vice*)
One Bryant Park, 47th Floor
New York, NY 10036
Tel: (212) 402-9400

*Attorneys for Plaintiff Pharmacia Corporation n/k/a Pfizer Inc.*