**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **PHARMACIA CORPORATION n/k/a PFIZER INC.**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TWIN CITY FIRE INSURANCE COMPANY,**<br><br>**Defendant.** | **Civil Action No.: 18-0510 (ES) (MAH)**<br><br>**OPINION** |

**SALAS, DISTRICT JUDGE**

This is an insurance dispute for coverage related to a large judgment entered against Plaintiff Pharmacia Corporation n/k/a Pfizer Inc. ("Pharmacia"). Before the Court are cross-motions for summary judgment filed by Pharmacia (D.E. No. 118) and one of its insurance carriers, Defendant Twin City Fire Insurance Company ("Twin City") (D.E. No. 119). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons below, Pharmacia's motion is **DENIED**, and Twin City's motion is **GRANTED**.

## I. BACKGROUND

On April 7, 2003, an investor in Pharmacia stock brought a federal securities class action against Pharmacia, Fred Hassan (then-CEO), and G. Steven Geis (then-vice president of clinical research). (*See* Complaint, *Garber v. Pharmacia Corp., et al.*, No. 03-1519 (D.N.J. Apr. 7, 2003), D.E. No. 1). Principally, the investor claimed that the defendants overstated the efficacy of Celebrex—Pharmacia's bestselling drug—in reducing unwanted gastrointestinal side effects. In

particular, the investor claimed that Pharmacia did so by publishing only half of its data from a study that it commissioned called the "Celecoxib Long-term Arthritis Safety Study"—the "CLASS Study." (*Id.* ¶¶ 6 & 13). "When all of the data was considered, it appeared that most or all of Celebrex's purported safety advantage disappeared." (*Id.*¶ 13). This revelation, as published by prominent publications such as the Washington Post, the Wall Street Journal, and the British Medical Journal, caused a stock drop. (*Id.* ¶¶ 14–19). As a result, the investor brought claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (*Id.*; *see also id.* ¶¶ 80–89).

Ultimately, *Garber* settled. On October 12, 2012, the district court preliminarily approved a $164 million settlement. (*See* Order Preliminary Approving Settlement and Providing for Notice, *Garber*, D.E. No. 390). A little over two months later, on January 30, 2013, the district court held a fairness hearing, approved the settlement, approved a plan of allocation, awarded attorneys' fees, and entered final judgment dismissing the action. (*See* Minute Entry, Final Judgment and Order of Dismissal, and Order Approving Plan of Allocation, *Garber*, D.E. Nos. 402–404). In total, "Pharmacia incurred approximately $207 million in total defense and indemnity costs for *Garber*." (D.E. No. 100, Twin City's Response ("Def.'s Resp.") ¶ 23).

To cover these costs, Pharmacia submitted claims for insurance coverage. For the 2002-2003 policy period, Pharmacia had purchased a tower of liability insurance. (Def.'s Resp. ¶ 2; D.E. No. 101-2, Pharmacia's Response ("Pl.'s Resp.") ¶ 2). An insurance tower is an insurance plan in which "a primary insurer respond[s] first to any covered loss, and excess insurers respond[] in a predetermined order if the loss exceeds the coverage provided by the primary policy." John F. O'Connor, *Caveat Settlor: Insurance Coverage Settlements and the Triumph of Policy Language over Precedent*, 79 Alb. L. Rev. 101, 102 (2016).

Defendant Twin City provided coverage as an excess insurer in the insurance tower. Like most policies within an insurance tower, Twin City's policy imposed an exhaustion limitation on coverage. That limitation provided that Twin City's coverage obligations kicked in "only after the Primary and Underlying Excess Insurers shall have duly admitted liability and shall have paid the full amount of their respective liability." (D.E. No. 88-12, Jt. Ex. 11 ("Twin City Policy") at PFIGARB002555).

In total, there was one primary insurer in the tower, the National Union Fire Insurance Co. of Pittsburgh ("National Union"), and twelve excess insurers, Twin City included. The following table captures Twin City's position in the tower:

| **Layer** | **Policy** | **Coverage (millions)** |
|---|---|---|
| 11th | Starr Excess | $175-$200 |
| 10th | Arch Reinsurance Ltd. (Bermuda) | $160-$175 |
| 9th | Liberty Mutual | $150-$160 |
| | | |
| 7th | Arch Specialty Insurance Company | $130-$140 |
| 6th | Allied World Assurance Company | $105-$130 |
| 5th | Executive Liability Underwriters | $90-$105 |
| 4th | (a) Lloyds of London<br>(b) US Specialty Insurance Co. | $80-90 |
| 3rd | Federal Insurance Company | $65-$80 |
| 2nd | Continental Casualty Company | $50-$65 |
| 1st | Zurich American Insurance Company | $25-$50 |
| Primary | National Union | $0-$25 |

(*See* D.E. No. 88-11, Jt. Ex. 1; D.E. No. 88-12, Jt. Ex. 11, Twin City Policy, at PFIGARB002553–PFIGARB002553).

In a letter dated March 20, 2012, Twin City denied coverage. (D.E. No. 91-8, Pl.'s Ex. 22). Twin City cited two exclusions in its policy. (*Id.*). First, Twin City cited a prior and pending litigation exclusion, which excludes coverage related to certain litigation or claims pending against Pharmacia at the time it purchased coverage from Twin City. (*Id.*). Second, Twin City cited a

warranty statement executed by Pharmacia when purchasing insurance from Twin City. (*Id.*). The warranty statement precludes coverage for claims that fall within the scope of the statement. (*Id.*). In invoking both exclusions, Twin City cited a consumer class action lawsuit that was filed against Pharmacia before *Garber* and before Pharmacia obtained coverage from Twin City. (D.E. No. 91-8, Pl.'s Ex. 22 (citing *Leonard v. Pharmacia Corp., et al.*, No. 01-4104 (D.N.J. Aug. 27, 2001)).[1] In that case, the consumer class claimed that Celebrex was not as efficacious as purported in the CLASS study. (*Id.*).

On January 12, 2018, Pharmacia brought this action against Twin City and two other excess insurers, Arch Specialty Insurance Company and Liberty Mutual Insurance Company, both of which had also denied coverage. (D.E. No. 1, Complaint). Pharmacia brought claims for breach and anticipatory breach and requested declaratory and monetary relief. (*Id.* ¶¶ 50–67). On April 23, 2018, Liberty Mutual Insurance Company was dismissed by stipulation. (D.E. No. 46). On June 28, 2019, the parties filed cross-motions for summary judgment. (D.E. Nos. 87 & 89). On January 1, 2020, Arch Specialty Insurance Company was dismissed by stipulation. (D.E. No. 110). The Court terminated the cross-motions for summary judgment on March 26, 2020, and stayed the action while Pharmacia and Twin City engaged in mediation. (D.E. No. 115). Mediation was unsuccessful (D.E. No. 116), and the parties refiled the instant motions (D.E. Nos. 118 & 119).

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when—in viewing the evidence and all reasonable

---

[1]    Twin City later discovered two other consumer class actions in which the consumer class claimed that Celebrex was not as efficacious as purported in the CLASS study. *See Cain et al. v. Pharmacia Corp., et al.*, No. 01-3441 (E.D.N.Y. May 29, 2001); *Astin v. Pharmacia Corp., et al.*, No. Som. L-1322-01 (N.J. Super Ct., Somerset County Aug. 27, 2001).

inferences drawn from it in the light most favorable to the nonmovant—a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant bears the burden of establishing that no "genuine issue" of facts exists. *Aman v. Cort Furniture Rental Cop.*, 85 F.3d 1074, 1080 (3d Cir. 1996).

## III. DISCUSSION

The parties raise a threshold dispute concerning choice of law—in particular, whether New York or New Jersey law govern this dispute. (D.E. No. 88 ("Def.'s Mov. Br.") at 14–17; D.E. No. 91 ("Pl.'s Mov. Br.") at 15–20; D.E. No. 99 ("Def.'s Opp.") at 9–13; D.E. No. 101 ("Pl.'s Opp.") at 6–13). The parties also dispute whether Twin City appropriately denied coverage under the prior and pending litigation exclusion and the warranty statement. (Def.'s Mov. Br. at 17–31; Pl.'s Mov. Br. at 29–50; Def.'s Opp. at 13–30; Pl.'s Opp. at 14–42). Finally, the parties dispute whether Pharmacia has exhausted all underlying coverage in the tower before it can obtain coverage from Twin City. (Def.'s Mov. Br. at 31–37; Pl.'s Mov. Br. at 21–29; Def.'s Opp. at 30–37; Pl.'s Opp. at 42–50).

Because the Court holds that Pharmacia is not entitled to coverage for failure to exhaust regardless of which jurisdiction's law applies, the Court applies the law of both New York and New Jersey. *See Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006) ("If there is no conflict [between the applicable bodies of law], then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply.").[2] Likewise, because Pharmacia's failure

---

[2]     If there was a conflict, the Court would apply New York law. When sitting in diversity jurisdiction, a federal court should look to the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). In New Jersey, when a "dispute arises out of a transaction governed by the parties' choice-of-law agreement," the "general New Jersey choice-of-law paradigm is altered." *Atl. Capes Fisheries, Inc. v. Graves & Schneider Intl, LLC*, No. 17-11479, 2018 WL 6716825, at *6 (D.N.J. Dec. 21, 2018). In that instance, a New Jersey court will honor the parties' choice-of-law arrangement unless the chosen state's law violates New Jersey public policy or the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice. *Id.* at 6–7.

to exhaust is dispositive, the Court does not address the prior and pending litigation exclusion or

the warrant statement. *See Children's Place, Inc. v. Great Am. Ins. Co.*, No. 18-11963, 2021 WL

6932533, at *3 (D.N.J. Sept. 28, 2021) (confining analysis to dispositive legal issue in summary

judgment motion).

As noted, Twin City's coverage obligations kicked in "only after the Primary and

Underlying Excess Insurers shall have duly admitted liability *and* shall have paid the full amount

of their respective liability." (Twin City Policy at PFIGARB002555 (emphasis added)). Twin

---

First, the parties' dispute is governed by a choice-of-law agreement. In particular, the Twin City Policy incorporated "the same warranties, terms, conditions, definitions, exclusions and endorsements . . . as are contained in or as may be added to the policy of the Primary Insurer, together with all the warranties, terms, conditions, exclusions, and limitations contained in or added by endorsement to any Underlying Excess Policy(ies)." (Twin City Policy at PFIGARB002556). The insurance policy issued by Allied World Assurance Company, which provided the sixth layer of excess insurance coverage, contains a choice-of-law clause directing the application of New York law. (D.E. No. 88-12, Jt. Ex. 9, at PFIGARB002543). Accordingly, New York law applies through incorporation. *See AT & T v. Clarendon Am. Ins. Co.*, No. 04C-11-167, 2008 WL 2583007, at *4–6 (Del. Super. Ct. Feb. 11, 2008) (interpreting a materially similar Twin City policy and holding that it incorporated an excess insurer's choice-of-law clause).

Pharmacia argues that the Twin City Policy does not incorporate Allied World's choice-of-law clause because other underlying insurers have conflicting choice-of-law arrangements, and because the Twin City Policy does not specify how to resolve such conflict. (Pl.'s Mov. Br. at 20; Pl.'s Opp. at 8–9 & n.3). In support, Pharmacia specifically points to the National Union policy, which Pharmacia claims directs the application of Delaware law. (Pl.'s Mov. Br. at 20; Pl.'s Opp. at 9). However, there is no general choice-of-law provision in the National Union policy. Instead, the National Union policy directs the "*mediator or arbitrator*" to give "due consideration" to Delaware law when resolving disputes under the policy. (D.E. No. 88-11, Jt. Ex. 2, at ARC 0015408 (emphasis added)). The parties here are not in mediation or arbitration, so there is no conflict between the National Union and Twin City policies.

Pharmacia also argues that Allied World's choice-of-law clause applies, like the National Union policy, only when the parties are in arbitration pursuant to Allied World's alternative dispute resolution ("ADR") provision. (Pl.'s Mov. Br. at 17–18; Pl.'s Opp. at 7). However, unlike the National Union policy, the Allied World policy places the ADR provision and the choice-of-law clause in different sections, and the policy does not by its terms specifically apply to mediators and arbitrators. (D.E. No. 88-12, Jt. Ex. 9, at PFIGARB002542–PFIGARB002543). While the Allied World choice-of-law provision references arbitration, it does not (unlike the National Union policy) purport to apply only in arbitration. (*Id.*). There is thus no basis to conclude these separate sections are inseparable. *See AT & T*, 2008 WL 2583007, at *5 (interpreting a materially similar policy; explaining "[t]he provisions are found in two distinct sections, under distinct headings, and are distinguished by their express terms," and that the insurer "offers no reason why the Court should conflate these two provisions.").

Second, New York has a substantial relationship to the parties and the transaction. As Twin City points out, Pharmacia has merged with Pfizer, which is incorporated in New York; the excess policies were underwritten in New York and brokered by a New York company; and the Twin City Policy contains New York endorsements. (Def.'s Opp. at 12; *see also* Pl.'s Resp. ¶¶ 120–22). Moreover, Twin City cited a case brought in the Eastern District of New York as a basis to deny coverage under the prior and pending litigation exclusion and the warranty statement. (D.E. No. 91-8, Pl.'s Ex. 22 (citing *Cain et al. v. Pharmacia Corp., et al.*, No. 01-3441 (E.D.N.Y. May 29, 2001)).

City argues that this provision requires all underlying insurers to admit their liability *and* to pay the full amount of their respective liability. (Def.'s Mov. Br. at 31–33). Pharmacia cannot satisfy the first condition, Twin City argues, because various underlying excess insurers expressly disclaim that they were admitting liability. (*Id.* at 33).[3] Pharmacia concedes that several underlying excess insurers expressly disclaim liability. (Pl.'s Resp. ¶¶ 111, 114–15 & 117–18). But it argues that the Twin City's reading of "duly admitted liability" is unreasonable, leads to absurd results, and therefore should not be enforced literally. (Pl.'s Mov. Br. at 27–29). In Pharmacia's view, payment alone from all underlying excess insurers is sufficient. (*Id.*). Under both New Jersey and New York law, the Court agrees with Twin City.

***New York Law:*** When applying New York law, the Court must predict how the New York Court of Appeals, as New York's highest court, would resolve this dispute. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 238 (3d Cir. 2007). "When predicting how the state's highest court would resolve the issue, [a court] must take into consideration: (1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006).

The parties have not cited, and the Court could not uncover, a decision of the New York Court of Appeals interpreting an exhaustion provision such as the one at issue here. The Court will therefore turn to the decisional law of the New York's intermediate appellate courts. In predicting how the New York Court of Appeals would rule on an issue, "the decisions of New York State's Appellate Division are helpful indicators." *Michalski v. Home Depot, Inc.*, 225 F.3d

---

[3] Twin City also argues that Pharmacia cannot satisfy the second condition because some of the underlying insurers did not pay the full amount under their respective policies but instead paid the *Garber* insurance claim in consideration of releasing other insurance claims. Because the Court agrees that Pharmacia cannot satisfy the first condition to coverage, the Court does not reach the second condition to coverage.

113, 116 (2d Cir. 2000). "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940); *accord Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 254 (3d Cir. 2010). This principle imposes an important constraint on the exercise of federal judicial power because a federal court may not, the Third Circuit has said, "'act as a judicial pioneer' in a diversity case." *Sheridan*, 609 F.3d at 254 (quoting *City of Phila. v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir. 1993)).

In *JP Morgan Chase & Co. v. Indian Harbor Insurance Co.*, the New York Appellate Division, First Department, interpreted an identical exhaustion provision involving the same defendant, Twin City. 98 A.D.3d 18 (1st Dept. 2012). There, the First Department, applying Illinois law, read Twin City's policy as unambiguously imposing *two* conditions precedent: "by the plain language of this attachment provision, the underlying insurers' admission of liability *and* the payment of the full amount of their liability were *conditions* precedent to Twin City's liability under its policy." *Id.* at 22 (emphasis added). The First Department then held that the plaintiff could not satisfy the first condition because "the insurer directly beneath Twin City in the . . . tower[] did not admit liability when it settled with plaintiff." *Id.* "In fact," the First Department pointed out, the settlement agreement "provided that 'the negotiation, execution and performance of this Agreement shall not constitute, or be construed as, an admission of liability or infirmity of any defense or claim whatsoever by any Party.'" *Id.*

*JP Morgan* unambiguously favors Twin City's interpretation of the policy because it interpreted an identical policy provision to require the insured to make a separate showing that the underlying primary and excess insurers admitted liability. It is true, as Pharmacia points out, that

*JP Morgan* formally applied Illinois law. (Pl.'s Mov. Br. at 2, 21 & 24; Pl.'s Opp. at 44 & 48). But the principles applied in *JP Morgan* are identical in both Illinois and New York. *Compare JP Morgan*, 98 A.D.3d at 21–24 (explaining under Illinois law that the interpretation of an insurance policy is a question of law; that absent ambiguity insurance policies are to be given their plain and ordinary meaning, just as any other contract; and that a condition precedent is an event that must occur before the other party is required to perform), *with J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 183 N.E.3d 443, 447 (N.Y. 2021) (explaining under New York law that insurance contracts should be construed like any other contract and will be enforced as written); *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995). ("Most conditions precedent describe acts or events which must occur before a party is obliged to perform a promise made pursuant to an existing contract . . . ."). Pharmacia does not argue otherwise.

Accordingly, the Court has no reason to believe *JP Morgan* would have rendered a different decision if it formally applied New York law. Nor does the Court have any reason to believe the New York Court of Appeals would reach a different outcome.

In fact, *JP Morgan*'s interpretation of the exhaustion provision is consistent with general interpretive principles under New York law. Under New York law, an insurance contract should be construed like any other contract and should be enforced according to its plain and ordinary meaning. *See J.P. Morgan Sec.*, 183 N.E.3d at 447. Twin City's exhaustion provision uses the conjunctive "and": Twin City is obligated to pay "only after the Primary and Underlying Excess Insurers shall have duly admitted liability *and* shall have paid the full amount of their respective liability." (Twin City Policy at PFIGARB002555 (emphasis added)). The provision twice uses the verb "have," suggesting that the parties intended the admission and payment to be separate acts. Pharmacia's reading of the exhaustion provision—that only the second condition is

required—"is strained, unnatural and unreasonable," because it "effectively turns the conjunctive 'and' into a disjunctive 'or.'" *Progressive Ne. Ins. Co. v. State Farm Ins. Companies*, 81 A.D.3d 1376, 1378 (4th Dept. 2011). "The structure of the sentence does not support that interpretation." *Id.* Moreover, where, as here, sophisticated parties negotiate an agreement at arm's length, New York law favors the "[f]reedom of contract," and "in the absence of countervailing public policy concerns[,] there is no reason to relieve [the parties] of the consequences of their bargain." *Oppenheimer & Co.*, 660 N.E.2d at 421. "If they are dissatisfied with the consequences of their agreement, 'the time to say so [was] at the bargaining table.'" *Id.* (quoting *Maxton Builders, Inc. v. Lo Galbo*, 502 N.E.2d 184, 189 (N.Y. 1986)).

Pharmacia distinguishes *JP Morgan* on the basis that it was concerned only with the second condition to coverage—whether the underlying insurers actually paid for the relevant claim under their respective policies. (Pl.'s Mov. Br. at 27). Pharmacia argues that *JP Morgan* only turned to the "duly admitted liability" language "as further evidence that its coverage was not exhausted." (*Id.*). Thus, "*JP Morgan* did not hold," according to Pharmacia, "the patently unreasonable interpretation that Twin City seeks here—that its Policy still does not attach to provide coverage even where the underlying carrier paid its full limit, unless the carrier also separately 'duly admit[s] liability.'" (*Id.*).

The Court disagrees. *JP Morgan* clearly viewed the admission of liability as a separate condition from the full payment of the claim:

> The *first condition* was not met because . . . the insurer directly beneath Twin City in the . . . tower[] did not admit liability when it settled with plaintiff. In fact, the settlement agreement between [the underlying excess insurer] and plaintiff provided that "the negotiation, execution and performance of this Agreement shall not constitute, or be construed as, an admission of liability or infirmity of any defense or claim whatsoever by any Party." *Moreover*, there is no way to determine that [the underlying excess insurer] paid the

> full amount of its liability under its . . . tower policy because the settlement provided for no allocation of the $17 million payment between [the two parties]. *Therefore*, the *second condition* set forth in Twin City's attachment provision was not met *either*.

98 A.D.3d at 22 (emphasis added).

Pharmacia also argues that Twin City's (and thus *JP Morgan*'s) reading of the exhaustion provision is absurd. (Pl.'s Mov. Br. at 28–29). "[S]uch a reading," says Pharmacia, "would effectively prohibit any settlement with an underlying carrier, even for full policy limits, since settlement agreements are, by design, compromises to resolve a dispute and always provide that payments thereunder do not constitute admissions of liability." (*Id.* at 28).

However, as a federal court sitting in diversity jurisdiction, the Court must defer to *JP Morgan* and not "act as a judicial pioneer." *Sheridan*, 609 F.3d at 254 (quoting *Lead Indus. Ass'n*, 994 F.2d at 123). And the Court is especially inclined to do so because Pharmacia has not cited any authority, let alone "persuasive" authority, suggesting "that the [New York Court of Appeals] would decide [the issue] otherwise." *West*, 311 U.S. at 237. In fact, as explained above, *JP Morgan* is consistent with New York law. Moreover, the premise of Pharmacia's argument—that insurance settlements "always provide that payments thereunder do not constitute admissions of liability"—is not supported by the record. Notably, Pharmacia's claim appears to be contradicted by its concession that several underlying excess insurers paid coverage, though not formally stylized as settlements, without expressly denying liability. (Pl.'s Opp. at 45 ("[T]hree of Pharmacia's underlying insurers paid the full policy limits but did so without any agreement.")).[4]

Pharmacia does not cite any case from another jurisdiction contradicting *JP Morgan*, and the Court has not found any. Said another way, there appears to be no case involving a conjunctive

---

[4] Factually, the Court agrees with Pharmacia that one could infer that "an underlying carrier's actual payment of its policy's full limit constitutes an admission of liability." (Pl.'s Opp. at 45). However, that inference is unreasonable where, as here, the underlying carrier expressly states its payment is *not* an admission of liability.

exhaustion provision, such as the one at issue here and in *JP Morgan*, where a court read out a condition to coverage. In canvassing other jurisdictions, the Court uncovered a plethora of cases involving exhaustion provisions providing, for example, that coverage "shall not attach unless and until the Underwriters of the Underlying Policy/ies shall have paid ***or*** have admitted liability ***or*** have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses." *John M. O'Quinn, P.C. v. Lexington Ins. Co.*, 906 F.3d 363, 372 (5th Cir. 2018) (emphasis added).[5] This language illustrates how easily the parties here and in *JP Morgan* could have structured their arrangement to reach Pharmacia's desired outcome. As Twin City points out, this fact is "a reflection of the negotiating strength of corporate policyholders like [Pharmacia]," who "do not need to throw themselves upon the mercy of the courts to overcome what they perceive as draconian policy language." (Def.'s Opp. at 34).

The Court follows *JP Morgan* and holds that Pharmacia must separately show that all underlying excess insurers duly admitted liability. Indeed, *JP Morgan* is "an intermediate appellate state court" that "rest[ed] its considered judgment upon" the meaning of the precise contract at issue here. *See West*, 311 U.S. at 237. *JP Morgan* is consistent with New York law. And Pharmacia has provided "no basis for predicting that the [New York Court of Appeals] would decide [the issue] otherwise." *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210, 228 (3d Cir. 1999).

Applying the first condition for exhaustion as written, Pharmacia cannot show that all

---

5 *See also Stewart Enterprises, Inc. v. RSUI Indem. Co.*, 614 F.3d 117, 121 (5th Cir. 2010); *Scottsdale Ins. Co. v. Dickstein Shapiro LLP*, 389 F. Supp. 3d 794, 821 (C.D. Cal. 2019); *Sec. & Exch. Comm'n v. Aequitas Mgmt., LLC*, No. 16-0438, 2017 WL 7789716, at *3 (D. Or. Oct. 23, 2017); *Regency 288, LLC v. Glencoe Ins. Ltd.*, No. 12-62461, 2013 WL 12092098, at *3 n.2 (S.D. Fla. Aug. 16, 2013); *ARM Properties Mgmt. Grp. v. RSUI Indem. Co.*, No. 07-0718, 2009 WL 10669488, at *7 (W.D. Tex. July 9, 2009); *Villa Capriani Homeowners Ass'n, Inc. v. Lexington Ins. Co.*, No. 20-2703, 2021 WL 4806512, at *5 (N.C. Super. Oct. 14, 2021); *Mine Safety Appliances Co. v. AIU Ins. Co.*, No. 10-7241, 2014 WL 605490, at *3 (Del. Super. Ct. Jan. 21, 2014); *Willwoods Cmty. v. Essex Ins. Co.*, 33 So. 3d 1102, 1114 (La. App. 2010); *Emscor Mfg., Inc. v. All. Ins. Grp.*, 879 S.W.2d 894, 902 (Tex. App. 1994).

underlying excess insurers duly admitted liability. As Pharmacia concedes, several of the underlying insurers paid for coverage while expressly disclaiming that they admitted liability. (Pl.'s Resp. ¶¶ 111, 114–15 & 117–18). For example, National Union paid Pharmacia's claim with the express provision:

(*Id.* ¶ 111 (quoting D.E. No. 88-7, Def.'s Ex. 42, at PFIGARB000018–PFIGARB000019)). Similarly, Zurich American Insurance Company paid Pharmacia's claim pursuant to a settlement agreement that contained the following caveat:

(*Id.* ¶ 114 (quoting D.E. No. 88-7, Def.'s Ex. 43, at PFIGARB000023)). Materially similar provisions appear in the settlement agreements of Executive Liability Underwriters, Continental Casualty Company, and Allied World Assurance Company. (*Id.* ¶¶ 115 & 117–18). Accordingly, Twin City is entitled to summary judgment under New York law.

***New Jersey Law:*** When applying New Jersey law, the Court must likewise predict how New Jersey's highest court would decide the issue. *See C.R. Bard, Inc. v. Liberty Mut. Ins. Co.*, 473 F. App'x 128, 132 (3d Cir. 2012). The parties have not cited, and the Court could not uncover, a decision of the New Jersey Supreme Court interpreting an exhaustion provision in an insurance contract similarly requiring an underlying excess insurer to duly admit liability. Further, the parties have not cited, nor could the Court uncover, an intermediate appellate court in New Jersey interpreting a similar policy. The Court thus begins with interpretative principles relevant to New

Jersey insurance law and predicts how a New Jersey court would apply those principles to this case.

"In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (N.J. 2016) (quoting *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). "If the plain language of the policy is unambiguous," a New Jersey court "will 'not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased.'" *Id.* (quoting *Chubb Custom Ins.*, 948 A.2d at 1289). "When the provision at issue is subject to more than one reasonable interpretation, it is ambiguous." *Id.* "A 'genuine ambiguity' arises only 'where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage.'" *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001) (quoting *Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 795 (N.J. 1979)). While New Jersey insurance law sometimes dictates that courts read policies, even sometimes unambiguous policies, in favor of the insured, "only genuine interpretational difficulties will implicate th[at] doctrine." *Id.*

Moreover, the presumption in favor of the insured does not apply to sophisticated parties represented by insurance brokers. For example, in *Templo*, the New Jersey Supreme Court strictly construed a condition precedent to a "claims made" insurance policy where the condition was unambiguous, the insured was a sophisticated business entity and represented by an insurance broker, and the insurer's bargained-for expectation was reasonably advanced by strictly enforcing the condition. *See* 129 A.3d at 1079–81. In particular, *Templo* was concerned with whether an insured should be excused from noticing the insurer of a claim "as soon as practicable" when the insurer suffered no prejudice as a result of the untimely notice. *Id.* Answering that question in the

negative, the New Jersey Supreme Court explained that there was no prejudice requirement in the policy; that it was inappropriate to engraft an atextual prejudice requirement (as some cases did for unsophisticated consumers) where the policyholders are knowledgeable insureds who purchased insurance through sophisticated brokers; and that the notice requirement reasonably advanced the insurer's interest by maximizing its opportunity to investigate, plan for, and participate in resolving the claim. *Id.* at 1077, 1080–81. Similarly, in *Werner*, the New Jersey Supreme Court strictly construed an insurance policy after applying similar factors as those in *Templo*. *Werner Indus. Inc. v. First State Ins. Co.*, 548 A.2d 188, 191–93 (N.J. 1988). In particular, *Werner* was concerned with whether an excess insurer should "drop down" and provide coverage that was not paid by the primary insurer because the primary insurer became insolvent. *Id.* at 189. Answering that question in the negative, *Werner* explained that the policy did not explicitly provide for "dropping down," the insurer was a sophisticated business entity represented by a broker, and the policy as strictly construed did not provide unrealistic or inadequate coverage. *Id.* at 192.

Applying New Jersey's interpretive principles here, the Court holds that Pharmacia must make a separate showing that the underlying primary and excess insurers admitted liability. First, the Twin City Policy, as explained above, is plain and unambiguous. Twin City's exhaustion provision uses the conjunctive "and," requiring Twin City to pay for coverage "only after the Primary and Underlying Excess Insurers shall have duly admitted liability *and* shall have paid the full amount of their respective liability." (Twin City Policy at PFIGARB002555 (emphasis added)). As New Jersey Supreme Court has explained, "[t]he word 'and' carries with it natural conjunctive import while the word 'or' carries with it natural disjunctive import." *Pine Belt Chevrolet, Inc. v. Jersey Cent. Power & Light Co.*, 626 A.2d 434, 441 (N.J. 1993) (quoting *State*

*v. Duva*, 470 A.2d 53, 55 (N.J. Super. Law Div. 1983)). While New Jersey courts have occasionally read "and" as disjunctive based on the context, *see Allstate Ins. Co. v. Howard Sav. Inst.*, 317 A.2d 770, 778 (N.J. Super. Ch. Div. 1974), the context of this case does not warrant that result. For one, reading the exhaustion provision in the disjunctive would gut its protections afforded to Twin City. Under a disjunctive reading, the insured would be entitled to benefits based just on an admission, regardless of whether the underlying excess insurers paid their contribution. For another, as discussed above, similar exhaustion provisions addressed in other jurisdictions use the disjunctive "or," which suggests an intentionality associated with using the conjunction "and." *See supra* p. 12 & n.5.

Second, the parties are sophisticated business entities, and Pharmacia was represented by a sophisticated insurance broker when obtaining coverage. Indeed, a national insurance brokerage, Aon Northeast Risk Services, represented Pharmacia in procuring its insurance tower for officer and director liability, including when obtaining coverage from Twin City. (Pl.'s Resp. ¶ 3; Def.'s Resp. ¶ 4). It is therefore inappropriate to read the conjunctive "and" for no reason other than to broaden insurance coverage. New Jersey "has never afforded a sophisticated insured the right to deviate from the clear terms of a 'claims made' policy." *See Templo*, 129 A.3d at 1081.

Third and finally, strictly construing the exhaustion provision of an excess insurance contract reasonably advances the interests of the excess insurer. As compared to primary insurance, excess insurance coverage is "generally available at a lesser cost" because "coverage is only triggered after the primary insurance limit has been exhausted." *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 91 (2d Cir. 2013) (quoting *Gabarick v. Laurin Mar. (Am.), Inc.*, 649 F.3d 417, 422 (5th Cir. 2011)). Indeed, due largely to exhaustion, "the risk of loss is less" for the excess insurer than it is "for the primary insurer," thus reducing the cost of coverage to the insured. *Id.* (quoting *Gabarick*,

649 F.3d at 422); *see also Fed. Ins. Co. v. Srivastava*, 2 F.3d 98, 101–02 (5th Cir. 1993) ("Excess liability insurers contract to provide inexpensive insurance with high policy limits by requiring the insured to contract for primary insurance with another carrier." (quoting *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278 (5th Cir. 1989)). Viewed this way, exhaustion of an insurance tower is central to the parties' bargained-for exchange, and the parties should reasonably expect that exhaustion be strictly enforced, regardless of whether one party might think a condition imposes an unnecessary or oppressive hurdle.

Moreover, an excess insurer might specifically seek an admission of liability (in addition to the payment of coverage) for at least three reasons. The first reason: to "deter[]" the insured (Pharmacia) from striking an inflated settlement with its adversary (the *Garber* class) that would increase the risk the excess insurers would be liable for coverage. *Cf. Ali*, 719 F.3d at 94. Indeed, recall that Pharmacia's claim is related to the judgment and costs it sustained in *Garber*—for which Pharmacia believes its insurance carriers should cover. By requiring an admission of liability from the insurers, an exhaustion provision might encourage the insured to include the more cost-conscious insurers in the settlement negotiations of the underlying case. The second reason: to promote global settlements between the insured and all insurance carriers. As Twin City points out, Pharmacia "could have attempted a global settlement with all carriers" and requested "Twin City to waive the 'admit liability' requirement." (Def.'s Opp. at 33). Instead, Pharmacia "pursued . . . piecemeal settlements" and "dangl[ed] broad releases of multiple policies issued to Pharmacia and Old Pfizer in exchange for ostensible 'full limits' settlement payments." (*Id.*). By doing so, Pharmacia increased the risk that Twin City would have to provide coverage. Twin City reasonably might want to mitigate that risk by encouraging its participation in all settlements through the condition that it admit liability to provide coverage. The third reason: to save on costs

associated with investigations and due diligence. As is the case here, higher levels of excess insurance generally follow form to lower levels of insurance coverage—in other words, coverage at the bottom is generally indicative of coverage at the top. In light of that, a lower-level insurer's admission of liability might provide greater certainty and predictability to a higher-level insurer.

Taken together, New Jersey interpretive principles support requiring Pharmacia to separately show that each underlying excess insurer duly admits liability. Moreover, as discussed above, the Court has not uncovered a case from another jurisdiction supporting Pharmacia's reading of the Twin City Policy, and at least one non-New Jersey case, *JP Morgan*, supports Twin City's reading. Finally, as explained above, and as Pharmacia concedes, several of the underlying insurers paid for coverage while expressly disclaiming liability. (Pl.'s Resp. ¶¶ 111, 114–15 & 117–18). Accordingly, Twin City is entitled to summary judgment under New Jersey law.

## IV. CONCLUSION

For the foregoing reasons, Pharmacia's motion for summary judgment (D.E. No. 118) is **DENIED**, and Twin City's motion for summary judgment (D.E. No. 119) is **GRANTED**. An appropriate Order follows.

Dated: August 5, 2022

**Hon. Esther Salas, U.S.D.J.**